**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

---

SECURITIES AND EXCHANGE COMMISSION,
  100 F Street N.E.
  Washington, DC 20549

          Plaintiff,

    v.

GARY G. BELL,
JOSEPH GRENDYS,
ANTHONY HOLOHAN, and
MICHAEL SMITH,

          Defendants.

Civil Action No.

**COMPLAINT**

---

Plaintiff Securities and Exchange Commission ("SEC" or "Commission") alleges:

## NATURE OF THE ACTION

1.      Defendant Gary G. Bell ("Bell") aided and abetted violations of the securities laws by signing, and returning, an audit confirmation letter pertaining to U.S. Foodservice ("USF"), a wholly-owned subsidiary of Koninklijke Ahold N.V. ("Royal Ahold" or "Ahold"), that Bell knew, or was reckless in not knowing, was materially false.

2.      Defendant Joseph Grendys ("Grendys") aided and abetted violations of the securities laws by signing, and returning, an audit confirmation letter pertaining to USF that Grendys knew, or was reckless in not knowing, was materially false.

3.      Defendant Anthony Holohan ("Holohan") aided and abetted violations of the securities laws by signing, and returning, four audit confirmation letters pertaining to USF that Holohan knew, or was reckless in not knowing, were materially false.

4.    Defendant Michael Smith ("Smith") aided and abetted violations of the securities laws by signing, and returning, three audit confirmation letters pertaining to USF that Smith knew, or was reckless in not knowing, were materially false.

5.    Ahold is a publicly-held company organized in The Netherlands with securities registered with the SEC pursuant to Section 12(b) of the Securities Exchange Act of 1934 ("Exchange Act"). Ahold's securities trade on the New York Stock Exchange and are evidenced by American Depositary Receipts.

6.    On or about October 17, 2003, Ahold filed its Form 20-F for the fiscal year ended December 29, 2002, which contained restatements for the fiscal years 2000 and 2001, corrected accounting adjustments for fiscal year 2002, and restated amounts for fiscal years 1998 and 1999 included in the five-year summary data. The restatements indicate that, in its original SEC filings and other public statements, Ahold had overstated: (a) net income by approximately 17.6%, 32.6%, and 88.1% for the fiscal years 2000, 2001 and first three quarters of 2002, respectively; (b) operating income by approximately 28.1%, 29.4%, and 51.3% for the fiscal years 2000, 2001 and first three quarters of 2002, respectively; and (c) net sales by approximately 20.8%, 18.6%, and 13.8% for the fiscal years 2000, 2001 and 2002, respectively. Accordingly, Ahold made materially false and misleading statements in SEC filings and in other public statements for at least fiscal years 2000 and 2001, as well as for the first three quarters of 2002.

7.    One reason for these misstatements was a large-scale fraud at Ahold's subsidiary, USF, a foodservice and distribution company with headquarters in Columbia, Maryland.

8.     During the relevant period, USF's operating income and profit depended on vendor payments, usually called "promotional allowances" or "PAs," but also referred to as rebates, allowances, or program money.  Promotional allowances were generally based on the volume of USF's purchases from a vendor.  Sometimes these volume-based promotional allowances were paid as they were earned, but common practice was for the vendor to "pre-pay" on multi-year contracts at least some portion of the projected amounts that would be due if USF met all of the projected volume targets in the contract.

9.     USF executives engaged in a scheme that materially inflated the amount of promotional allowances recorded by USF and reflected in operating income on USF's financial statements, which were included in Ahold's Commission filings and other public statements.

10.     USF executives also provided their independent auditors with false and misleading information and personnel at many of USF's major vendors falsely confirmed overstated promotional allowances to the auditors in connection with year-end audits. Bell, Grendys, Holohan, and Smith provided substantial assistance in this process by signing material false audit confirmation letters.

11.     The overstated promotional allowances aggregated at least $700 million for fiscal years 2001 and 2002 and caused Ahold to report materially false operating and net income for those and other periods.

## JURISDICTION AND VENUE

12.     The SEC brings this action pursuant to Sections 21(d) and 21(e) of the Exchange Act [15 U.S.C. §§ 78u(d) and 78u(3)].

13.    This Court has jurisdiction over this action pursuant to Sections 21(e) and 27 of the Exchange Act [15 U.S.C. §§ 78u(e) and 78aa]. Defendants directly or indirectly made use of the means or instrumentalities of interstate commerce, or of the mails, or the facilities of a national securities exchange in connection with the transactions, acts, practices and courses of business alleged herein. Certain transactions, acts, practices and courses of business that are the subject of this action, including filings with the SEC, occurred within this District, and venue is proper pursuant to Section 27 of the Exchange Act.

### DEFENDANTS

14.    During the relevant time, Gary G. Bell was Vice President for Business Development at Hunt-Wesson Foodservice and, in that capacity, arranged for the sale of product to USF. Bell is a resident of California.

15.    During the relevant time, Anthony Holohan was a sales representative for C. F. Sauer Foods, Inc. ("C. F. Sauer"), which sold various products to USF. Holohan currently resides in Pennsylvania.

16.    During the relevant time, Joseph Grendys was the owner of Koch Poultry, which sold frozen chicken commodities to USF. Grendys currently resides in Illinois.

17.    During the relevant time, Michael Smith was Corporate Accounts Manager for Citrus World, which sold citrus products to USF. Smith resides in Florida.

### STATEMENT OF FACTS

18.    USF, a foodservice and distribution company with headquarters in Columbia, Maryland, is a wholly-owned subsidiary of Ahold. USF engaged in a scheme to report earnings equal to or greater than its targets, regardless of the company's true

performance.  The primary method used to carry out this fraudulent scheme was to improperly inflate USF's promotional allowance income and record completely fictitious promotional allowances sufficient to cover any shortfall from budgeted earnings.

19.    In an attempt to keep the fraud from being discovered, USF convinced vendors to sign and return audit confirmation letters even though the vendors knew, or were reckless in not knowing, that the letters were false.

20.    The promotional monies earned, paid and receivable as stated in many of the confirmations were grossly inflated and in many cases were simply fictitious, having no relationship to the actual promotional allowances earned, paid or receivable.

21.    USF personnel contacted vendors and urged them to sign and return the false confirmation letters.  In some cases, USF personnel encouraged the vendors by, for example, falsely representing that the confirmation was just "an internal number" and that USF did not consider the receivable reflected in the confirmation to be an actual debt that it would seek to collect.  In other instances, USF personnel sent side letters to vendors, assuring them that they did not, in fact, owe USF amounts reflected as outstanding in the confirmation letters.

22.    As a result of the schemes described here, USF materially overstated its operating income during at least fiscal years 2001 and 2002 and made false and misleading statements in filings with the Commission and other public statements.

**BELL'S FALSE AUDIT CONFIRMATION LETTER**

23.    Bell knowingly provided substantial assistance to USF executives by signing and sending to USF's independent auditors a materially false confirmation letter.

24.    For the audit of the fiscal year ending December 29, 2001, Bell received a confirmation letter dated January 23, 2002 from USF.  It stated, in part:

> In connection with the audit of our financial statements of U.S. Foodservice, Inc. (USF) for the year ended December 29, 2001, please confirm directly with our auditors, Deloitte & Touche, LLP, 100 South Charles Street 12th Floor, Baltimore, Maryland 21201, the following with respect to Marketing and Merchandising Allowances offered by you to U.S. Foodservice as of December 29, 2001:

| | |
|---|---|
| Balance due to USF at December 30, 2000: | $ 1,528,000 |
| Less:  Payments/Deductions made/allowed during 2001 | (2,956,590) |
| Plus:  Allowances earned during 2001 | 5,903,749 |
| Ending Balance due to USF at December 29, 2001 | $4,475,159 |

At the end of the letter, and directly underneath the sentence "THE ABOVE INFORMATION IS CORRECT AS OF DECEMBER 29, 2001, except as noted below:" Bell signed the letter without noting any exception, and then on or about February 6, 2002 returned the letter to USF's independent auditors.

25.    The amounts reflected as "Ending Balance due to USF at December 29, 2001" and "Allowances earned during 2001" were materially misstated.  Bell knew, or was reckless in not knowing, that these amounts were false.

26.    The same confirmation letter also falsely stated that USF had purchased volume totaling $49,000,000 under the base corporate program with Hunt Wesson.  Bell knew, or was reckless in not knowing, that this representation was false.

27.    Bell also knew, or was reckless in not knowing, that other information he confirmed in the January 23, 2002 audit confirmation letter was false despite the specific request in the confirmation letter to notify the auditors of any incorrect information in the space provided.

6

## BELL'S SIDE LETTER

28.    Shortly before Bell sent the false 2001 audit confirmation letter to USF's independent auditor on or about February 6, 2002, he drafted a side letter dated February 5, 2002. The side letter was signed by Bell and countersigned at Bell's request by USF.

29.    The side letter that Bell signed said that Bell's employer, Hunt Wesson, did not agree with the January 23, 2002 letter from USF. Bell's side letter listed specific "areas of concern" with several amounts contained in the audit confirmation letter, including the annual purchase volume, the percentages and amounts paid under the corporate program, and the amounts purportedly due to USF on December 29, 2001 and December 30, 2000. In the side letter, Bell stated that the actual purchase volume was $42,125,000, and that Hunt Wesson did not have an outstanding balance due to USF as of December 29, 2001 and December 30, 2000. All of these items contradicted the information Bell confirmed to USF's independent auditors.

30.    One day after creating the side letter, Bell falsely confirmed to USF's independent auditors that Hunt Wesson owed $4,475,159 to USF as of December 29, 2001 and $1,528,000 as of December 30, 2000. Bell also falsely confirmed that USF's purchase volume from Hunt Wesson totaled $49,000,000.

31.    Bell did not disclose the side letter or its contents to USF's independent auditors.

32.    Given the facts alleged above, Bell had a general awareness that USF was engaged in illegal activity. Bell was aware of several "red flags" or suspicious events, including without limitation that USF management explicitly encouraged him to sign and send to USF's independent auditors an audit confirmation letter that Bell knew, or was

7

reckless in not knowing, was (1) materially false, and (2) would misstate USF's books

and records and mislead USF's independent auditors. In so doing, Bell knowingly

provided substantial assistance to USF in the conduct of its illegal acts.

## GRENDYS' FALSE AUDIT CONFIRMATION LETTER

33.    Grendys knowingly provided substantial assistance to USF executives by

signing and sending to USF's independent auditors a materially false confirmation letter.

34.    For the audit of the fiscal year ending December 29, 2001, Grendys

received a confirmation letter from USF dated January 24, 2002. It stated, in part:

> In connection with the audit of our financial statements of U.S. Foodservice, Inc.
> (USF) for the year ended December 29, 2001, please confirm directly with our
> auditors, Deloitte & Touche, LLP, 100 South Charles Street, 12th Floor,
> Baltimore, Maryland 21201, the following with respect to Marketing and
> Merchandising Allowances offered by you to U.S. Foodservice as of December
> 29, 2001:

| | |
|---|---|
| Balance due to USF at December 30, 2000: | $ 1,650,000 |
| Less: Payments/Deductions made/allowed during 2001 | (2,315,725) |
| Plus: Allowances earned during 2001 | 3,850,000 |
| Ending Balance due to USF at December 29, 2001 | $ 3,184,275 |

At the end of the letter, and directly underneath the sentence "THE ABOVE

INFORMATION IS CORRECT AS OF DECEMBER 29, 2001, except as noted below:"

Grendys signed the letter without noting any exception, and then returned the letter to

USF's independent auditors.

35.    The amounts reflected as "Ending Balance due to USF at December 29,

2001" and "Allowances earned during 2001" were materially misstated. Grendys knew,

or was reckless in not knowing, that these amounts were false.

36.    The same confirmation letter also falsely stated that USF had purchased 45,000,000 pounds under the base corporate program with Koch Poultry.  Grendys knew, or was reckless in not knowing, that this representation was false.

37.    Grendys also knew, or was reckless in not knowing, that other information he confirmed in the January 24, 2002 audit confirmation letter was false despite the specific request in the confirmation letter to notify the auditors of any incorrect information in the space provided.

## GRENDYS' SIDE LETTER

38.    On the day that Grendys sent the false 2001 audit confirmation letter to USF's independent auditor – February 7, 2002 – he obtained a side letter from USF that was signed by a Vice President of Purchasing for USF.

39.    The side letter referred to the January 24, 2002 audit confirmation letter and purported to "clarify" it.  The side letter, addressed to Grendys, stated,

*The purpose of [the January 24, 2002 audit confirmation letter] was to have you confirm Marketing and Merchandising Allowances offered by you to USF as of December 29, 2001.*

*Koch Poultry owes $68,075.97 to USF as of 12-29-01.*

\* \* \*

*Volume purchased during Dec 31, 2000 to Dec 29, 2001 [was] 10,866,269 [pounds].*

Despite this side letter, Grendys falsely confirmed to USF's independent auditors that Koch Poultry owed USF $3,184,275 as of December 29, 2001.  Grendys also falsely confirmed to USF's auditors that Koch Poultry sold 45,000,000 pounds of volume to USF from December 31, 2000 to December 29, 2001.

40.    The side letter also stated that "any documented differences from the confirmation and actual activity during the time frame covered with the confirmation are not obligations of Koch Poultry and no payments will be requested of Koch Poultry now or in the future as part of the confirmation."

41.    Grendys' side letter went on to list, in one column, what the January 24, 2002 confirmation letter said and, in an adjacent column, what the real numbers were. For example, the side letter shows that Grendys confirmed a $.05 Base Program for Marketing Programs, but in fact the correct number was $.03.

42.    Grendys did not disclose the side letter or its contents to USF's independent auditors.

43.    Given the facts alleged above, Grendys had a general awareness that USF was engaged in illegal activity.  Grendys was aware of several "red flags" or suspicious events, including without limitation that USF management explicitly encouraged him to sign and send to USF's independent auditors an audit confirmation letter that Grendys knew, or was reckless in not knowing, was (1) materially false, and (2) would misstate USF's books and records and mislead USF's independent auditors.  In so doing, Grendys knowingly provided substantial assistance to USF in the conduct of its illegal acts.

**HOLOHAN'S FALSE AUDIT CONFIRMATION LETTERS**

44.    Holohan also knowingly provided substantial assistance to USF executives by signing and sending to USF's independent auditors two materially false confirmation letters relating to the fiscal year ending December 29, 2001 and another two materially false confirmation letters relating to the fiscal year ending December 28, 2002.

**Holohan's 2002 Audit Confirmation Letters**

45.    The two false confirmation letters that Holohan signed for the fiscal year

ending December 28, 2002 were dated January 29, 2003 and February 7, 2003 and were

addressed to "CF Sauer Foods" and "CF Sauer Condiments," respectively.

46.    Holohan received a confirmation letter dated January 29, 2003 from USF

addressed to him as Regional Sales Manager of CF Sauer Foods.  The letter stated, in

part:

> In connection with the audit of our financial statements of U.S. Foodservice, Inc.
> (USF) for the year ended December 28, 2002, please confirm directly with our
> auditors, Deloitte & Touche, LLP, 100 South Charles Street, 12th Floor,
> Baltimore, Maryland 21201, the following with respect to Marketing and
> Merchandising Allowances offered by you to U.S. Foodservice as of December
> 28, 2002:

| | |
|---|---|
| Balance due to USF at December 29, 2001: | $ 3,900,000 |
| Less:  Payments/Deductions made/allowed during 2002 | (4,518,545) |
| Plus:  Allowances earned during 2002 | 20,400,000 |
| Ending Balance due to USF at December 28, 2002 | $ 19,781,455 |

At the end of the letter, and directly underneath the sentence "THE ABOVE

INFORMATION IS CORRECT AS OF DECEMBER 28, 2002, except as noted below:"

Holohan signed the letter without noting any exception and returned the letter to USF's

independent auditors.

47.    In the January 29, 2003 audit confirmation letter pertaining to CF Sauer

Foods, the amount reflected as "Ending Balance due to USF at December 28, 2002" was

materially overstated.  Holohan knew, or was reckless in not knowing, that this amount

was false.

11

48.     The January 29, 2003 audit confirmation letter also stated:

*All amounts paid to USF during 2002 and all amounts due to USF as of December 28, 2002 as shown in the above table, have been fully earned by USF and are not contingent upon USF performing any additional duties or responsibilities in the future.*

49.     Holohan knew, or was reckless in not knowing, that his employer, C. F. Sauer, had paid substantial amounts to USF that were not fully earned by USF. Holohan knew, or was reckless in not knowing, that C. F. Sauer had paid substantial amounts to USF that were contingent upon USF's future performance.

50.     Holohan also knew, or was reckless in not knowing, that other information he confirmed in the audit confirmation letter dated January 29, 2003 was false.

51.     Holohan also received a confirmation letter dated February 7, 2003 from USF addressed to him as Regional Sales Manager of CF Sauer Condiments. The letter stated, in part:

In connection with the audit of our financial statements of U.S. Foodservice, Inc. (USF) for the year ended December 28, 2002, please confirm directly with our auditors, Deloitte & Touche, LLP, 100 South Charles Street, 12th Floor, Baltimore, Maryland 21201, the following with respect to Marketing and Merchandising Allowances offered by you to U.S. Foodservice as of December 28, 2002:

| | |
|---|---|
| Balance due to USF at December 29, 2001: | $ 4,450,000 |
| Less: Payments/Deductions made/allowed during 2002 | (6,489,165) |
| Plus: Allowances earned during 2002 | 16,250,000 |
| Ending Balance due to USF at December 28, 2002 | $ 14,210,835 |

At the end of the letter, and directly underneath the sentence "THE ABOVE INFORMATION IS CORRECT AS OF DECEMBER 28, 2002, except as noted below:"

Holohan signed the letter without noting any exception and returned the letter to USF's independent auditors.

52.     In the February 7, 2003 audit confirmation letter pertaining to CF Sauer Condiments, the amount reflected as "Ending Balance due to USF at December 28, 2002" was materially overstated. Holohan knew, or was reckless in not knowing, that this amount was false.

53.     The February 7, 2003 audit confirmation letter also stated:

*All amounts paid to USF during 2002 and all amounts due to USF as of December 28, 2002 as shown in the above table, have been fully earned by USF and are not contingent upon USF performing any additional duties or responsibilities in the future.*

54.     Holohan knew, or was reckless in not knowing, that his employer, C. F. Sauer, had paid substantial amounts to USF that were not fully earned by USF. Holohan knew, or was reckless in not knowing, that C. F. Sauer had paid substantial amounts to USF that were contingent upon USF's future performance.

55.     Holohan also knew, or was reckless in not knowing, that other information he confirmed in audit confirmation letter dated February 7, 2003 was false.

56.     When he signed the February 7, 2003 audit confirmation letter, Holohan knew, or was reckless in not knowing, that the February 7, 2003 audit confirmation letter encompassed the same promotional allowances that he had already confirmed by signing the January 29, 2003 audit confirmation letter.

57.     Holohan knew, or was reckless in not knowing, that by signing audit confirmation letters for "CF Sauer Condiments" and "CF Sauer Foods," he was facilitating double-counting of income and accounts receivable balances by USF.

58.    Before Holohan signed the February 7, 2003 confirmation letter, he received oral assurances from USF that it would not seek to collect the accounts receivable balances on the confirms in an attempt to satisfy Holohan's concerns.

59.    Contemporaneous documentary and other evidence shows that Holohan knew, or was reckless in not knowing, that his representations in the letters dated January 29, 2003 and February 7, 2003 were materially inaccurate.  For example, an email sent by Holohan on or about November 24, 2002 to USF shows that Holohan knew, or was reckless in not knowing, that USF's fiscal year 2002 purchases were not likely to be enough to satisfy the terms of the $2.8 million prepayment made to USF during 2001, which is inconsistent with the information that Holohan confirmed to USF's independent auditors (i.e., that C. F. Sauer owed over $33 million in A/R to USF).

### i.  Holohan's 2001 Audit Confirmation Letters

60.    The two false audit confirmation letters that Holohan signed for the fiscal year ending December 29, 2001 were dated January 23, 2002 and January 29, 2002. Both letters were addressed to CF Sauer.

61.    Holohan received a confirmation letter  dated January 23, 2002 from USF. It stated, in part:

> In connection with the audit of our financial statements of U.S. Foodservice, Inc. (USF) for the year ended December 29, 2001, please confirm directly with our auditors, Deloitte & Touche, LLP, 100 South Charles Street 12th Floor, Baltimore, Maryland 21201, the following with respect to Marketing and Merchandising Allowances offered by you to U.S. Foodservice as of December 29, 2001:

| | |
|---|---|
| Balance due to USF at December 30, 2000: | $ 2,820,000 |
| Less:  Payments/Deductions made/allowed during 2001 | (5,304,947) |
| Plus:  Allowances earned during 2001 | 6,384,947 |
| Ending Balance due to USF at December 29, 2001 | $ 3,900,000 |

14

At the end of the letter, and directly underneath the sentence "THE ABOVE INFORMATION IS CORRECT AS OF DECEMBER 29, 2001, except as noted below:" Holohan signed the letter without noting any exception and returned the letter to USF's independent auditors.

62.    The amount reflected as "Ending Balance due to USF at December 29, 2001" was materially overstated.  Holohan knew, or was reckless in not knowing, that this amount was false.

63.    The January 23, 2002 audit confirmation letter also stated:

*Amounts paid or to be paid are not contingent upon U.S. Foodservice performing any additional duties or responsibilities in the future.*

64.    Holohan knew, or was reckless in not knowing, that C. F. Sauer had paid substantial amounts to USF in 2001 that were contingent upon USF's future performance.

65.    Holohan also knew, or was reckless in not knowing, that other information he confirmed in audit confirmation letter dated January 23, 2002 was false.

66.    Also for the audit of the fiscal year ending December 29, 2001, Holohan received a confirmation letter  dated January 29, 2002 from USF pertaining to CF Sauer. It stated, in part:

In connection with the audit of our financial statements of U.S. Foodservice, Inc. (USF) for the year ended December 29, 2001, please confirm directly with our auditors, Deloitte & Touche, LLP, 100 South Charles Street 12th Floor, Baltimore, Maryland 21201, the following with respect to Marketing and Merchandising Allowances offered by you to U.S. Foodservice as of December 29, 2001:

| | |
|---|---:|
| Balance due to USF at December 30, 2000: | $ 0 |
| Less:  Payments/Deductions made/allowed during 2001 | (0) |
| Plus:  Allowances earned during 2001 | 4,450,000 |
| Ending Balance due to USF at December 29, 2001 | $ 4,450,000 |

At the end of the letter, and directly underneath the sentence "THE ABOVE INFORMATION IS CORRECT AS OF DECEMBER 29, 2001, except as noted below:" Holohan signed the letter without noting any exception and returned the letter to USF's independent auditors.

67.    The amount reflected as "Ending Balance due to USF at December 29, 2001" was materially overstated.  Holohan knew, or was reckless in not knowing, that this amount was false.

68.    The January 29, 2002 audit confirmation letter also stated:

*Amounts paid or to be paid are not contingent upon U.S. Foodservice performing any additional duties or responsibilities in the future.*

69.    Holohan knew, or was reckless in not knowing, that C. F. Sauer had paid substantial amounts to USF in 2001 that were contingent upon USF's future performance.

70.    Holohan also knew, or was reckless in not knowing, that other information he confirmed in audit confirmation letter dated January 29, 2002 was false

71.    When he signed the January 29, 2002 audit confirmation letter, Holohan knew, or was reckless in not knowing, that the January 29, 2002 audit confirmation letter encompassed the same promotional allowances that he had already confirmed by signing the January 23, 2002 audit confirmation letter.

72.    Holohan knew, or was reckless in not knowing, that by signing two audit confirmation letters for CF Sauer, he was facilitating double-counting of income and accounts receivable balances by USF.

73.    Contemporaneous documentary and other evidence shows that Holohan knew, or was reckless in not knowing, that his representations in the January 23, 2002 and January 29, 2002 letters were materially inaccurate.  For example, an email dated

January 16, 2002 and attachment received by Holohan show he knew, or was reckless in not knowing, that C. F. Sauer had made prepayments of over $2.8 million to USF that were to be earned by USF by purchases from C. F. Sauer during 2002, which contradicted information Holohan confirmed to USF's independent auditors. Additionally, in that same email and attachment, Holohan is shown to know, or be reckless in not knowing, that USF had taken deductions of over $500,000 from amounts otherwise owed C. F. Sauer at the end of 2001, resulting in USF owing money to C. F. Sauer at the end of 2001 (i.e., USF deducted more money than it was owed).

74.     Finally, Holohan was not authorized by C. F. Sauer to sign audit confirmation letters, specifically including those dated January 29, 2003, February 7, 2003, January 23, 2002 and January 29, 2002.

75.     Given the facts alleged above, Holohan had a general awareness that USF was engaged in illegal activity. Holohan was aware of several "red flags" or suspicious events, including without limitation that USF management orally encouraged Holohan to sign and send to USF's independent auditors audit confirmation letters that Holohan knew, or was reckless in not knowing, were (1) materially false and that facilitated double-counting of income and accounts receivable, and (2) would misstate USF's books and records and mislead USF's independent auditors. In so doing, Holohan knowingly provided substantial assistance to USF in the conduct of its illegal acts.

### Smith's 2002 Audit Confirmation Letters

76.     The two false confirmation letters that Smith signed for the fiscal year ending December 28, 2002 were dated January 29, 2003 and February 3, 2003 and were addressed to "Citrus World/Florida's Natural" and "Florida's Natural," respectively.

77.     Smith received a confirmation letter dated January 29, 2003 from USF addressed to him as Corporate Accounts Manager of Citrus World/Florida's Natural.  The letter stated, in part:

> In connection with the audit of our financial statements of U.S. Foodservice, Inc. (USF) for the year ended December 28, 2002, please confirm directly with our auditors, Deloitte & Touche, LLP, 100 South Charles Street, 12th Floor, Baltimore, Maryland 21201, the following with respect to Marketing and Merchandising Allowances offered by you to U.S. Foodservice as of December 28, 2002:

| | |
|---|---|
| Balance due to USF at December 29, 2001: | $ 4,506,058 |
| Less:  Payments/Deductions made/allowed during 2002 | (7,616,733) |
| Plus:  Allowances earned during 2002 | 13,100,000 |
| Ending Balance due to USF at December 28, 2002 | $ 9,989,325 |

At the end of the letter, and directly underneath the sentence "THE ABOVE INFORMATION IS CORRECT AS OF DECEMBER 28, 2002, except as noted below:" Smith signed the letter without noting any exception and returned the letter to USF's independent auditors.

78.     In the January 29, 2003 audit confirmation letter, the amounts reflected as "Ending Balance due to USF at December 28, 2002" and "Allowances earned during 202" were materially overstated.  Smith knew, or was reckless in not knowing, that these amounts were false.

79.     The January 29, 2003 audit confirmation letter also stated:

*All amounts paid to USF during 2002 and all amounts due to USF as of December 28, 2002 as shown in the above table, have been fully earned by USF and are not contingent upon USF performing any additional duties or responsibilities in the future.*

80.     Smith knew, or was reckless in not knowing, that his employer, Citrus World, had paid substantial amounts to USF during 2002 that were not fully earned by USF. Smith knew, or was reckless in not knowing, that Citrus World had paid substantial amounts to USF in 2002 that were contingent upon USF's future performance.

81.     Smith also knew, or was reckless in not knowing, that other information he confirmed in the audit confirmation letter dated January 29, 2003 was false.

82.     Smith also received a confirmation letter dated February 3, 2003 from USF addressed to him as Corporate Accounts Manager of Florida's Natural. The letter stated, in part:

> In connection with the audit of our financial statements of U.S. Foodservice, Inc. (USF) for the year ended December 28, 2002, please confirm directly with our auditors, Deloitte & Touche, LLP, 100 South Charles Street, 12th Floor, Baltimore, Maryland 21201, the following with respect to Marketing and Merchandising Allowances offered by you to U.S. Foodservice as of December 28, 2002:

| | |
|---|---|
| Balance due to USF at December 29, 2001: | $ 116,588 |
| Less: Payments/Deductions made/allowed during 2002 | (157,522) |
| Plus: Allowances earned during 2002 | 8,000,000 |
| Ending Balance due to USF at December 28, 2002 | $ 7,959,066 |

At the end of the letter, and directly underneath the sentence "THE ABOVE INFORMATION IS CORRECT AS OF DECEMBER 28, 2002, except as noted below:" Smith signed the letter without noting any exception and returned the letter to USF's independent auditors.

83.    In the February 3, 2003 audit confirmation letter, the amounts reflected as "Ending Balance due to USF at December 28, 2002" and "Allowances earned during 2002" were materially overstated.  Smith knew, or was reckless in not knowing, that these amounts were false.

84.    The February 3, 2003 audit confirmation letter also stated:

*All amounts paid to USF during 2002 and all amounts due to USF as of December 28, 2002 as shown in the above table, have been fully earned by USF and are not contingent upon USF performing any additional duties or responsibilities in the future.*

85.    Smith knew, or was reckless in not knowing, that his employer, Citrus World, had paid substantial amounts to USF during 2002 that were not fully earned by USF.  Smith knew, or was reckless in not knowing, that Citrus World had paid substantial amounts to USF in 2002 that were contingent upon USF's future performance.

86.    Smith also knew, or was reckless in not knowing, that other information he confirmed in audit confirmation letter dated February 7, 2003 was false.

87.    When he signed the February 3, 2003 audit confirmation letter, Smith knew, or was reckless in not knowing, that the February 3, 2003 audit confirmation letter encompassed the same promotional allowances that he had already confirmed by signing the January 29, 2003 audit confirmation letter.

88.    Smith knew, or was reckless in not knowing, that by signing audit confirmation letters for "Citrus World/Florida's Natural" and "Florida's Natural," he was facilitating double-counting of income and accounts receivable balances by USF.

89.    Contemporaneous documentary and other evidence shows that Smith knew, or was reckless in not knowing, that his representations in the letters dated January 29, 2003 and February 3, 2003 were materially inaccurate.  For example, Smith knew, or

was reckless in not knowing, that Citrus World had made an additional prepayment of

$750,000 at the end of USF's fiscal year 2002, which is inconsistent with the information

that Smith confirmed to USF's independent auditors (i.e., that Citrus World owed over

$17 million in A/R to USF).

### Smith's 2001 Audit Confirmation Letter

90.     For the fiscal year ending December 29, 2001, Smith received a

confirmation letter  dated January 23, 2002 from USF.  It stated, in part:

> In connection with the audit of our financial statements of U.S. Foodservice, Inc.
> (USF) for the year ended December 29, 2001, please confirm directly with our
> auditors, Deloitte & Touche, LLP, 100 South Charles Street 12th Floor, Baltimore,
> Maryland 21201, the following with respect to Marketing and Merchandising
> Allowances offered by you to U.S. Foodservice as of December 29, 2001:

| | |
|---|---|
| Balance due to USF at December 30, 2000: | $ 1,882,861 |
| Less:  Payments/Deductions made/allowed during 2001 | (3,404,445) |
| Plus:  Allowances earned during 2001 | 5,721,584 |
| Ending Balance due to USF at December 29, 2001 | $ 4,197,500 |

At the end of the letter, and directly underneath the sentence "THE ABOVE

INFORMATION IS CORRECT AS OF DECEMBER 29, 2001, except as noted below:"

Smith signed the letter without noting any exception and returned the letter to USF's

independent auditors.

91.     The amounts reflected as "Ending Balance due to USF at December 29,

2001" and "Allowances earned during 2001" were materially overstated.  Smith knew, or

was reckless in not knowing, that these amounts were false.

92.     The January 23, 2002 audit confirmation letter also stated:

> *Amounts paid or to be paid are not contingent upon U.S. Foodservice performing*
> *any additional duties or responsibilities in the future.*

93.    Smith knew, or was reckless in not knowing, that Citrus World had paid substantial amounts to USF that were contingent upon USF's future performance.

94.    Smith also knew, or was reckless in not knowing, that other information he confirmed in audit confirmation letter dated January 23, 2002 was false.

95.    Given the facts alleged above, Smith had a general awareness that USF was engaged in illegal activity. Smith was aware of several "red flags" or suspicious events, including without limitation that Smith signed and sent to USF's independent auditors audit confirmation letters that he knew, or was reckless in not knowing, were (1) materially false and that facilitated double-counting of income and accounts receivable, and (2) would misstate USF's books and records and mislead USF's independent auditors. In so doing, Smith knowingly provided substantial assistance to USF in the conduct of its illegal acts.

## FIRST CLAIM FOR RELIEF

### Fraud

Aiding and Abetting Violations of Section 10(b)
of the Exchange Act [15 U.S.C. § 78j(b)] and
Exchange Act Rule 10b-5 [17 C.F.R. § 240.10b-5]

96.    Paragraphs 1 through 95 are re-alleged and incorporated by reference.

97.    By reason of the foregoing, defendants Bell, Grendys, Holohan, and Smith knowingly provided substantial assistance to another who directly or indirectly, acting intentionally, knowingly or recklessly, by use of the means or instrumentalities of interstate commerce or of the mails, in connection with the purchase of securities: (a) employed devices, schemes or artifices to defraud; (b) made untrue statements of material fact or omitted to state a material fact necessary to make the statements made, in the light

of the circumstances under which they were made, not misleading; or (c) engaged in acts, practices or courses of business which operated as a fraud or deceit upon other persons.

98.     By reason of the foregoing, defendants Bell, Grendys, Holohan, and Smith aided and abetted, and unless enjoined will continue to aid and abet, violations of Section 10(b) of the Exchange Act, and Exchange Act Rule 10b-5.

## SECOND CLAIM FOR RELIEF

### Reporting

Violations of Section 13(a) of the Exchange Act
[15 U.S.C. § 78m(a)]

99.     Paragraphs 1 through 95 are re-alleged and incorporated by reference.

100.   The Exchange Act and rules promulgated thereunder require every issuer of a registered security to file reports with the SEC that accurately reflect the issuer's financial performance and provide other true and accurate information to the public.

101.   By reason of the foregoing, defendants Bell, Grendys, and Holohan aided and abetted violations of Section 13(a) of the Exchange Act.

### THIRD CLAIM FOR RELIEF

**Record Keeping**

Aiding and Abetting Violations of Sections
13(b)(2)(A), 13(b)(2)(B) and 13(b)(5) of the Exchange
Act [15 U.S.C. §§ 78m(b)(2)(A),78m(b)(2)(B), and
78m(b)(5)] and Exchange Act Rule 13b2-1 [17 C.F.R. §
240.13b2-1]

102.    Paragraphs 1 through 95 are re-alleged and incorporated by reference.

103.    The Exchange Act and rules promulgated thereunder require each issuer of registered securities to make and keep books, records, and accounts which, in reasonable detail, accurately and fairly reflect the business of the issuer and to devise and maintain a system of internal controls sufficient to provide reasonable assurances that, among other things, transactions are recorded as necessary to permit preparation of financial statements and to maintain the accountability of accounts.

104.    By reason of the foregoing, defendants Bell, Grendys, Holohan, and Smith aided and abetted, and unless enjoined will continue to aid and abet, violations of Sections 13(b)(2)(A), 13(b)(2)(B), and 13(b)(5) of the Exchange Act and Rule 13b2-1 thereunder.

## PRAYER FOR RELIEF

WHEREFORE, the SEC respectfully requests that this Court enter a judgment:

    a)  permanently enjoining defendants Bell, Grendys, and Holohan from aiding

and abetting any violations of Sections 10(b), 13(a), 13(b)(2)(A),

13(b)(2)(B), and 13(b)(5) of the Exchange Act and Exchange Act Rules

10b-5 and 13b2-1;

    b)  permanently enjoining defendant Smith from aiding and abetting any

violations of Sections 10(b), 13(b)(2)(A), 13(b)(2)(B), and 13(b)(5) of the

Exchange Act and Exchange Act Rules 10b-5 and 13b2-1;

    c)  ordering defendants Bell, Grendys, Holohan and Smith to pay civil

monetary penalties pursuant to Section 21(d)(3) of the Exchange Act:

violations; and

    c)  granting such other relief as this Court may deem just and appropriate.

Dated: January 18, 2007

Respectfully submitted,

Charles D. Stodghill (DC Bar No. 256792)
Scott W. Friestad
James T. Coffman
Roger Paszamant
Matthew B. Greiner (DC Bar No. 448480)

Attorneys for Plaintiff
Securities and Exchange Commission
100 F Street N.E.
Washington, DC 20549
Telephone:  (202) 551-4413 (Stodghill)
Facsimile:  (202) 772-9246 (Stodghill)

# CIVIL COVER SHEET

JS-44
(Rev.1/05 DC)

| I (a) PLAINTIFFS | DEFENDANTS |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION | GARY G. BELL, JOSEPH GRENDYS, ANTHONY HOLOHAN and MICHAEL SMITH |

**(b) COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF**
(EXCEPT IN U.S. PLAINTIFF CASES)

COUNTY OF RESIDENCE OF FIRST LISTED DEFENDANT
(IN U.S. PLAINTIFF CASES ONLY)  Fresno County, LA
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED

**(c) ATTORNEYS (FIRM NAME, ADDRESS, AND TELEPHONE NUMBER)**

SEC, Charles D. Stodghill, 100 F Street, N.E., Washington, DC 20549-4010, (202) 551-4413

ATTORNEYS (IF KNOWN)

## II. BASIS OF JURISDICTION
(PLACE AN x IN ONE BOX ONLY)

○ 1 U.S. Government Plaintiff

○ 2 U.S. Government Defendant

○ 3 Federal Question (U.S. Government Not a Party)

○ 4 Diversity (Indicate Citizenship of Parties in item III)

## III CITIZENSHIP OF PRINCIPAL PARTIES (PLACE AN x IN ONE BOX FOR PLAINTIFF AND ONE BOX FOR DEFENDANT) FOR DIVERSITY CASES ONLY!

| | PTF | DFT | | PTF | DFT |
|---|---|---|---|---|---|
| Citizen of this State | ○ 1 | ○ 1 | Incorporated or Principal Place of Business in This State | ○ 4 | ○ 4 |
| Citizen of Another State | ○ 2 | ○ 2 | Incorporated and Principal Place of Business in Another State | ○ 5 | ○ 5 |
| Citizen or Subject of a Foreign Country | ○ 3 | ○ 3 | Foreign Nation | ○ 6 | ○ 6 |

## IV. CASE ASSIGNMENT AND NATURE OF SUIT
**(Place a X in one category, A-N, that best represents your cause of action and one in a corresponding Nature of Suit)**

**○ A. Antitrust**

☐ 410 Antitrust

**○ B. Personal Injury/ Malpractice**

☐ 310 Airplane
☐ 315 Airplane Product Liability
☐ 320 Assault, Libel & Slander
☐ 330 Federal Employers Liability
☐ 340 Marine
☐ 345 Marine Product Liability
☐ 350 Motor Vehicle
☐ 355 Motor Vehicle Product Liability
☐ 360 Other Personal Injury
☐ 362 Medical Malpractice
☐ 365 Product Liability
☐ 368 Asbestos Product Liability

**○ C. Administrative Agency Review**

☐ 151 Medicare Act

**Social Security:**
☐ 861 HIA ((1395ff)
☐ 862 Black Lung (923)
☐ 863 DIWC/DIWW (405(g)
☐ 864 SSID Title XVI
☐ 865 RSI (405(g)
**Other Statutes**
☐ 891 Agricultural Acts
☐ 892 Economic Stabilization Act
☐ 893 Environmental Matters
☐ 894 Energy Allocation Act
☐ 890 Other Statutory Actions (If Administrative Agency is Involved)

**○ D. Temporary Restraining Order/Preliminary Injunction**

Any nature of suit from any category may be selected for this category of case assignment.

*(If Antitrust, then A governs)*

**◎ E. General Civil (Other)**    OR    **○ F. Pro Se General Civil**

**Real Property**
☐ 210 Land Condemnation
☐ 220 Foreclosure
☐ 230 Rent, Lease & Ejectment
☐ 240 Torts to Land
☐ 245 Tort Product Liability
☐ 290 All Other Real Property

**Personal Property**
☐ 370 Other Fraud
☐ 371 Truth in Lending
☐ 380 Other Personal Property Damage
☐ 385 Property Damage Product Liability

**Bankruptcy**
☐ 422 Appeal 28 USC 158
☐ 423 Withdrawal 28 USC 157

**Prisoner Petitions**
☐ 535 Death Penalty
☐ 540 Mandamus & Other
☐ 550 Civil Rights
☐ 555 Prison Condition

**Property Rights**
☐ 820 Copyrights
☐ 830 Patent
☐ 840 Trademark

**Federal Tax Suits**
☐ 870 Taxes (US plaintiff or defendant
☐ 871 IRS-Third Party 26 USC 7609

**Forfeiture/Penalty**
☐ 610 Agriculture
☐ 620 Other Food &Drug
☐ 625 Drug Related Seizure of Property 21 USC 881
☐ 630 Liquor Laws
☐ 640 RR & Truck
☐ 650 Airline Regs
☐ 660 Occupational Safety/Health
☐ 690 Other

**Other Statutes**
☐ 400 State Reapportionment
☐ 430 Banks & Banking
☐ 450 Commerce/ICC Rates/etc.
☐ 460 Deportation

☐ 470 Racketeer Influenced & Corrupt Organizations
☐ 480 Consumer Credit
☐ 490 Cable/Satellite TV
☐ 810 Selective Service
☒ 850 Securities/Commodities/ Exchange
☐ 875 Customer Challenge 12 USC 3410
☐ 900 Appeal of fee determination under equal access to Justice
☐ 950 Constitutionality of State Statutes
☐ 890 Other Statutory Actions (if not administrative agency review or Privacy Act

| ○ **G. Habeas Corpus/ 2255** | ○ **H. Employment Discrimination** | ○ **I. FOIA/PRIVACY ACT** | ○ **J. Student Loan** |
|---|---|---|---|
| ☐ 530 Habeas Corpus-General<br>☐ 510 Motion/Vacate Sentence | ☐ 442 Civil Rights-Employment<br>(criteria: race, gender/sex,<br>national origin,<br>discrimination, disability<br>age, religion, retaliation)<br><br>*(If pro se, select this deck)* | ☐ 895 Freedom of Information Act<br>☐ 890 Other Statutory Actions<br>(if Privacy Act)<br><br><br><br>*(If pro se, select this deck)* | ☐ 152 Recovery of Defaulted<br>Student Loans<br>(excluding veterans) |

| ○ **K. Labor/ERISA (non-employment)** | ○ **L. Other Civil Rights (non-employment)** | ○ **M. Contract** | ○ **N. Three-Judge Court** |
|---|---|---|---|
| ☐ 710 Fair Labor Standards Act<br>☐ 720 Labor/Mgmt. Relations<br>☐ 730 Labor/Mgmt. Reporting &<br>Disclosure Act<br>☐ 740 Labor Railway Act<br>☐ 790 Other Labor Litigation<br>☐ 791 Empl. Ret. Inc. Security Act | ☐ 441 Voting (if not Voting Rights<br>Act)<br>☐ 443 Housing/Accommodations<br>☐ 444 Welfare<br>☐ 440 Other Civil Rights<br>☐ 445 American w/Disabilities-<br>Employment<br>☐ 446 Americans w/Disabilities-<br>Other | ☐ 110 Insurance<br>☐ 120 Marine<br>☐ 130 Miller Act<br>☐ 140 Negotiable Instrument<br>☐ 150 Recovery of Overpayment &<br>Enforcement of Judgment<br>☐ 153 Recovery of Overpayment of<br>Veteran's Benefits<br>☐ 160 Stockholder's Suits<br>☐ 190 Other Contracts<br>☐ 195 Contract Product Liability<br>☐ 196 Franchise | ☐ 441 Civil Rights-Voting<br>(if Voting Rights Act) |

**V. ORIGIN**

● 1 Original Proceeding   ○ 2 Removed from State Court   ○ 3 Remanded from Appellate Court   ○ 4 Reinstated or Reopened   ○ 5 Transferred from another district (specify)   ○ 6 Multi district Litigation   ○ 7 Appeal to District Judge from Mag. Judge

**VI. CAUSE OF ACTION (CITE THE U.S. CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE A BRIEF STATEMENT OF CAUSE.)**
Aiding & abetting violations of 15 U.S.C. 78j(b), 78m(a), 78m(b)(2)(A), 78m(b)(2)(B), 78m(b)(5) and 17 C.F.R. 240.10b-5 and 240.13b2-1

| **VII. REQUESTED IN COMPLAINT** | CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23 ☐ | DEMAND $ [_____] | Check YES only if demanded in complaint |
|---|---|---|---|
| | | **JURY DEMAND:** YES ☐  NO ☒ | |

**VIII. RELATED CASE(S) IF ANY**    (See instruction)    YES ☒    NO ☐    If yes, please complete related case form.

**DATE** Jan. 18, 2007     **SIGNATURE OF ATTORNEY OF RECORD** *[signature]*

**INSTRUCTIONS FOR COMPLETING CIVIL COVER SHEET JS-44**
Authority for Civil Cover Sheet

The JS-44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. Consequently a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed. Listed below are tips for completing the civil cover sheet. These tips coincide with the Roman Numerals on the Cover Sheet.

I.    COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF/DEFENDANT (b) County of residence: Use 11001 to indicate plaintiff is resident of Washington, D.C.; 88888 if plaintiff is resident of the United States but not of Washington, D.C., and 99999 if plaintiff is outside the United States.

III.   CITIZENSHIP OF PRINCIPAL PARTIES: This section is completed only if diversity of citizenship was selected as the Basis of Jurisdiction under Section II.

IV.   CASE ASSIGNMENT AND NATURE OF SUIT: The assignment of a judge to your case will depend on the category you select that best represents the primary cause of action found in your complaint. You may select only one category. You must also select one corresponding nature of suit found under the category of case.

VI.   CAUSE OF ACTION: Cite the US Civil Statute under which you are filing and write a brief statement of the primary cause.

VIII.  RELATED CASES, IF ANY: If you indicated that there is a related case, you must complete a related case form, which may be obtained from the Clerk's Office.

Because of the need for accurate and complete information, you should ensure the accuracy of the information provided prior to signing the form.