UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | Civil Action No. 1:07CV00120 |
| *Plaintiff*, | ORAL ARGUMENT REQUESTED |
| v. | |
| GARY G. BELL, JOSEPH GRENDYS, ANTHONY HOLOHAN, and MICHAEL SMITH, | |
| *Defendants*. | |

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF
GARY BELL'S MOTION TO STAY, OR IN THE ALTERNATIVE TO
TRANSFER TO THE DISTRICT OF MARYLAND, OR IN THE ALTERNATIVE
TO DISMISS FOR FAILURE TO STATE A CLAIM**

# TABLE OF CONTENTS

**Page**

I.  INTRODUCTION AND SUMMARY OF ARGUMENT ................................. 1

II. STATEMENT OF FACTS ..................................................................... 4

    A.  Parties.............................................................................................. 4

    B.  USF Proffers Letters Pertaining To USF ............................................. 5

    C.  Mr. Bell's Alleged Response ............................................................. 7

    D.  The (Lack Of) Impact Of Mr. Bell's Response ..................................... 8

    E.  The United States Attorney's Criminal Investigation............................. 9

III. THE COURT SHOULD STAY THIS ACTION AS TO MR. BELL PENDING
     RESOLUTION OF THE ONGOING CRIMINAL INVESTIGATION ........................ 10

    A.  The Court Has Broad Discretion To Stay The Case ............................. 10

    B.  Each Factor Weighs Heavily In Favor Of A Stay................................. 12

        1.  The Issues In This Action Overlap Those In The Criminal
            Investigation................................................................................ 12

        2.  Status Of The Criminal Proceeding:  Mr. Bell Faces A Tangible
            Threat Of Indictment..................................................................... 13

        3.  The Severe Burdens Imposed On Mr. Bell If This Case Proceeds
            Greatly Outweigh The Minimal Prejudice To Plaintiff If A Stay Is
            Granted...................................................................................... 14

        4.  A Stay Would Promote Judicial Efficiency ..................................... 17

        5.  A Stay Would Not Injure The Public Interest.................................... 18

IV. IF THE COURT DECLINES TO STAY, IT SHOULD TRANSFER THIS CASE
     TO THE DISTRICT OF MARYLAND .......................................................... 19

    A.  Transfer To The District Of Maryland Is Appropriate Under 28 U.S.C.
       § 1404(a) ...................................................................................... 19

        1.  Venue Is Proper In The District Of Maryland ................................. 20

        2.  The Considerations Of Convenience And The Interests Of Justice
            Weigh In Favor Of Transferring This Action........................................ 21

            a.  The Private Interest Factors Warrant Transferring This
                Action To The District Maryland ................................................. 21

            b.  The Public Interest Factors Also Weigh In Favor Of
                Transferring This Action To The District Of Maryland .............. 24

# TABLE OF CONTENTS
(continued)

**Page**

V.    IF THE COURT DECLINES TO STAY OR TRANSFER THIS CASE, IT
      SHOULD DISMISS THE COMPLAINT WITH PREJUDICE ...................................... 25

      A.    Claims 2 And 3 Fail To State A Claim For Lack Of An Issuer ........................... 26

      B.    Claim 1 Fails To State A Claim ........................................................................ 29

            1.    The Complaint Does Not Allege That Mr. Bell Knowingly
                  Rendered Substantial Assistance To A Securities Fraud ........................ 29

            2.    The Complaint Does Not Allege Any Fraud In Connection With
                  The Purchase Or Sale Of Securities ........................................................ 32

            3.    The Complaint Does Not Allege A Material Misstatement
                  Resulting From Mr. Bell's Alleged Conduct ........................................... 34

                  a.    The Theoretical Overstatement From The Hunt-Wesson
                        Vendor Allowance Is Quantitatively Immaterial ......................... 34

                  b.    The Complaint Does Not Allege Any Other Reason Why
                        Such A Tiny Overstatement Is Material For Section 10(b)
                        Purposes ..................................................................................... 35

      C.    The Complaint Should Be Dismissed Without Leave To Amend ...................... 38

VI.   CONCLUSION ............................................................................................................ 40

# TABLE OF AUTHORITIES

**Page**

## Cases

*Adair v. Johnson,*
    216 F.R.D. 183 (D. D.C. 2003)................................................................. 38

*Ashworth v. Albers Medical, Inc.*, 229 F.R.D. 527 (S.D. W. Va. 2005)................................ 12, 14

*Associated General Contractors of California, Inc. v. California State Council of Carpenters,*
    459 U.S. 519 (1983)................................................................................ 26

*Backman v. Polaroid Corp.,*
    901 F.2d 10 (1st Cir. 1990)........................................................................ 37

*Baker v. Library of Congress,*
    260 F. Supp. 2d 59 (D.D.C. 2003).................................................................. 38

*Baxter v. Palmigiano,*
    425 U.S. 308 (1976)................................................................................ 15

*Blue Chip Stamps v. Manor Drug Stores,*
    421 U.S. 723 (1975)................................................................................ 32

*Braude & Margulies, P.C. v. Fireman's Fund Ins. Co.,*
    No. 05-649, 2007 U.S. Dist. LEXIS 290, *8-*9 (D.D.C. Jan. 5, 2007) ........................... 18, 25

*Brock v. Tolkow,*
    109 F.R.D. 116 (E.D.N.Y. 1985).................................................................. 12, 18

*Chemical Bank v. Arthur Andersen & Co.,*
    726 F.2d 930 (2d Cir. 1984) ....................................................................... 33

*Citibank v. Hakim,*
    No. 92 Civ. 6233, 1993 U.S. Dist. LEXIS 16299, *2 (S.D.N.Y. 1993) ............................ 17

*Comptroller of Currency v. Calhoun First Nat'l Bank,*
    626 F. Supp. 137 (D.D.C. 1985).................................................................... 22

*Corbin v. Federal Deposit Insurance Corp.,*
    74 F.R.D. 147 (E.D.N.Y. 1977)..................................................................... 16

*Davis v. Northside Realty Assoc., Inc.,*
    95 F.R.D. 39 (N.D. Ga. 1982)...................................................................... 15

# TABLE OF AUTHORITIES
### (continued)

**Page**

*Devaughn v. Inphonic, Inc.*,
   403 F. Supp. 2d 68 (D.D.C. 2005) .......................................................................... 20

*Dienstag v. Bronson*,
   49 F.R.D. 327 (S.D.N.Y. 1970) .............................................................................. 16

*Doe v. Glazner*,
   232 F.3d 1258 (9th Cir. 2000) ................................................................................ 15

*Dura Pharmaceuticals, Inc. v. Broudo*,
   544 U.S. 336, 125 S.Ct. 1627 (2005) ................................................................ 30, 33

*Estate of Gaither v. District Court*,
   No. 03-1458, 2005 U.S. Dist. LEXIS 35426, *6 (D.D.C. 2005) ......................... 11, 17

*Fund For Animals, Inc. v. Norton*,
   322 F.3d 728 (D.C. Cir. 2003) ................................................................................ 39

*Gallagher v. Abbott Laboratories, Inc.*,
   269 F.3d 806 (7th Cir. 2001) .................................................................................. 37

*Ganino v. Citizens Utilities Co.*,
   228 F.3d 154 (2d Cir. 2000) .............................................................................. 35, 36

*Gemological Inst. of Am., Inc. v. Thi-Dai Phan*,
   145 F. Supp. 2d 68 (D.D.C. 2001) .......................................................................... 20

*Greenhouse v. MCG Cap. Corp.*,
   392 F.3d 650 (4th Cir. 2004) .................................................................................. 33

*Howard v. Securities & Exch. Comm'n*,
   376 F.3d 1136 (D.C. Cir. 2004) .............................................................................. 29

*In re Adelphia Communications Sec. Litig.*,
   No. 02-1781, 2003 U.S. Dist. LEXIS 9736, *7 (E.D. Pa. May 14, 2003) ........................ passim

*In re Citigroup, Inc. Sec. Litig.,* \
   330 F. Supp. 2d 367 (S.D.N.Y. 2004) ..................................................................... 37

*In re Convergent Techs. Second Half 1984 Sec. Litig.*,
   1990 WL 606271, *10 (N.D. Cal. Jan. 10, 1990) .................................................... 34

*In re First Union Sec. Litig.*,
   128 F. Supp. 2d 871 (W.D.N.C. 2001) .................................................................... 34

# TABLE OF AUTHORITIES
(continued)

Page

*In re Homestore.com, Inc. Sec. Litig.*,
  347 F. Supp. 2d 814 (C.D. Cal. (2004) ................................................................. 10

*In re NAHC, Inc. Securities Litig.*,
  306 F.3d 1314 (3d Cir. 2002) ............................................................................... 9

*In re PetsMart, Inc. Sec. Litig.*,
  61 F. Supp. 2d 982 (D. Ariz. 1999) ...................................................................... 34

*In re SCB Computer Tech, Inc. Sec. Litig.*,
  149 F. Supp. 2d 334 (W.D. Tenn. 2001) ............................................................... 35

*In re Segue Software, Inc. Sec. Litig.*,
  106 F. Supp. 2d 161 (D. Mass. 2000) ................................................................... 34

*In re Silicon Graphics Inc. Sec. Litig.*,
  183 F.3d 970, 986 (9th Cir. 1999) ....................................................................... 9

*Investors Research Corp. v. Securities  & Exch. Comm'n*,
  628 F.2d 168 (D.C. Cir. 1980) ............................................................................. 29

*Islamic American Relief Agency v. Gonzales*,
  477 F.3d 728 (D.C. Cir. 2007) ............................................................................. 26

*Kafack v. Primerica Life Ins. Co.*,
  934 F. Supp. 3 (D.D.C. 1996) .............................................................................. 25

*King v. Navistar Int'l Transit Corp.*,
  709 F. Supp. 261 (D.D.C. 1989) ......................................................................... 22

*Kowal v. MCI Communications Corp.*,
  16 F.3d 1271 (D.C. Cir. 1994) ............................................................................ 26

*Kramer v. Time Warner, Inc.*,
  937 F.2d 767 (2d Cir. 1991) ............................................................................... 9

*Landis v. North American Co.*,
  299 U.S. 248 (1936) ........................................................................................... 11

*Liban v. Churchey Group II, L.L.C.*,
  305 F. Supp. 2d 136 (D.D.C. 2004) .......................................................... 20, 21, 24

*Mathews v. Centex Telemanagement, Inc.*,
  No. C-92-1837-CAL, 1994 WL 269734, *6-7 (N.D. Cal. June 8, 1994) ................. 34

# TABLE OF AUTHORITIES
### (continued)

**Page**

*Menkes v. Stolt-Nielsen S.A.,*
  No. 3:03 CV 409 (DJS), 2005 WL 3050970, *7 (D. Conn. Nov. 10, 2005) ........................... 38

*Merrill Lynch, Pierce Fenner & Smith v. Dabit,*
  547 U.S. ___, 2006 WL 694137, *7 (Mar. 21, 2006) ............................................................. 33

*Oceanic Exploration Co. v. ConocoPhillips, Inc.,*
  No. 04-332, 2007 U.S. Dist LEXIS 7915, *16 (D.D.C. Feb. 5, 2007) .............................. 20, 25

*Papasan v. Allain,*
  478 U.S. 265 (1986) .............................................................................................................. 26

*Parnes v. Gateway 2000, Inc.,*
  122 F.3d 539 (8th Cir. 1997) ................................................................................................. 34

*Pavlidas v. New England Football Club, Inc.,*
  675 F. Supp. 688 (D. Mass. 1986) ......................................................................................... 34

*Schuster v. Symmetricom, Inc.,*
  No. 94-20024 RMW, 2000 WL 3315909, *7 (N.D. Cal. Aug. 1, 2000) ................................. 34

*Securities & Exch. Comm'n v. Dresser Industries, Inc.,*
  628 F.2d 1368 (D.C. Cir. 1980) ....................................................................................... 11, 15

*Securities & Exch. Comm'n v. HealthSouth Corp.,*
  261 F. Supp. 2d 1298 (N.D. Al. 2003) ........................................................................ 11, 14, 16

*Securities & Exch. Comm'n v. Bilzerian,*
  814 F.Supp. 116 (D.C. Cir. 1993) ............................................................................................ 9

*Securities & Exch. Comm'n v. Cymaticolor Corp.,*
  106 F.R.D. 545 (S.D.N.Y. 1985) ............................................................................................ 15

*Securities & Exch. Comm'n v. Dauplaise,*
  No. 6:05 CV 1391 ORL 31KRS, 2006 WL 449175, *7 (M.D. Fla. Feb. 22, 2006) ................ 28

*Securities & Exch. Comm'n v. Ernst & Young,*
  775 F. Supp. 411 (D.D.C. 1991) ....................................................................................... 22, 23

*Securities & Exch. Comm'n v. International Loan Network, Inc.,*
  770 F. Supp. 678 (D.D.C. 1991) ............................................................................................ 15

*Securities & Exch. Comm'n v. Morris,*
  No. Civ. A. H-04-3096, 2005 WL 2000665, *10 (S.D. Tex. Aug. 18, 2005) ......................... 30

# TABLE OF AUTHORITIES
(continued)

Page

*Securities & Exch. Comm'n v. Orr*,
No. 04-74702, 2006 WL 542986, *8 (E.D. Mich. Mar. 6, 2006) ...................................... 30, 31

*Securities & Exch. Comm'n v. Solow*,
No. 06-81041-CV, 2007 WL 917269, *4 (S.D. Fla. Mar. 23, 2007) ...................................... 30

*Securities & Exch. Comm'n v. Tambone*,
417 F. Supp. 2d 127 (D. Mass. 2006) .................................................................................... 31

*Securities & Exch. Comm'n v. Tandem Mgt.*,
No. 95 Civ. 8411, 2001 U.S. Dist. LEXIS 19109, *12 (S.D.N.Y. 2001) ............................... 11

*Securities & Exch. Comm'n v. Washington County Utility Dist.*,
676 F.2d 218 (6th Cir. 1982) ................................................................................................. 30

*Securities & Exch. Comm'n v. Zandford*,
535 U.S. 813 (2002) ............................................................................................................... 32

*Southern Utah Wilderness Alliance v. Norton*,
No. 01-2518, 2002 U.S. Dist. LEXIS 27414, *6 (D.D.C. June 28, 2002) ........................ 19, 21

*Stewart Org. v. Ricoh Corp.*,
487 U.S. 22 (1988) ................................................................................................................. 19

*Transorient Navigators Co. v. M/S Southwind*,
788 F.2d 288 (5th Cir. 1986) ................................................................................................... 9

*Trout Unlimited v. U.S. Dept. of Agric.*,
944 F. Supp. 13 (D.D.C. 1996) ...................................................................................... passim

*Trustees of the Plumbers & Pipefitters National Pension Fund v. Transworld Mechanical, Inc.*,
886 F. Supp. 1134 (S.D.N.Y. 1995) ....................................................................................... 11

*Trustees of the Plumbers and Pipefitters National Pension Fund v. Transworld Mechanical, Inc.*,
866 F. Supp. 1134 (S.D.N.Y. 1995) ....................................................................................... 13

*United States v. Certain Real Property & Premises Known As 1344 Ridge Road*,
751 F. Supp. 1060 (E.D.N.Y. 1989) ................................................................................. 13, 15

*United States v. Kordel*,
397 U.S. 1 (1970) .................................................................................................................. 10

*United States v. O'Hagan*,
521 U.S. 642 (1997) ............................................................................................................... 33

# TABLE OF AUTHORITIES
### (continued)

**Page**

*United States v. Wilson*,
   No. 01 Cr. 53, 2001 WL 798018, *6 (S.D.N.Y. July 13, 2001) ................................................ 29

*Vandervelde v. Put & Call Brokers & Dealers Ass'n*,
   344 F. Supp. 118 (S.D.N.Y. 1972) ........................................................................................ 9

*Veg-Mix, Inc. v. U.S. Dep't of Agriculture*,
   832 F.2d 601 (D.C. Cir. 1987) ........................................................................................ 18, 25

*Vidosh v. Holsapple*,
   Civ. A. No. 84 CV2447 DT, 1987 WL 273164, *17 (E.D. Mich. 1987) ................................ 29

*Volmar Distributors, Inc. v. New York Post Co.*,
   152 F.R.D. 36 (S.D.N.Y. 1993) ................................................................................ 11, 12, 13

*Walsh Securities, Inc. v. Cristo Property Mgt., Ltd.*,
   7 F. Supp. 2d 523 (D.N.J. 1998) .................................................................................... passim

*Wehling v. Columbia Broadcasting Sys.*, 608 F.2d 1084 (5th Cir. 1979) .............................. 14, 16

## Statutes

Securities Exchange Act
   Section 10(b) ........................................................................................................... passim

Securities Exchange Act
   Section 13(a) ................................................................................................ 1, 26, 27, 28

Securities Exchange Act
   Section 13(b)(2) ...................................................................................................... 27, 28

Securities Exchange Act
   Section 13(b)(2)(A) .......................................................................................... 1, 27, 28

Securities Exchange Act
   Section 13(b)(2)(B) ................................................................................................... 1

Securities Exchange Act
   Section 13(b)(5) ..................................................................................................... 1, 27

United States Code
   Title 15, section 78(c)(8) .......................................................................................... 27

# TABLE OF AUTHORITIES
### (continued)

**Page**

United States Code
Title 15, Section 78aa ................................................................................ 20

United States Code
Title 15, section 78j(b) ..................................................................... 29, 32

United States Code
Title 15, section 78m(a) ............................................................................ 26

United States Code
Title 15, section 78m(b)(2) ....................................................................... 27

United States Code
Title 15, section 78m(b)(2)(A) .................................................................. 27

United States Code
Title 15, section 78m(b)(2)(B) .................................................................. 27

United States Code
Title 15, section 78m(b)(5) ....................................................................... 27

United States Code
Title 15, section 78o(d) ...................................................................... 27, 28

United States Code
Title 17, section 240 ................................................................................. 29

United States Code
Title 18, section 3282(a) ........................................................................... 12

United States Code
Title 28, Section 1404(a) .............................................................. 2, 19, 20, 22

## Other Authorities

Department of Justice, Nine Individuals Charged for Submitting False Audit Confirmation
Letters to Auditors of Ahold Subsidiary U.S. Foodservice (Jan. 13, 2005) ............................ 10

Department of Justice, U.S. Attorney Charges an Additional Seven in Connection with a Multi-
Million Dollar Fraud Scheme Involving Ahold Subsidiary, U.S. Foodservice (Nov. 2, 2005) 10

Securities & Exch. Comm'n, Nine Individuals Charged by the Securities and Exchange
Commission with Aiding and Abetting Financial Fraud at Royal Ahold's U.S. Foodservice

## TABLE OF AUTHORITIES
(continued)

**Page**

Subsidiary for Signing and Returning False Audit Confirmations.  One Also Charged with Insider Trading (Jan. 13, 2005) ................................................................................................ 10

Securities & Exch. Comm'n, SEC Charges Seven Individuals with Aiding and Abetting Financial Fraud at Royal Ahold's U.S. Foodservice Subsidiary for Signing and Returning False Audit Confirmations (Nov. 2, 2005) ............................................................................. 10

## Rules

Code of Federal Rules
    Title 17, rule 240.13b2-1 ...................................................................................................... 27

Federal Rules of Civil Procedure
    Rule 12(b)(6).................................................................................................................. 2, 25, 29

Federal Rules of Civil Procedure
    Rule 15(a) .............................................................................................................................. 38

Federal Rules of Civil Procedure
    Rule 9(b) ................................................................................................................................ 30

Federal Rules of Evidence
    Rule 201(b)(2)............................................................................................................... 10, 18, 25

Federal Rules of Evidence
    Rule 201(d) ................................................................................................................... 10, 18, 25

Securities and Exchange Commission
    Rule 10b-5........................................................................................................................... 1, 29

Securities and Exchange Commission
    Rule 13b-2-1 .................................................................................................................. 1, 27, 28

## Regulations

Federal Regulation
    Regulation 45150.................................................................................................................. 35

Federal Regulation
    Regulation 45152.................................................................................................................. 36

Federal Regulation
    Regulation 45153.................................................................................................................. 36

**TABLE OF AUTHORITIES**
(continued)

**Page**

Defendant Gary Bell respectfully submits this memorandum in support of his motion to stay this case; or, in the alternative, to transfer it to the District of Maryland; or, in the alternative, to dismiss the Complaint with prejudice.

## I.    INTRODUCTION AND SUMMARY OF ARGUMENT

During the relevant time period, Mr. Bell was an employee of Hunt-Wesson Foodservice. In its Complaint, the Securities and Exchange Commission ("SEC") asserts that Mr. Bell aided and abetted securities law violations pertaining to a customer of Hunt-Wesson, U.S. Foodservice ("USF"). The claims arise solely from a letter proffered *by* USF *to* Mr. Bell. The letter set forth the volume of Hunt-Wesson product USF had purchased in 2001, and the amount USF claimed it was owed as a vendor allowance based on that volume. The Complaint asserts three claims against Mr. Bell, based on his signature on the letter:

> Claim 1: Aiding and abetting securities fraud, in violation of Securities Exchange Act Section 10(b) and the accompanying SEC Rule 10b-5.

> Claim 2: Aiding and abetting a violation of the SEC reporting provisions of Securities Exchange Act Section 13(a).

> Claim 3: Aiding and abetting a violation of the books and records and internal controls provisions of Securities Exchange Act Sections 13(b)(2)(A), 13(b)(2)(B) and 13(b)(5); and the accompanying SEC Rule 13b2-1.

This case presents a classic scenario for a stay. *See* Section III, *infra*. The United States Attorney for the Southern District of New York has indicated an interest in prosecuting Mr. Bell criminally. While there is no valid basis for this threat of criminal prosecution, it is nevertheless tangible and real, especially since parallel criminal actions have been brought against sixteen persons similarly situated to Mr. Bell. Unless and until this threat of criminal prosecution is resolved, Mr. Bell will be compelled to assert his Fifth Amendment privilege against self-incrimination in this case. As numerous courts have recognized, it would unduly prejudice Mr. Bell to be compelled to proceed with this case under these circumstances. This

consideration and the other relevant factors (including the lack of any tangible harm to the SEC or the public interest if this case is stayed) weigh heavily in favor of a stay. In fact, the United States Attorney has himself moved for and obtained a stay in one of the related SEC cases.

If the Court declines to stay, it should transfer this case to the District of Maryland for the convenience of the parties and witnesses, and in the interests of justice. 28 U.S.C. § 1404(a). *See* Section IV, *infra*. USF is headquartered in the District of Maryland, and that venue is where the relevant witnesses and evidence are located. The District of Maryland is also familiar with the issues in this case, as it is the venue for two pending lawsuits arising from the same type of letters at issue here. In contrast, the District of Columbia has little connection to the specific allegations asserted against Mr. Bell.

If the Court declines to stay or transfer this case, it should dismiss it because the Complaint fails to state a claim. Fed. R. Civ. P. 12(b)(6). Each claim in the Complaint is deficient on its face.

Claim 1 is deficient because the Complaint fails to allege at least three elements of a Section 10(b) claim. *See* Section V(B), *infra*. First, the Complaint does not allege that Mr. Bell knowingly rendered substantial assistance to a securities fraud. The Complaint alleges—and hence admits—that Mr. Bell and the recipients of similar letters were told that the information therein represented just the *internal* numbers of USF. The only reasonable inference is that Mr. Bell would *not* have understood that the letter had any connection whatsoever to any *external* statements (including financial statements) made to investors. This is buttressed by the fact that USF was not a public company and did not issue securities. Absent such an understanding, Mr. Bell could not have knowingly assisted a securities fraud.

Second, and for similar reasons, Claim 1 fails to allege any nexus between Mr. Bell and any fraud in connection with the purchase or sale of securities. The only company with whom Mr. Bell is alleged to have been involved or aware is USF. USF does not issue securities or make public statements regarding any of its securities.

Claim 1 also fails to allege that any resulting misstatement was material. The USF letter allegedly overstated USF's vendor allowance for 2001 by approximately $4.5 million. Even assuming that this amount was incorporated into Ahold's financial statements—which the Complaint does not allege—$4.5 million represents less than *0.5%* of Ahold's net income. This difference is immaterial as a matter of law.

Claims 2 and 3 are deficient because they fail to allege the existence of, or any affect on, an "issuer" of securities. *See* Section V(A), *infra*. To state claims, Claim 2 requires an issuer that filed false SEC reports, and Claim 3 requires an issuer with falsified books and records or deficient internal controls. The only issuer alleged in the Complaint is a Dutch conglomerate named Koninklijke Ahold N.V. ("Ahold"). The Complaint does not allege that Mr. Bell had any interaction whatsoever with Ahold—not with its personnel, SEC filings, books, records, internal controls, or auditors. Indeed, the Complaint does not even allege that Mr. Bell was aware of Ahold. Mr. Bell's only alleged interactions were with USF, an Ahold subsidiary. The Complaint does not—and cannot—allege that USF is an issuer.

For these reasons, if the Court declines to stay or transfer this case, it should dismiss the Complaint for failure to state a claim. Dismissal should be with prejudice, as the SEC has had more than four years to investigate yet has failed to allege at least four elements of these securities law claims.

## II.    STATEMENT OF FACTS

For purposes of this motion, Mr. Bell presents the allegations of the Complaint, without conceding their truthfulness or accuracy.

### A.    Parties

Gary Bell was Vice President for Business Development at Hunt-Wesson Foodservice, a vendor to USF. Complaint ¶ 14. He is a resident of California. *Id*. Mr. Bell is one of four individuals sued by the SEC. The other three defendants were representatives of other USF vendors. *Id*. ¶¶ 15-17. The Complaint does not allege that Mr. Bell had any relationship to the other defendants or the circumstances of the claims against them. Mr. Bell refers to the other defendants solely for the purposes of discussing the nature of the allegations made against him, which are substantially similar to the allegations against the other defendants.

Six of the first eleven paragraphs of the Complaint refer to a company called Ahold. It is a publicly held company organized in the Netherlands. Complaint ¶ 5. Ahold is registered with the SEC pursuant to Securities Exchange Act Section 12(b), and its securities (in the form of ADRs) trade on the New York Stock Exchange. *Id*. In a Form 20-F filed in October 2003, Ahold allegedly restated its financials for its fiscal years 2000 and 2001, and the first three quarters of 2002. *Id*. ¶ 6. The restatement allegedly arose, in part, from a fraud at one of its subsidiaries, USF. *Id*. ¶¶ 7, 9, 11. This is all the Complaint alleges about Ahold. The remaining ninety-three paragraphs of the Complaint do not mention Ahold. The Complaint does not allege that Mr. Bell had any interaction whatsoever with Ahold or its personnel, auditors, books and records, SEC filings, or internal controls. Indeed, as far as can be gleaned from the Complaint, Mr. Bell did not even know that Ahold existed.

The bulk of the Complaint concerns a company called USF. USF allegedly was a wholly owned subsidiary of Ahold. Complaint ¶¶ 1, 7, 18. It is headquartered in Columbia,

Maryland. *Id.* ¶¶ 7, 18. It is a foodservice and distribution company. *Id.* ¶ 7. It sells and distributes many products that it buys from suppliers like Hunt-Wesson and Sarah Lee to restaurants and other institutional food preparers.

The Complaint does not characterize USF as an "issuer" of securities, or allege that it ever, in fact, issued any securities. At one point, the Complaint alleges in a conclusory manner that USF "made false and misleading statements in filings with the [SEC] and other public statements." *Id.* ¶ 22. However, the Complaint does not identify any SEC filing or public statement issued by or in the name of USF. Indeed, the Complaint does not even allege that USF was required to make SEC filings. The Complaint alleges a "large-scale fraud" at USF, supposedly engaged in by "USF executives" who inflated promotional allowances and lied to auditors. *Id.* ¶¶ 7, 9-11.

### B.    USF Proffers Letters Pertaining To USF

The SEC's purported claims arise from promotional payments to USF from its vendors. Complaint ¶¶ 8, 18. "USF executives" allegedly schemed to inflate these payments as recorded on USF's financial statements, and to provide USF's independent auditors with false information about the payments. *Id.* ¶¶ 9-10. The false information included false "audit confirmation letters" that USF procured from personnel at USF's vendors, including Mr. Bell and the other defendants. *Id.* ¶¶ 10, 19, 23, 33, 44, 95. While most of the allegations regarding these letters are the same for all defendants (as demonstrated below), the Complaint does not allege that Mr. Bell was aware of any letter other than the one proffered to him.

As the letter to Mr. Bell provides the sole basis for the purported claims against him, the Complaint's common allegations regarding that letter and the letters proffered to the other defendants merit additional scrutiny. The letters pertained to USF. Complaint ¶¶ 1-4. By signing them, defendants allegedly provided "substantial assistance" in the process by which

"USF executives" misled USF's auditors.  Complaint ¶¶ 10, 23, 33, 44.  "USF management explicitly encouraged" Mr. Bell to sign the letter proffered to him.  *Id.* ¶ 32; *see also id.* ¶¶ 43, 75 ("USF management" also encouraged other defendants to sign).

The letters from USF were to be sent to USF's independent auditors.  *See* Complaint ¶¶ 23, 24, 28, 30, 32 (letter to Mr. Bell).[1]  The alleged preface to all the letters was the same (other than the time period to which certain letters pertained):

> In connection with the audit of our financial statements of U.S. Foodservice, Inc. (USF) for the year ended December 29, 2001, please confirm directly with our auditors, Deloitte & Touche, LLP, 110 South Charles Street 12th Floor, Baltimore, Maryland 21201, the following with respect to Marketing and Merchandising Allowances offered by you to U.S. Foodservice as of December 29, 2001.

*Id.* ¶ 24 (letter to Mr. Bell); *see also id.* ¶¶ 34, 45, 51, 61, 66, 77, 82, 90 (same, letters to other defendants).[2]  The letters did not mention the financial statements of any company other than USF.  The letters did not mention any auditors, other than the auditors of USF.  The letters did not mention Ahold.

The numbers referenced in the letters related to vendor allowances to USF.  For example, the letter to Mr. Bell referred to the amount Hunt-Wesson purportedly owed USF in vendor allowances as of the end of the prior year (December 30, 2000) ($1.528 million); the volume of Hunt-Wesson products USF had purchased during 2001; the vendor allowances earned by USF during 2001 as a consequence of its purchases; any payments or deductions made during 2001; and the resulting ending balance purportedly due USF at the end of 2001 ($4,475,159).  Complaint ¶¶ 24, 26.

---

[1]  The same is true for all other letters allegedly proffered to the other defendants.  *See* Complaint ¶¶ 33, 38, 39, 43, 44, 46, 51, 61, 66, 75, 77, 82, 90, 95.

[2]  Some of the letters pertained to the fiscal year ended December 28, 2002, rather than 2001.  *See*, *e.g.*, Complaint ¶ 46.  USF did not send Mr. Bell a letter covering 2002.  The only time period at issue for Mr. Bell is the period ending December 29, 2001.  Thus, the remainder of this brief will refer only to 2001.

The Complaint does not allege that USF asked Mr. Bell (or anyone else) to attest that these numbers were intended to be used in USF's financial statements. Rather, it alleges the opposite. It alleges that in some cases, "USF personnel encouraged the vendors by, for example, falsely representing that the confirmation was just 'an internal number' and that USF did not consider the receivable reflected in the confirmation to be an actual debt that it would seek to collect." *Id.* ¶ 21. In other words, USF represented that the numbers were internal, *not* external. The Complaint does not allege that USF informed Mr. Bell that it was lying when it said that the numbers were purely for internal purposes. The Complaint does not allege that Mr. Bell knew that USF was lying, and that the numbers actually were not just internal numbers.

### C.    Mr. Bell's Alleged Response

The SEC alleges that Mr. Bell signed the letter containing the internal numbers proffered by USF, but that Hunt-Wesson did not agree with the vendor allowance numbers contained in the letter to Mr. Bell. Complaint ¶¶ 27, 30. Mr. Bell allegedly sent a separate letter to USF noting "areas of concern" with "several amounts" in the USF letter, and opined that USF's purchases during 2001 had been $42.125 million rather than $49 million. *Id.* ¶¶ 28-29. The Complaint characterizes this separate letter as a "side letter" and asserts that it was not disclosed to USF's auditors (*id.* ¶¶ 28, 31), but does not allege that Mr. Bell was asked either to send or not send the letter to USF's auditors. The Complaint alleges that USF "countersigned" Mr. Bell's letter (*id.* ¶ 28), but does not allege that USF agreed with Hunt-Wesson's numbers.

Apparently, the SEC believes that Hunt-Wesson's numbers were correct and USF's were not. The Complaint hence alleges that Hunt-Wesson did not owe USF $1.528 million as of the end of 2000, and did not owe USF $4,475,159 as of the end of 2001, as reflected in the USF letter proffered to Mr. Bell. It alleges rather that Hunt-Wesson did not owe USF anything, as opined in Mr. Bell's letter. Complaint ¶¶ 25, 27, 29.

D.    **The (Lack Of) Impact Of Mr. Bell's Response**

From the allegations in the Complaint, one is left to speculate about the impact of the USF letter and Mr. Bell's response to it.  The Complaint does not explicitly allege that the internal numbers in the USF letter to Mr. Bell were incorporated into any financial statements.  The Complaint does not allege that USF issued any public financial statements or filed any SEC reports, nor does it allege that the numbers in the USF letter were incorporated into Ahold's financial statements.  Rather, it summarily alleges that "overstated promotional allowances" at USF "aggregated to at least $700 million for fiscal years 2001 and 2002," and caused Ahold to report false operating and net income for those years.  Complaint ¶ 11.

As noted above, Ahold restated its financials for 2000 and 2001 and part of 2002, but this restatement arose only in part from USF's vendor allowance fraud.  *See* Section II(A), *supra*.  One may surmise from the Complaint's reference to Ahold's "income" and "net income" (Complaint ¶ 6), its allegation that the USF vendor allowance malfeasance affected Ahold's financials in 2001 and 2002 (*id.* ¶ 11), and its allegation that the USF letter to Mr. Bell referred to 2001 USF numbers only (*id.* ¶ 24), that the Complaint means to allege (although it does not actually allege) as to Mr. Bell that the $4,475,159 vendor allowance from Hunt-Wesson purportedly owed to USF for 2001 was false, and should not have been included in Ahold's income or net income for that fiscal year.[3]

But even with these conjectures and assumptions, it is not possible to identify any material impact of Mr. Bell's alleged signing of the USF letter.  The Complaint alleges that Ahold's net income for 2001 was overstated by 32.6% and its operating income for 2001 was overstated by 29.4%.  Complaint ¶ 6.  However, the Complaint does not allege the absolute

---

[3]    The Complaint also refers to Ahold's "net sales" (Complaint ¶ 6), but it does not allege that USF's letter to Mr. Bell referred to sales by USF, as distinguished from purchases by USF.

income or net income reported in that year, as is necessary to assess whether a theoretical

overstatement of $4,475,159 was material to Ahold's reported numbers.  For that information,

one must consider Ahold's SEC filings.  In its Annual Report on Form 20-F for Fiscal Year 2001

(filed Apr. 9, 2002), Ahold reported net income for 2001 of €1,113,521,000.  *Id.* at 70.[4]  The

$4,475,159 Hunt-Wesson vendor allowance in the USF letter translates to €5,095,818, using a $1

to €1.13869 conversion ratio as of the date of the letter (January 24, 2002).[5]  If 2001 net income

was overstated by €5,095,818, this was an overstatement of only 0.46%.  The percentage

overstatement of operating income (0.30%) or net sales (0.01%) was even smaller.

### E.    The United States Attorney's Criminal Investigation

Like the SEC, the United States Attorney's Office for the Southern District of New York

("USAO") has been investigating these matters for several years.  The USAO continues to

investigate employees of USF's vendors for alleged criminal violations of the same statutory and

regulatory framework upon which this civil lawsuit is predicated, and based on allegations

similar to those made by the SEC in this action.  *See* Affidavit of Matthew G. Jacobs ("Jacobs

---

[4]  Mr. Bell respectfully requests that the Court take judicial notice of this document.  The Form 20-F may be noticed because it is an SEC filing, and can be obtained from the SEC's website (URL http://www.sec.gov/Archives/edgar/data/869425/000119312503066077/d20f.htm).  Courts routinely take judicial notice of SEC filings even if they are not specifically cited in the complaint.  *See In re Silicon Graphics Inc. Sec. Litig.*, 183 F.3d 970, 986 (9th Cir. 1999) (judicially noticing SEC filings was proper); *In re NAHC, Inc. Securities Litig.*, 306 F.3d 1314, 1331 (3d Cir. 2002) (district court did not err in taking judicial notice of documents filed with the SEC, but not relied upon in the complaint); *Kramer v. Time Warner, Inc.*, 937 F.2d 767, 774 (2d Cir. 1991) (same).  The Form 20-F also may be noticed because it is referenced in the Complaint, albeit implicitly.  The Complaint alleges that Ahold restated its originally reported financial statements, and that false SEC filings were filed.  By necessity, the Complaint relies on the SEC filing containing the restated numbers.  Because the Form 20-F is more than 400 pages, a copy is not attached to the Request for Judicial Notice filed concurrently herewith.

[5]  Mr. Bell respectfully requests that the Court take judicial notice of this conversion ratio, which was obtained from a public source on the Internet, x-rates.com (URL  http://www.x-rates.com/cgi-bin/hlookup.cgi), a copy of which is attached as Exhibit "A" to the Request for Judicial Notice filed concurrently herewith.  Courts take judicial notice of this type of historical financial market information.  *See, e.g.*, *Securities & Exch. Comm'n v. Bilzerian*, 814 F.Supp. 116, 123 n.19 (D.C. Cir. 1993) (closing stock prices); *Transorient Navigators Co. v. M/S Southwind*, 788 F.2d 288, 293 (5th Cir. 1986) (prevailing interest rates); *Vandervelde v. Put & Call Brokers & Dealers Ass'n*, 344 F. Supp. 118, 150 (S.D.N.Y. 1972) (interest rates on savings deposits and United States Treasury obligations).

Aff.") ¶ 2.  The criminal investigation has already resulted in the indictment of sixteen individuals in the same or similar position as Mr. Bell and for nearly identical conduct as that alleged in the Complaint.  *Id.* ¶ 3.[6]  The SEC filed civil complaints against these same sixteen individuals on the same days the criminal indictments issued.  *Id.*[7]  Mr. Bell thus faces a tangible threat of criminal prosecution.  Indeed, the USAO has informed counsel for Mr. Bell that Mr. Bell is a target of its investigation.  *Id.* ¶¶ 2, 4.  As set forth in greater detail below, this Court should stay this case as to Mr. Bell until the resolution of any criminal proceedings or the expiration of the criminal statute of limitations.  *See* Section III, *supra*.

## III.    THE COURT SHOULD STAY THIS ACTION AS TO MR. BELL PENDING RESOLUTION OF THE ONGOING CRIMINAL INVESTIGATION

### A.    The Court Has Broad Discretion To Stay The Case

It is well settled that a court has broad discretion to stay a civil case in light of a pending parallel criminal proceeding when the interest of justice so requires.  *United States v. Kordel*, 397 U.S. 1, 12 n.27 (1970).  As explained by Justice Cardozo:

> The power to stay proceedings is incidental to the power inherent in every court to control the disposition of the causes on its docket with economy of time and effort for itself, for counsel, and for litigants.  How this can best be

---

[6]    *See* Department of Justice, Nine Individuals Charged for Submitting False Audit Confirmation Letters to Auditors of Ahold Subsidiary U.S. Foodservice (Jan. 13, 2005) and Department of Justice, U.S. Attorney Charges an Additional Seven in Connection with a Multi-Million Dollar Fraud Scheme Involving Ahold Subsidiary, U.S. Foodservice (Nov. 2, 2005) (hereinafter "DOJ Press Releases").  Mr. Bell respectfully requests that the Court take judicial notice of these documents, copies of which are attached as Exhibits "B" and "C," respectively, to the Request for Judicial Notice filed concurrently herewith.  Fed. R. Evid. 201(b)(2), (d); *In re Homestore.com, Inc. Sec. Litig.*, 347 F. Supp. 2d 814, 817 (C.D. Cal. (2004) ("[T]he court may take judicial notice of press releases.").

[7]    *See* Securities & Exch. Comm'n, Nine Individuals Charged by the Securities and Exchange Commission with Aiding and Abetting Financial Fraud at Royal Ahold's U.S. Foodservice Subsidiary for Signing and Returning False Audit Confirmations.  One Also Charged with Insider Trading (Jan. 13, 2005) and Securities & Exch. Comm'n, SEC Charges Seven Individuals with Aiding and Abetting Financial Fraud at Royal Ahold's U.S. Foodservice Subsidiary for Signing and Returning False Audit Confirmations (Nov. 2, 2005) (hereinafter "SEC Press Releases").  Mr. Bell respectfully requests that the Court take judicial notice of these documents, copies of which are attached as Exhibits "D" and "E," respectively, to the Request for Judicial Notice filed concurrently herewith.  Fed. R. Evid. 201(b)(2), (d); *In re Homestore.com, Inc. Sec. Litig.*, 347 F. Supp. at 817.

done calls for the exercise of judgment, which must weigh competing interests and maintain an even balance.

*Landis v. North American Co.*, 299 U.S. 248, 254-55 (1936).[8]  Courts consider the following six factors in determining whether to stay a civil case:

1.    The extent to which the issues in the criminal and civil cases overlap;
2.    The status of the criminal proceeding;
3.    The potential prejudice to the plaintiff caused by a stay;
4.    The burdens the defendant will face if a stay is not granted;
5.    Judicial efficiency; and
6.    The public interest.

*See, e.g., Securities & Exch. Comm'n v. HealthSouth Corp.*, 261 F. Supp. 2d 1298, 1326 (N.D. Al. 2003); *In re Adelphia Communications Sec. Litig.*, No. 02-1781, 2003 U.S. Dist. LEXIS 9736, *7 (E.D. Pa. May 14, 2003); *Walsh Securities, Inc. v. Cristo Property Mgt., Ltd.*, 7 F. Supp. 2d 523, 526-27 (D.N.J. 1998).[9]  A court must balance these factors on a case-by-case basis, "with the basic goal being to avoid prejudice."  *HealthSouth Corp.*, 261 F. Supp. 2d at 1326, *citing Volmar Distributors, Inc. v. New York Post Co.*, 152 F.R.D. 36, 39 (S.D.N.Y. 1993).

Here, each factor weighs heavily in favor of a stay.  In particular, allowing the instant action to proceed against Mr. Bell would severely prejudice him.  Although Mr. Bell is innocent of any wrongdoing, he cannot make any statements in this litigation (such as in an answer, discovery responses, or at deposition) because of the chance that such statements would be used against him in a subsequent criminal case.  The SEC could then use that silence against Mr. Bell

---

[8]    *See also Estate of Gaither v. District Court*, No. 03-1458, 2005 U.S. Dist. LEXIS 35426, *6 (D.D.C. 2005) ("It is well-established that a district court has discretionary authority to stay a civil proceeding pending the outcome of a parallel criminal case when the interests of justice so require."); *Securities & Exch. Comm'n  v. Dresser Industries, Inc.*, 628 F.2d 1368, 1375 (D.C. Cir. 1980); *Securities & Exch. Comm'n v. Tandem Mgt.*, No. 95 Civ. 8411, 2001 U.S. Dist. LEXIS 19109, *12 (S.D.N.Y. 2001) ("Where . . . the SEC brings a civil enforcement action that proceeds in parallel with a related criminal proceeding, it is often appropriate to stay the civil action pending resolution of the criminal proceedings.").

[9]    *See also Estate of Gaither*, 2005 U.S. Dist. LEXIS at *8; *Trustees of the Plumbers & Pipefitters National Pension Fund v. Transworld Mechanical, Inc.*, 886 F. Supp. 1134, 1139 (S.D.N.Y. 1995) (footnotes omitted).

by invoking negative inferences from it.  Faced with such a Hobson's choice, the only reasonable

and equitable alternative is for this Court to grant a stay of this action as to Mr. Bell until the

resolution of any criminal proceedings or the expiration of the criminal statute of limitation in

2008.[10]  Such a stay would not injure the SEC, judicial economy, or the public interest.  In fact,

the USAO moved for and obtained a stay in a related SEC case, indicating that the government's

interests are also advanced by permitting criminal matters to be resolved first.  *See*

Section III(B)(5), *infra*.

      **B.**     <u>**Each Factor Weighs Heavily In Favor Of A Stay**</u>

          **1.**     **The Issues In This Action Overlap Those In The Criminal Investigation**

A stay is most appropriate when "the civil and criminal actions involve the same subject

matter . . . and is even more appropriate when both actions are brought by the government."

*Brock v. Tolkow,* 109 F.R.D. 116, 119 (E.D.N.Y. 1985).  One court called the overlap of issues

between civil and criminal matters "the most important issue" in determining whether to grant a

stay.  *Walsh Securities,* 7 F. Supp. 2d at 527 (citations omitted).[11]  This factor is so critical

because the greater the similarity between the issues, the greater the probability for self-

incrimination from statements made by the defendant during the civil action.  *See Trustees of the*

*Plumbers and Pipefitters National Pension Fund v. Transworld Mechanical, Inc.*, 866 F. Supp.

---

[10]   The statute of limitations for the applicable potential criminal charges will expire no later than October 2008, which is five years after Ahold restated its financials for the years in question.  Complaint ¶ 6.  (The criminal statute of limitations is five years.  18 U.S.C. § 3282(a).).

[11]   *See also Volmar Distributors*, 152 F.R.D. at 39 ("The strongest case for granting a stay is where a party under criminal indictment is required to defend a civil proceeding involving the same matter."); *Ashworth v. Albers Medical, Inc.*, 229 F.R.D. 527, 531 (S.D. W. Va. 2005) ("[T]he requirement of the existence of a nexus between the parallel proceedings sufficient to show that such proceedings are related and involve substantially similar issues is the threshold factor for a stay."); *Adelphia*, 2003 U.S. Dist. LEXIS 9736 at *8 ("The similarity of the issues underlying the civil and criminal actions is considered the most important threshold issue in determining whether or not to grant a stay.").

1134, 1139 (S.D.N.Y. 1995); *Volmar Distributors*, 152 F.R.D. at 39 ("[D]enying a stay might

undermine a defendant's Fifth Amendment privilege against self-incrimination.").

Here, there is almost complete overlap between the issues in this action and the criminal

investigation, both of which involve agencies of the U.S. government.  The SEC alleges that in

signing a false audit confirmation letter for USF and sending a "side letter" to USF expressing

concern with several amounts contained in the audit confirmation letter, Mr. Bell violated

various securities laws.  *See* Section II(B)-(C), *supra*.  The USAO has similarly advised counsel

that Mr. Bell has been and remains under investigation for possible criminal violations of those

same statutes and regulations based on the very same facts.  Jacobs Aff. ¶¶ 2, 4.

Given the nearly complete overlap of issues and subject matter between this action and

the criminal investigation, this factor weighs heavily in favor of a stay.

**2.      Status Of The Criminal Proceeding:  Mr. Bell Faces A Tangible Threat Of Indictment**

A court may grant a stay "even though an indictment . . . has not yet been returned, if the

Government is conducting an active parallel criminal investigation."  *Walsh Securities,* 7 F.

Supp. 2d at 527.  So long as the prospect of a criminal indictment is neither "fanciful" nor

"imaginary," a stay is appropriate even where no criminal charges have been levied.  *United*

*States v. Certain Real Property & Premises Known As 1344 Ridge Road*, 751 F. Supp. 1060,

1063 (E.D.N.Y. 1989).  For example, in *Walsh Securities*, the court stayed a civil case even

though a criminal indictment had not been brought, where the Government was "conducting an

active parallel criminal investigation" and had informed civil defendants they were targets of a

criminal investigation.  7 F. Supp. 2d at 527.  The situation presented "a strong case for a stay"

because the defendants had indicated they would need to assert their Fifth Amendment privileges

extensively (such as in interrogatories and depositions), as providing substantive responses

would pose a substantial risk of self-incrimination.  *Id.*[12]

    The same tangible threat of indictment exists here.  Although Mr. Bell has not been

indicted by the USAO, the possibility of criminal indictment is neither fanciful nor imaginary.

The USAO has explicitly stated that Mr. Bell is a present target of its investigation.  Jacobs Aff.

¶ 4; *see also* Section III(B)(1), *supra*.  Moreover, the USAO has already indicted sixteen

individuals in substantially similar positions to Mr. Bell for virtually the same alleged conduct,

and the SEC has similarly filed civil charges against those same individuals.  Jacobs Aff. ¶ 3;

DOJ Press Releases; SEC Press Releases.[13]  This repeated, concerted action by the USAO and

SEC raises a strong inference that the second shoe will soon drop on Mr. Bell (the first one being

this Complaint), as it did on these other USF vendor employees.

    Given this tangible threat of indictment, this factor also weighs in favor of staying this

case.

    **3.**    **The Severe Burdens Imposed On Mr. Bell If This Case Proceeds Greatly Outweigh The Minimal Prejudice To Plaintiff If A Stay Is Granted**

    As discussed above, Mr. Bell faces a tangible threat of criminal prosecution.  Unless this

case is stayed, Mr. Bell would be forced to choose between defending himself in this case or

saving his best defense for the potential criminal case.  Despite his innocence, Mr. Bell has only

---

[12]  *See also Wehling v. Columbia Broadcasting Sys.*, 608 F.2d 1084, 1087 n.5 (5th Cir. 1979) (staying discovery until criminal statute of limitations had run where no indictment had been filed because, *inter alia*, a party who "reasonably apprehends a risk of self-incrimination" can claim Fifth Amendment privilege); *HealthSouth*, 261 F. Supp. at 1326-27 (granting stay even though defendant had not been indicted); *Ashworth*, 229 F.R.D. at 531, 533 (staying discovery without indictment until after United States Attorney's self-imposed deadline to file charges had run).

[13]  Each of the other criminal defendants held similar positions to Mr. Bell at their respective companies. DOJ Press Releases; SEC Press Releases.

one logical choice given the threat of jail time for a criminal conviction—to assert his Fifth Amendment privilege against self-incrimination throughout the civil matter.  *See, e.g., Adelphia,* 2003 U.S. Dist. LEXIS 9736 at *10 (a defendant faces a "substantial risk of self-incrimination" if a civil case is allowed to proceed where the civil and criminal issues are "closely intertwined"); *Doe v. Glazner*, 232 F.3d 1258, 1263 (9th Cir. 2000) ("the privilege against self-incrimination does not depend upon the *likelihood*, but upon the *possibility* of prosecution and also covers those circumstances where the disclosures would not be directly incriminating, but could provide an indirect link to incriminating evidence") (citations omitted, emphasis in original).

But asserting his Fifth Amendment privilege here will hamstring his defense to this case. Mr. Bell would, as mentioned, be precluded from making any statements in his own defense. The SEC could go a step further and seek to preclude Mr. Bell from attempting to introduce *any* evidence in his defense at trial.  *See Securities & Exch. Comm'n v. Cymaticolor Corp.*, 106 F.R.D. 545, 549-50 (S.D.N.Y. 1985).  The SEC could also attempt to use Mr. Bell's silence against him at trial.  *E.g., Baxter v. Palmigiano*, 425 U.S. 308, 318 (1976) ("[T]he Fifth Amendment does not forbid adverse inferences against parties to civil actions when they refuse to testify in response to probative evidence offered against them.")[14]  Any substantive participation in this action by Mr. Bell could also give the USAO an unfair advantage by expanding the scope of discovery beyond the limits of Federal Rule of Criminal Procedure 16(b) or by revealing Mr. Bell's criminal defense strategy.  *Certain Real Property*, 751 F. Supp. at 1062; *Dresser Industries*, 628 F.2d at 1376; *Adelphia*, 2003 U.S. Dist. LEXIS 9736 at *10.

---

[14]   *See also Securities & Exch. Comm'n v. International Loan Network, Inc.*, 770 F. Supp. 678, 695-96 (D.D.C. 1991) (relying on *Baxter* to draw a limited adverse inference against defendants who asserted their Fifth Amendment privilege); *Davis v. Northside Realty Assoc., Inc.*, 95 F.R.D. 39, 45 (N.D. Ga. 1982) ("Unfortunately for all the civil defendants, failure to respond, albeit for good cause, creates an adverse inference against those to whom the questions were submitted . . . . When the negative inferences are coupled with the assumption that the substantive allegations of the pleadings are true, a scenario is produced that is highly suggestive of a conspiracy.").

In sum, the potential prejudice to Mr. Bell if a stay is not granted would be severe. Such prejudice greatly outweighs any burden on the SEC if a stay is granted. At worst, the SEC would be delayed until the resolution of the criminal matter, or, if no charges are filed, until the expiration of the criminal statute of limitations. That statute will expire no later than October 2008. *See* n.10, *supra*. Such a delay is not extraordinary, especially in the context of complex securities litigation. Courts have issued stays when faced with much longer delays. *See Walsh Securities*, 7 F. Supp. 2d at 529 (a pre-indictment stay that could delay the civil case for years was not prejudicial to plaintiff because "[d]elays in civil cases are fairly common"); *Wehling*, 608 F.2d at 1088-89 (granting over three-year stay until criminal statute of limitations had expired) ("Although a three-year hiatus in the lawsuit is undesirable from the standpoint of both the court and the defendant, permitting such inconvenience seems preferable at this point to requiring plaintiff to choose between his silence and his lawsuit."); *HealthSouth Corp.,* 261 F. Supp. 2d at 1327, 1330 (indefinite stay of entire action proper until threat of criminal prosecution has subsided).

In any event, delay alone does not justify denial of a stay. *E.g., Adelphia*, 2003 U.S. Dist. LEXIS 9736 at *10; *Corbin v. Federal Deposit Insurance Corp.*, 74 F.R.D. 147, 149-50 (E.D.N.Y. 1977) (protecting a defendant's constitutional rights are more important than mere inconvenience or delay to the plaintiff); *Dienstag v. Bronson*, 49 F.R.D. 327, 329 (S.D.N.Y. 1970) ("While [a stay] will undoubtedly cause inconvenience and delay to plaintiffs, protection of defendants' constitutional rights against self-incrimination is the more important consideration."). Rather, the prejudice sufficient to deny a stay generally only arises where the stay would result in a "particularly unique injury, such as the dissipation of assets or an attempt to gain an unfair advantage from the stay." *Adelphia*, 2003 U.S. Dist. LEXIS 9736, at *11; *see*

*also Walsh Securities*, 7 F. Supp. 2d at 528; *Citibank v. Hakim*, No. 92 Civ. 6233, 1993 U.S. Dist. LEXIS 16299, *2 (S.D.N.Y. 1993).  There is no suggestion of any such unique injury here.[15]

In sum, any inconvenience that the SEC would suffer if a stay is granted does not outweigh the severe prejudice to Mr. Bell if a stay is denied.  These factors, like the others, strongly weigh in favor of a stay.

### 4.    A Stay Would Promote Judicial Efficiency

Judicial economy is another factor guiding the Court's determination of whether to stay a civil case.  This factor, too, supports Mr. Bell's motion.  Absent a stay, Mr. Bell would be forced to assert his privilege against self-incrimination frequently.  This could lead to significant motion practice over the scope of such assertions.  For example, the SEC could bring a motion each time Mr. Bell asserts the privilege (such as in response to the Complaint, written discovery, or deposition questions).  *See, e.g., Walsh Securities,* 7 F. Supp. 2d at 528 ("Without a stay, interrogatory and deposition discovery would likely cause inefficiency, because several defendants will be forced to assert Fifth Amendment privileges . . . [which would] burden the Magistrate Judge and this Court with deciding the constant stream of privilege issues . . . .")[16] Thus, a stay would promote judicial efficiency by avoiding onerous motion practice.

---

[15]   For example, there is no suggestion here that Mr. Bell is attempting to dispose of assets; that any alleged harm is continuing; or that Mr. Bell is even capable of continuing any alleged harm.  In fact, the Complaint alleges that Ahold publicly disclosed the USF vendor allowance fraud, which has presumably, therefore, ceased.  Complaint ¶ 6.  Moreover, the SEC's delay in bringing this action buttresses the conclusion that there is no "unique injury" here militating against a stay.

[16]   *See also Adelphia,* 2003 U.S. Dist. LEXIS 9736 at *15 (finding that a stay "promotes judicial efficiency" by preventing the court from having to decide a number of privilege issues during discovery); *Estate of Gaither,* 2005 U.S. Dist. LEXIS at *15-*16 (stay can promote judicial economy by avoiding "duplicative and unnecessary" discovery-related litigation over assertion of Fifth Amendment privilege).

5.    <u>A Stay Would Not Injure The Public Interest</u>

The final factor guiding the Court's discretion in issuing a stay is the public interest.  If a civil action will not mitigate the potential injury to the public, a stay pending the resolution of a criminal matter does not adversely impact the public interest.  *See Brock*, 109 F.R.D. at 119. Potential injury to the public exists only where there is a "tangible threat of immediate and serious harm to the public at large."  *Id*. at 120.  As explained above, no such threat exists here.

In fact, the District Court for the District of Maryland has twice stayed civil actions, including one brought by the SEC, involving the same facts and allegations as those alleged here. Those stays were granted *at the USAO's behest*.[17]  This manifests the government's belief that the civil action should yield to the criminal.

---

[17]    The first case, *Securities & Exch. Comm'n v. Resnick et al.*, is currently pending before Judge Catherine C. Blake in the District of Maryland (hereinafter, the "Resnick action").  Mr. Bell respectfully requests that the Court take judicial notice of the Docket Report in the Resnick action, Civil Case No. 1:05-cv-01254-CCB, a copy of which is attached as Exhibit "F" to the Request for Judicial Notice filed concurrently herewith (hereinafter the "Resnick Docket Report").  Fed. R. Evid. 201(b)(2), (d); *Veg-Mix, Inc. v. U.S. Dep't of Agriculture*, 832 F.2d 601, 607 (D.C. Cir. 1987) (stating that courts "may take judicial notice of official court records"); *Braude & Margulies, P.C. v. Fireman's Fund Ins. Co.*, No. 05-649, 2007 U.S. Dist. LEXIS 290, *8-*9 (D.D.C. Jan. 5, 2007) (On a motion to dismiss, "[a] court may take judicial notice of public records from other court proceedings," such as pleadings and exhibits to pleadings.)  Mr. Bell also requests that the Court take judicial notice of the Second Amended Complaint in the Resnick action (hereinafter the "Resnick SAC") and the original Complaint in that action (hereinafter, the "Resnick Complaint"), copies of which are attached as Exhibits "G" and "H," respectively, to the Request for Judicial Notice filed concurrently herewith.

The Resnick action involves the same type of audit confirmation letters at issue here.  Resnick SAC ¶¶ 9, 10, 27, 50; Resnick Complaint ¶¶ 7, 11; Complaint ¶¶ 24, 28.  The USAO filed a motion to intervene and to stay discovery in the Resnick action.  Resnick Docket Report, ¶¶ 15, 16, 18.  Although the court apparently never entered an order granting that motion (*see* Resnick Docket Report), the SEC recently represented to counsel for Mr. Bell that the court had granted the USAO's motion to stay.  Jacobs Aff. ¶ 9.  In addition, a recent letter from counsel to the court in the Resnick action suggests that a stay is currently in place.  Mr. Bell respectfully requests that the Court take judicial notice of a March 14, 2007 letter from Neil A. Steiner to Judge Blake, entry number 63 to the Resnick Docket Report, a copy of which is attached as Exhibit "I" to the Request for Judicial Notice filed concurrently herewith.

The second case, *In re: Royal Ahold N.V. Sec.*, is currently pending in the District of Maryland before the same judge handling the Resnick action, and also involves similar facts, parties, and evidence as those at issue here (hereinafter, the "Ahold action").  *See In re Royal Ahold N.V. Securities & ERISA Litig.*, 351 F. Supp. 2d 334, 348-49, 378-79 (D. Md. 2004).  Mr. Bell respectfully requests that the Court take judicial notice of the Docket Report in that case, Civil Case No. 1:03-md-01539-CCB, a copy of which is attached as Exhibit "J" to the Request for Judicial Notice filed concurrently herewith (hereinafter

-18-

In short, the public interest factor also weighs in favor of a stay.

Each of the relevant factors alone weighs in favor of staying this case. Cumulatively, their weight is very strong. Accordingly, the Court should stay this action as to Mr. Bell until the final resolution of the criminal investigation or the expiration of the criminal statute of limitations.

## IV.    IF THE COURT DECLINES TO STAY, IT SHOULD TRANSFER THIS CASE TO THE DISTRICT OF MARYLAND

### A.    Transfer To The District Of Maryland Is Appropriate Under 28 U.S.C. § 1404(a)

If the Court decides not to stay this action as to Mr. Bell, the Court should transfer it to the District of Maryland pursuant to 28 U.S.C. section 1404(a) ("Section 1404(a)"). This statute provides in pertinent part: "For the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought." Section 1404(a) gives the court "broad discretion" to adjudicate motions for transfer according to an "'individualized, case-by-case consideration of convenience and fairness.'" *Southern Utah Wilderness Alliance v. Norton*, No. 01-2518, 2002 U.S. Dist. LEXIS 27414, *6 (D.D.C. June 28, 2002) (quoting *Stewart Org. v. Ricoh Corp.*, 487 U.S. 22, 29 (1988)).

To establish that a transfer would be appropriate, the moving party must first make a threshold showing that the plaintiff originally could have brought the action in the proposed

---

Footnote continued…

"Ahold Docket Report"). The USAO also filed a motion to intervene and stay discovery in that case. Ahold Docket Report ¶ 112. The court granted that motion, stating in its Memorandum Opinion that a stay was warranted because of the overlap between the case and the USAO's pending criminal investigation, even though no criminal indictments had been issued. Mr. Bell respectfully requests that this Court take judicial notice of the Memorandum Opinion, entry number 153 to the Ahold Docket Report, a copy of which is attached as Exhibit "K" to the Request for Judicial Notice filed concurrently herewith.

forum.  *See, e.g., Gemological Inst. of Am., Inc. v. Thi-Dai Phan*, 145 F. Supp. 2d 68, 71 (D.D.C.

2001); *Liban v. Churchey Group II, L.L.C.*, 305 F. Supp. 2d 136, 139 (D.D.C. 2004); *Oceanic*

*Exploration Co. v. ConocoPhillips, Inc.*, No. 04-332, 2007 U.S. Dist LEXIS 7915, *16 (D.D.C.

Feb. 5, 2007).  Once venue in the proposed forum is established, the moving party must then

demonstrate that the considerations of convenience and the interests of justice weigh in favor of

a transfer.  *See, e.g., Devaughn v. Inphonic, Inc.*, 403 F. Supp. 2d 68, 72 (D.D.C. 2005); *Trout*

*Unlimited v. U.S. Dept. of Agric.*, 944 F. Supp. 13, 16 (D.D.C. 1996).  Both criteria are satisfied

here.

### 1.    Venue Is Proper In The District Of Maryland

Venue for violations of the federal securities laws is provided at 15 U.S.C. section 78aa.

That statute provides in pertinent part:

> Any criminal proceeding may be brought in the district wherein any act or transaction
> constituting the violation occurred.  Any suit or action to enforce any liability or duty
> created by this chapter or rules and regulation thereunder, or to enjoin any violation of
> such chapter or rules and regulations, may be brought in any such district or in the district
> wherein the defendant is found or is an inhabitant or transacts business.

Venue is proper in the District of Maryland under Section 78aa for two reasons.  First, the

SEC alleges that Mr. Bell transacted business in Maryland.  Specifically, the Complaint alleges

that Mr. Bell arranged for the sale of product to USF, a Maryland-based company.  *See* Section

II(B), *supra*.  It also alleges that Mr. Bell sent a false audit confirmation letter to USF's

independent auditors in Baltimore, Maryland, and sent a "side letter" to USF's headquarters in

Columbia, Maryland.  *See* Sections II(A), (B), *supra*.  Second, the SEC alleges that the violation

of the securities laws occurred in Maryland.  *See* Section II(B), *supra*.  Accordingly, the first

factor for a Section 1404(a) transfer is satisfied.

2.      **The Considerations Of Convenience And The Interests Of Justice Weigh In Favor Of Transferring This Action**

Moving on to the second factor, to determine whether convenience and justice weigh in favor of a transfer, courts consider the convenience of the parties and the witnesses, and the interests of justice. *Trout Unlimited*, 944 F. Supp. at 16. These factors are not exclusive, and a motion to transfer requires the court to adjudicate such motions on an individualized basis weighing "case specific factors relating to the private interests of the parties and the public interests of the courts." *S. Utah Wilderness Alliance*, 2002 U.S. Dist. LEXIS 27414 at *6; *see also Stewart Organization*, 487 U.S. at 30. The private interest factors include:

> (1) the plaintiff's choice of forum, unless the balance of convenience is strongly in favor of defendants; (2) the defendants' choice of forum; (3) whether the claim arose elsewhere; (4) the convenience of the parties; (5) the convenience of the witnesses, but only to the extent that the witnesses may actually be unavailable for trial in one of the fora; and (6) the ease of access to sources of proof.

*Trout Unlimited*, 944 F. Supp. at 16 (internal citations omitted); *see also Liban*, 305 F. Supp. 2d at 139. The public interest considerations include: "(1) the transferee's familiarity with the governing laws; (2) the relative congestion of the calendars of the potential transferee and transferor courts; and (3) the local interest of deciding local controversies at home." *Id.* As discussed below, analysis of these factors in the instant action weighs, on balance, decidedly in favor of transferring this action to the District of Maryland.

a.      **The Private Interest Factors Warrant Transferring This Action To The District Maryland**

The First Private Interest Factor: The SEC presumably prefers to litigate this action in this forum. But the plaintiff's choice of forum should be given little deference, because the District of Columbia has little factual nexus to the allegations against Mr. Bell. Indeed, the plaintiff's choice of venue "is mitigated where the plaintiff's choice of forum has 'no meaningful

ties to the controversy.'" *Trout Unlimited*, 944 F. Supp. at 17 (internal citations and quotations omitted). *See Securities & Exch. Comm'n v. Ernst & Young*, 775 F. Supp. 411, 414-15 (D.D.C. 1991) (motion to transfer pursuant to Section 1404(a) granted where "no underlying operative facts" arose in District of Columbia, and all relevant conduct besides the filings occurred in Texas).[18]  No defendant is a resident of this District.  *See* Section II(A), *supra*.[19]  USF is not a resident of this District.  *See id.*  Mr. Bell is not alleged to have aided and abetted any conduct that occurred in this District.[20]  More importantly, Mr. Bell is not alleged to have transacted any business in this District.  Rather, the Complaint alleges that Mr. Bell's wrongful conduct involved sending letters from California to Maryland.  *See* Section II(B), *supra*.  Further, while the Complaint alleges that USF contacted various vendors (including Mr. Bell) in an attempt to persuade them to sign and return false audit confirmation letters (Complaint ¶ 21), no such contact is alleged to have taken place in this District.

---

[18]   *See also Comptroller of Currency v. Calhoun First Nat'l Bank*, 626 F. Supp. 137, 149 n.9 (D.D.C. 1985) ("[P]laintiff's choice of forum is no longer entitled to a great deal of weight, particularly when there is an insubstantial factual nexus with the plaintiff's choice.") (internal citations omitted); *King v. Navistar Int'l Transit Corp.*, 709 F. Supp. 261, 262-63 & n.2 (D.D.C. 1989) (granting a transfer even though the plaintiff was a resident of Washington, D.C. because the relevant facts were so "inextricably linked to the state of Virginia, plaintiff's choice of forum cannot be given anything like the same consideration given in cases where the chosen forum has a true connection with the matter").

[19]   Counsel on behalf of plaintiff SEC apparently is based in the District of Columbia.  *See* Complaint at p. 25.  However, the location of counsel is immaterial to any Section 1404(a) balancing.  *See Securities & Exch. Comm'n v. Ernst & Young*, 775 F. Supp. 411, 416 (D.D.C. 1991).

[20]   Although the Complaint includes the vague and conclusory allegation that USF "made false and misleading statements in filings with the Commission and other public statements" (Complaint ¶ 22), the SEC does not identify any specific statements filed by USF in the District of Columbia.  The only specific filings alleged to have been made in this District were those of Ahold, not USF.  *Id.* ¶¶ 5-6.  The Complaint does not allege any connection between Mr. Bell and Ahold whatsoever, and thus it is immaterial whether Ahold may have made filings in this District.  Moreover, as set forth in greater detail in Section V(A), *infra*, USF is not an "issuer" of securities as defined in the relevant statutes and regulations of the Exchange Act.  USF thus had no obligation to file, and could not have filed, the books and records at issue under the statutes alleged in the second and third claims asserted against Mr. Bell.  Accordingly, USF had no relevant contact with this District.

The Second Private Interest Factor:  Mr. Bell's choice of forum is the District of Maryland.  Thus, the second private factor weighs in favor of transferring this action to that District.

The Third Private Interest Factor:  The alleged facts giving rise to the SEC's claims against Mr. Bell arose in Maryland, and therefore weigh in favor of transfer.  Indeed, the SEC alleges that Mr. Bell aided and abetted USF's scheme to overstate its income and create false reports, books and records by submitting an audit confirmation letter to USF's outside auditors in Baltimore, Maryland.  *See* Section II(B), *supra*.

The Fourth and Fifth Private Interest Factors:  The convenience of parties and witnesses also weighs in favor of transfer.  USF and its auditors are located in Maryland.  *See* Section II(B).  Thus, key witnesses from these companies presumably are at least employed in Maryland.[21]  It is anticipated that evidence and additional witnesses may also be located in Maryland.  The SEC would not be unreasonably inconvenienced if this action were to be transferred to the District of Maryland because Maryland and the District of Columbia are in close proximity.  More importantly, where the SEC is involved, the convenience factors generally weigh in favor of transfer, because "[t]he SEC regularly investigates and tries cases all over the country."  *Ernst & Young*, 775 F. Supp. at 415 ("minor litigation inconveniences" not sufficient to deny transfer because otherwise, "every enforcement action, regardless of where the underlying events took place, would be entertained in this District [Washington, D.C.] simply because the agency is located here.  This Court would be inundated.").

---

[21]  In the Resnick action (*see* n.17, *supra*), the SEC alleges in its Second Amended Complaint that the two former USF executives alleged to have been partly responsible for USF's alleged fraudulent scheme, Mark P. Kaiser and Michael Resnick, reside in Maryland.  Resnick SAC ¶¶ 9, 10, 27.  The SEC also alleges in that action that Mr. Kaiser signed the same audit confirmation letter at issue in the case at bar.  *Compare id.* ¶ 50, *with* Complaint ¶ 24.  Moreover, in its original Complaint in the Resnick action, the SEC alleges that the USF executive who allegedly countersigned Mr. Bell's side letter, William Carter,

The Sixth Private Interest Factor:  The ease of access to sources of proof weighs in favor of transfer.  Most of the relevant evidence is likely located in Maryland.  *See* Section IV(B)(3)(a), *supra*.

**b.    The Public Interest Factors Also Weigh In Favor Of Transferring This Action To The District Of Maryland**

The First Public Interest Factor:  The transferee's familiarity with governing laws is inapplicable here because any United States District Court is capable of adjudicating federal question cases.  *Liban*, 305 F. Supp. 2d at 143 ("A transferee federal court is competent to decide federal issues correctly.") (internal quotations omitted).

The Second Public Interest Factor:  There is no indication that a transfer to Maryland will lead to unnecessary congestion or delay.  Significantly, this case is in its early stages, and transfer at this early stage would not lead to unnecessary delay.  *Trout Industries*, 944 F.Supp. at 19 (transfer appropriate because case was in early stages and District of Columbia was not familiar with the underlying merits of either the case or any of the other issues in the suit).  Furthermore, transfer would promote judicial economy, as the District of Maryland presently is adjudicating two related cases, including (1) an SEC action involving USF's alleged fraudulent scheme to overstate its income through the use of audit confirmation letters (*see* n.17, *supra*);[22]

---

Footnote continued…

also resides in Maryland.  *Compare* Resnick Complaint ¶¶ 7, 11, *and* Resnick SAC ¶ 50, *with* Complaint ¶ 28.

[22]  This case, the Resnick action, involves claims by the SEC against the former Chief Marketing Officer of USF, Mark P. Kaiser, and USF's former Executive Vice President of Purchasing, Michael J. Resnick. The Second Amended Complaint in that action alleges that Messrs. Kaiser and Resnick were responsible in part, for the scheme to inflate USF's income that Mr. Bell is alleged to have aided and abetted. Resnick SAC ¶¶ 5, 9, 10, 27, 50; *see also* n.17, *supra*.

and (2) a private securities fraud action against numerous parties and individuals, including USF's parent company, Ahold.[23,24]

The Third Public Interest Factor: The local interest in having local controversies decided at home also weighs in favor of transfer to the District of Maryland. It is well-settled that "controversies should be resolved in the locale where they arise and where related litigation existed." *Kafack v. Primerica Life Ins. Co.*, 934 F. Supp. 3, 9 (D.D.C. 1996); *see also Trout Unlimited*, 944 F. Supp. at 19. As demonstrated above, the claims against Mr. Bell arose in the District of Maryland, and related litigation is pending there. That district thus has a strong interest in deciding a case involving a controversy that arose there and relates to a Maryland-based corporation. *See Oceanic Exploration*, 2007 U.S. Dist. LEXIS 7915, at *28 (public factors weighed in favor of transfer to the District where the defendant's headquarters was located).

## V.    IF THE COURT DECLINES TO STAY OR TRANSFER THIS CASE, IT SHOULD DISMISS THE COMPLAINT WITH PREJUDICE

For the reasons set forth above, this case should be stayed or, if not stayed, transferred to the District of Maryland. If and only if the Court declines to stay or stay, it must consider Mr. Bell's motion to dismiss under Fed. R. Civ. P. 12(b)(6) ("Rule 12(b)(6)").

A complaint may be dismissed under Rule 12(b)(6) if a plaintiff can prove no set of facts in support of its claim which would entitle it to relief. *Kowal v. MCI Communications Corp.*, 16

---

[23]   This case, the Ahold action, is currently pending in the District of Maryland before the same judge handling the Resnick action. *See* n.17, *supra*.

[24]   It should also be noted that the Resnick action originated in the Southern District of New York, but that court transferred the action to the District of Maryland on or about May 9, 2005. Mr. Bell respectfully requests that the Court take judicial notice of the transfer order of the Southern District of New York granting an alternative motion to transfer on April 28, 2005, entry number 46 to the Resnick Docket Report, a copy of which is attached as Exhibit "L" to the Request for Judicial Notice filed concurrently herewith. Fed. R. Evid. 201(b)(2), (d); *Veg-Mix, Inc.*, 832 F.2d at 607; *Braude & Margulies*, 2007 U.S. Dist. LEXIS 290, at *8-*9. Although the court in the Southern District of New York did not expound on its ruling, it is reasonable to conclude that it believed, as contended by Mr. Bell here, that an action in which the claims arose in Maryland and all relevant parties and evidence are located in Maryland is best suited for the District of Maryland.

F.3d 1271, 1276 (D.C. Cir. 1994) (citations omitted).  In assessing whether a complaint meets

this standard, the court "need not accept inferences drawn by plaintiffs if such inferences are

unsupported by the facts set out in the complaint.  Nor must the court accept legal conclusions

cast in the form of factual allegations."  *Id.* at 1276, *citing Papasan v. Allain,* 478 U.S. 265, 286

(1986); *Islamic American Relief Agency v. Gonzales*, 477 F.3d 728, 732 (D.C. Cir. 2007) (same)

(citations omitted).  "A court must pay deference to a plaintiff's allegations, but it is not proper

to assume that 'the [plaintiff] can prove facts which [he or she] has not alleged.'"  *Associated*

*General Contractors of California, Inc. v. California State Council of Carpenters,* 459 U.S. 519,

527 (1983).  Applying these standards, the Complaint fails to state a claim, and hence must be

dismissed.

### A.    Claims 2 And 3 Fail To State A Claim For Lack Of An Issuer

The Complaint purports to assert two claims under sub-sections of Securities Exchange

Act Section 13.[25]  Claim 2 is brought under Section 13(a), 15 U.S.C. § 78m(a).  It provides, in

pertinent part:

> Every *issuer* of a security registered pursuant to section 78l of this title shall file with the
> Commission, in accordance with such rules and regulations as the Commission may
> prescribe as necessary or appropriate for the proper protection of investors and to insure
> fair dealing in the security –
>
> > (1) such information and documents (and such copies thereof) as the Commission
> > shall require to keep reasonably current the information and documents required
> > to be included in or filed with an application or registration statement filed
> > pursuant to section 78l of this title....
> >
> > (2) such annual reports (and such copies thereof), certified if required by the rules
> > and regulations of the Commission by independent public accountants, and such
> > quarterly reports (and such copies thereof), as the Commission may prescribe.

15 U.S.C. § 78m(a) (emphasis added).

---

[25]    All subsequent references to "Section" are to the corresponding Section of the Securities Exchange
Act of 1934.  The Securities Exchange Act of 1934 will be referred to as the "Exchange Act."

Claim 3 is brought, ultimately, under Section 13(b)(2).  15 U.S.C. § 78m(b)(2).  Section 13(b)(2) applies only to "[e]very *issuer* which has a class of securities registered pursuant to section 78l of this title and every *issuer* which is required to file reports pursuant to section 78o(d) of this title. . . ."  *Id.* (emphasis added).  Section 13(b)(2)(A) requires such issuers to "make and keep books, records, and accounts, which, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the issuer. . . ."  15 U.S.C. § 78m(b)(2)(A).  Section 13(b)(2)(B) requires such issuers to "devise and maintain a system of internal accounting controls sufficient to provide reasonable assurances that" certain requirements are met (such as that transactions are executed in accordance with management's general or specific authorization).  15 U.S.C. § 78m(b)(2)(B).  Section 13(b)(5) provides that "[n]o person shall knowingly circumvent or knowingly fail to implement a system of internal accounting controls or knowingly falsify any book, record, or account described in paragraph (2)."  15 U.S.C. § 78m(b)(5) .  Similarly, SEC Rule 13b2-1 provides that "[n]o person shall directly or indirectly, falsify or cause to be falsified, any book, record or account subject to" Section 13(b)(2)(A).  17 C.F.R. § 240.13b2-1

There is a common element in all of these statutes:  the word "issuer."  Indeed, the Complaint acknowledges that Section 13(a), the purported basis for Claim 2, requires "every *issuer* of a registered security" to file accurate SEC reports, and that the statutes and rule forming the purported basis for Claim 3 "require each *issuer* of registered securities" to keep accurate books and records, and adequate internal controls.  Complaint ¶¶ 100, 103 (emphasis added).  "Issuer" is a defined term in the Exchange Act.  "The term 'issuer' means any person who issues or proposes to issue any security."  15 U.S.C. § 78c(c)(8).

Only one company is alleged to be an issuer in the Complaint: Ahold. The Complaint, however, does not allege any interaction whatsoever between Mr. Bell and Ahold—let alone with Ahold's SEC filings, books and records, or internal controls, the necessary subject matter of Claims 2 and 3.[26] Indeed, the Complaint repeatedly acknowledges the absence of any connection between Mr. Bell and Ahold with respect to the pertinent subject matter of a viable false SEC reports or false books and records claim. The Complaint alleges that the letter pertained to USF, not Ahold, *see* Section II(B), *supra*; and the Complaint alleges that Mr. Bell knew that the letter would "misstate *USF's* books and records" and "mislead *USF's* independent auditors." Complaint ¶ 32 (emphasis added). Consequently, Ahold is irrelevant to the claims at issue.

The Complaint also alleges that Mr. Bell interacted with unspecified person(s) at USF, and was asked about USF's books and records. But the Complaint does not characterize USF as an issuer, nor allege facts which, if true, qualify USF as an issuer. The Complaint does not allege that USF issued any "security registered pursuant to section 78l of this title," the jurisdictional requirement under Section 13(a) and Claim 2. The Complaint does not allege that USF was "required to file reports pursuant to section 78o(d) of this title," the jurisdictional requirement under Section 13(b)(2) and Claim 3. The Complaint does not identify any false or misleading SEC filing or public statement made by USF.

Consequently, even accepting the allegations of the Complaint regarding USF and Mr. Bell as true, USF is not an issuer, and hence the allegations cannot state a claim for violation of the statutes and rule invoked in Claims 2 and 3. *See Securities & Exch. Comm'n v. Dauplaise*, No. 6:05 CV 1391 ORL 31KRS, 2006 WL 449175, *7 (M.D. Fla. Feb. 22, 2006) (Section 13(b)(2)(A) and Rule 13b2-1 "essentially require *publicly held corporations* to keep accurate

---

[26]  Nor does the Complaint identify any Ahold SEC filings that were false or misleading, even though that company's SEC filings are a matter of public record. Claim 2 may be dismissed on that basis too.

records and accounts.") (*quoting United States v. Wilson*, No. 01 Cr. 53, 2001 WL 798018, *6

(S.D.N.Y. July 13, 2001)) (emphasis added).  Accordingly, these claims must be dismissed

**B.**    **Claim 1 Fails To State A Claim**

Claim 1 purports to allege that Mr. Bell aided and abetted another person's securities

fraud, in violation of Exchange Act Section 10(b) and the accompanying SEC Rule 10b-5.  15

U.S.C § 78j(b), 17 U.S.C. § 240,10b-5.[27]  The Complaint fails to state at least three elements of

this claim:  knowingly rendering substantial assistance to a securities fraud, the "in connection

with" element of a securities fraud claim, and materiality.  Consequently, this claim, too, must be

dismissed under Rule 12(b)(6).

**1.**    **The Complaint Does Not Allege That Mr. Bell Knowingly Rendered
Substantial Assistance To A Securities Fraud**

To state a claim for aiding and abetting liability, the SEC must plead that (1) a primary

violator committed a securities violation;[28] (2) the alleged aider and abettor had a general

awareness of his role in the violation; and (3) the aider and abettor knowingly rendered

substantial assistance in furtherance of it.  *Investors Research Corp. v. Securities  & Exch.

Comm'n*, 628 F.2d 168, 178 (D.C. Cir. 1980).  The defendant must know the wrongful character

of the activity, not merely have knowledge of the activity which led to the wrong.  *Howard v.

Securities & Exch. Comm'n*, 376 F.3d 1136, 1143 (D.C. Cir. 2004) (awareness of wrongdoing

element of willfully aiding and abetting a securities law violation not shown where SEC target

knew of transactions but was not aware of any wrongdoing therein); *Vidosh v. Holsapple*, Civ.

A. No. 84 CV2447 DT, 1987 WL 273164, *17 (E.D. Mich. 1987).  The underlying primary

---

[27]    As Mr. Bell's contentions do not depend upon any distinction between Section 10(b) and Rule 10b-5, the remainder of the brief will refer to Section 10(b), and apply also to Rule 10b-5.

[28]    The Complaint does not identify who committed any primary violation of Section 10(b), or what that violation entailed.  It may be dismissed on this basis alone.

violation in the Complaint, and hence the aiding and abetting claim purportedly asserted as

Claim 1, is for securities fraud under Section 10(b).  Accordingly, Claim 1 sounds in fraud, and

must meet the particularity standards of Fed. R. Civ. P. 9(b).  *Securities & Exch. Comm'n v. Orr*,

No. 04-74702, 2006 WL 542986, *8 (E.D. Mich. Mar. 6, 2006); *Securities & Exch. Comm'n v.

Solow*, No. 06-81041-CV, 2007 WL 917269, *4 (S.D. Fla. Mar. 23, 2007).

To determine whether the defendant had a "general awareness" that his activity is

improper, a court must consider "the surrounding circumstances and expectations of the parties."

*Securities & Exch. Comm'n v. Washington County Utility Dist.*, 676 F.2d 218, 226 (6th Cir.

1982).  In this case, the alleged circumstances surrounding the proffer of the USF letter to Mr.

Bell do not allow an inference that he knew he was rendering assistance to a securities fraud, or

indeed that he rendered substantial assistance.  Rather, the only reasonable inference is that Mr.

Bell had no such knowledge, and took no such action.  *See Securities & Exch. Comm'n v.

Morris*, No. Civ. A. H-04-3096, 2005 WL 2000665, *10 (S.D. Tex. Aug. 18, 2005 ("In this case,

…, the SEC has alleged no facts showing that the defendant knew or was severely reckless in not

knowing of his participation in a fraudulent scheme.").

Claim 1 is based solely on the letter proffered by USF to Mr. Bell.  But the Complaint

itself alleges that Mr. Bell was told that the information in the letter represented just the *internal*

numbers of USF.   *See* Section II(B), *supra*.  The only reasonable inference from the allegation is

that Mr. Bell would *not* have understood that the letter had any connection whatsoever to any

external statements (including financial statements) made to investors.  Absent a false or

misleading statement to investors, there can be no underlying securities fraud that Mr. Bell could

have aided or abetted.  *Dura Pharmaceuticals, Inc. v. Broudo*, 544 U.S. 336, 125 S.Ct. 1627,

1631 (2005) (false or misleading statement is a basic element of a §10(b) claim).  Nor can it be

said that Mr. Bell consciously threw in his lot with any primary securities fraud violators, where he was informed that the letter had nothing to do with any external statements to investors. *Securities & Exch. Comm'n v. Tambone*, 417 F. Supp. 2d 127, 137 (D. Mass. 2006) (aiding and abetting claim dismissed where SEC "has made no allegation that the defendants consciously threw in their lot with the primary violators.").

For this reason alone, the Complaint does not allege that Mr. Bell knowingly rendered substantial assistance to a securities fraud. *SEC v. Orr*, 2006 WL 542986, provides a pertinent analogy. In *Orr*, the SEC alleged that Bixler, an employee of a vendor of Kmart, engaged in securities fraud and aided and abetted Kmart in committing securities fraud, by signing a vendor allowance form (known as a VATS) which misrepresented the effective date and terms of the contract between Kmart and the vendor, and hence allowed Kmart to record improper vendor allowance revenue. The court granted Bixler's motion to dismiss the aiding and abetting claim based on the absence of allegations that he "had a general awareness that his actions were part of an improper scheme or that he knowingly provided substantial assistance in the same." *Id.* at *13. In so holding, the court accepted Bixler's contention that the complaint did not allege that he "had knowledge that the VATS form would be used by Kmart as the basis for recording the transaction. . . ." *Id.* at *4. In this case, too, the Complaint does not allege that Mr. Bell knew that the USF letter was to be used for any purpose with respect to any external statements (including financial statement) of USF, let alone for an improper purpose or scheme. Rather, the Complaint alleges that the letter was proffered for internal purposes only, and for a company (USF) that did not issue securities or make public statements to investors.

In opposition to this motion, the SEC may assert that the Complaint alleges substantial assistance to a securities fraud notwithstanding USF's representation that the numbers in the

letter were for internal purposes only. However, the Complaint does not contain any other allegations which, if true, show that Mr. Bell was informed or believed that the numbers were to be used for any external public statements regarding any securities, or for that matter any scheme involving securities. Rather, the Complaint allows only the contrary inference, based on what it does *not* allege. According to the Complaint, the letter pertained only to USF and its auditors and public statements. *See* Section II(B), *supra*. But the Complaint does not allege that USF issued any securities or made any public statements. *See* Section II(A), *supra*. Thus, accepting all the Complaint's allegations as true, Mr. Bell cannot possibly have been informed that the letter had anything to do with a securities fraud. There was no indication that anyone intended to make any public statements to investors; there was no indication that anyone intended to make any statements about securities; there was no indication that any public company was involved whatsoever in the USF letter. There was nothing even so much as resembling a securities fraud presented to Mr. Bell.

### 2. The Complaint Does Not Allege Any Fraud In Connection With The Purchase Or Sale Of Securities

As explained in the previous section, to state an aiding and abetting claim, the SEC must allege an underlying securities fraud claim under Section 10(b). Not every fraud is a *securities* fraud falling within the ambit of that statute. Rather, there must be a false or misleading statement, or a scheme to defraud, "in connection with the purchase or sale of any security...." 15 U.S.C. § 78j(b); *Blue Chip Stamps v. Manor Drug Stores,* 421 U.S. 723, 730-31 (1975). The "in connection with" element need not involve a misrepresentation about the inherent value of a particular security. *Securities & Exch. Comm'n v. Zandford,* 535 U.S. 813, 820 (2002). Nevertheless, a fraud must coincide with a securities transaction, whether by the plaintiff or by someone else, for the "in connection with" element to be satisfied. *Merrill Lynch, Pierce Fenner*

*& Smith v. Dabit*, 547 U.S. ___, 2006 WL 694137, *7 (Mar. 21, 2006), *citing United States v. O'Hagan*, 521 U.S. 642, 651 (1997).

It follows that if there are no securities or securities transactions involved, there can be no Section 10(b) claim. For example, in *Chemical Bank v. Arthur Andersen & Co.*, 726 F.2d 930 (2d Cir. 1984), the Second Circuit considered a Section 10(b) claim brought by four banks against the accountants of their common borrower. The banks alleged that the accountants had certified false financials on which the banks had relied in making the loans, which were evidenced by promissory notes issued by the lender. *Id.* at 933. The Court held that the promissory notes were not "securities" for purposes of the "in connection with" requirement, and that as a result the Section 10(b) claim must be dismissed for failure to allege violations of the federal securities laws. *Id.* at 945.

The same result should obtain here. The only company alleged to have contacted Mr. Bell was USF, and USF is not alleged to have issued securities or made any statements to investors regarding securities. *See* Section II(A), *supra*. The absence of an alleged connection between anything Mr. Bell did (or did not do) and any securities, securities communication, or securities transaction, precludes a finding that the Complaint satisfies the "in connection with" element.

### 3. The Complaint Does Not Allege A Material Misstatement Resulting From Mr. Bell's Alleged Conduct

As explained above, to state an aiding and abetting claim, the SEC must allege an underlying securities fraud claim under Section 10(b). A Section 10(b) claim requires, among other elements, a false statement or omission of *material* fact to investors. *Dura Pharmaceuticals*, 125 S.Ct. at 1631 (materiality is a basic element of a § 10(b) claim); *Greenhouse v. MCG Cap. Corp.*, 392 F.3d 650, 656 (4th Cir. 2004) ("The plain language of Rule

10b-5 … requires any successful securities-fraud suit to allege a fact that is both untrue *and* material.") (emphasis in original).  The Complaint does not plead any material misstatement to investors resulting from Mr. Bell's alleged conduct, even accepting its allegations as true.

### a.    The Theoretical Overstatement From The Hunt-Wesson Vendor Allowance Is Quantitatively Immaterial

As previously explained, it requires speculation and conjecture to find *any* materiality allegations in the Complaint.  *See* Section II(D), *supra*.  The closest the Complaint comes to a connection between Mr. Bell and any misstatement to investors is that Ahold overstated its 2001 net income by slightly over €5 million, representing the vendor allowance from Hunt-Wesson set forth in the USF letter.  This represents an overstatement of only 0.46%.  *Id.*

Numerous courts have held as a matter of law that a difference of this tiny magnitude is irrelevant to investors.  *See Parnes v. Gateway 2000, Inc.*, 122 F.3d 539, 547 (8th Cir. 1997) (alleged overstatement of assets by 2% is immaterial as a matter of law); *In re First Union Sec. Litig.*, 128 F. Supp. 2d 871, 895 (W.D.N.C. 2001) (alleged understatement of losses immaterial as a matter of law, where misstatement reflected 2.1% of operating earnings and 2.8% of earnings after charges); *In re Segue Software, Inc. Sec. Litig.*, 106 F. Supp. 2d 161, 171 (D. Mass. 2000) (revenue recognition claims dismissed where, *inter alia*, challenged transactions represented approximately 2.6% of sales).[29]  The same principle applies here.  Ahold told investors that it earned over €1.1 *billion* in net income for 2001.  Even if Ahold did not recognize

---

[29]  *See also Mathews v. Centex Telemanagement, Inc.*, No. C-92-1837-CAL, 1994 WL 269734, *6-7 (N.D. Cal. June 8, 1994) (alleged understatement of reserves by 2% immaterial as a matter of law); *Schuster v. Symmetricom, Inc.*, No. 94-20024 RMW, 2000 WL 3315909, *7 (N.D. Cal. Aug. 1, 2000) (alleged improper inflation of revenue by 2% immaterial as a matter of law); *In re Convergent Techs. Second Half 1984 Sec. Litig.*, 1990 WL 606271, *10 (N.D. Cal. Jan. 10, 1990) (alleged improper inflation of revenue by 1.5% immaterial as a matter of law); *Pavlidas v. New England Football Club, Inc.*, 675 F. Supp. 688, 692 (D. Mass. 1986) (failure to disclose additional 1% of revenue immaterial as a matter of law); *accord, In re PetsMart, Inc. Sec. Litig.*, 61 F. Supp. 2d 982 (D. Ariz. 1999) ("under Ninth Circuit precedent, shortfalls of 10% or less may be immaterial as a matter of law"); *In re SCB Computer Tech,*

€5 million in revenue or income from the Hunt-Wesson vendor allowance (assuming *arguendo* that it did), it still would have reported over €1.1 billion in net income for 2001. Investors would not have assessed Ahold's performance any differently had it disclosed its net income without including the Hunt-Wesson vendor allowance.

> **b.    The Complaint Does Not Allege Any Other Reason Why Such A Tiny Overstatement Is Material For Section 10(b) Purposes**

As shown in the previous section, on a quantitative basis, the Complaint does not allege the material misstatement required for Section 10(b) liability. Mr. Bell recognizes that several courts have declined to consider materiality at the pleading stage. This reticence was stimulated by *Ganino v. Citizens Utilities Co.*, 228 F.3d 154 (2d Cir. 2000), in conjunction with SEC Staff Accounting Bulletin 99 ("SAB 99"), 64 FED. REG. 45150 (Aug. 19, 1999). *Ganino* reversed the dismissal of a securities case predicated on a district court's holding that the alleged falsely recorded transactions led to only a 1.7% misstatement of the defendant company's annual revenue. 228 F.3d at 162. The Court agreed with the plaintiffs and the SEC (which filed an amicus brief) that the district court had erred in its "exclusive reliance on a single numerical or percentage benchmark to determine materiality." *Id.* In so holding, the Court cited and relied on SAB 99, notwithstanding the fact that SAB 99 does not have the force of law. *Id.* at 163. The Court then found that that the complaint had alleged a material misstatement of financials on other bases than the alleged inflation of revenues. *Id.* at 164-65.

SAB 99 addresses the concept of materiality, not for purposes of assessing § 10(b) liability but rather for accounting and books and records purposes. *See* 64 FED. REG. at 45150 (posing hypothetical question of whether small deviation from GAAP is immaterial and hence

---

Footnote continued…

*Inc. Sec. Litig.*, 149 F. Supp. 2d 334 (W.D. Tenn. 2001) (scienter not pleaded where challenged transactions affected 1.65% to 2.9% of revenues).

that the accounting is permissible); *id.* at 45153 (raising issue for books and records provisions of Exchange Act). As *Ganino* recognizes, SAB 99 opines that there may be reasons why a divergence from proper accounting that is small when measured by one metric is nevertheless material in other respects. 228 F.3d at 163 ("Qualitative factors may cause misstatements of quantitatively small amounts to be material.") (*quoting* 64 FED. REG. at 45152). Thus, for example, the *Ganino* plaintiffs stated a claim because the allegedly false revenue constituted 15.78% of the company's annual *income*, which was a much more significant and meaningful number than the amount by which it inflated annual *revenue* (1.7%); and because the false revenue allegedly allowed the company to maintain a trend of increasing quarterly income. 228 F.3d at 166. SAB 99 conjectures other reasons why a divergence from proper accounting that is small when measured in one respect may be significant when assessed in other respects. For example, a small misstatement may allow an issuer to meet analysts' expectations, turn a loss into a profit, or conceal an unlawful transaction. 64 FED. REG. at 45152.

As *Ganino* recognized, SAB 99 is not the law. It is especially not the law for purposes of assessing Section 10(b) liability, which SAB 99 does not even purport to address. But even if SAB 99 were the law, the Complaint does not allege any reason why a theoretical overstatement of €5 million in annual net income from the Hunt-Wesson vendor allowance for an issuer that reported more than 200 times that amount of net income would be material to investors, such that the inclusion of such a trivial amount would constitute a material misstatement for Section 10(b) purposes. For example, the Complaint does not allege that there was some financial metric, analogous to net income in *Ganino*, that was inflated by a significant percentage as a result of the Hunt-Wesson vendor allowance. Likewise, the Complaint does not allege that as a result of the Hunt-Wesson vendor allowance, Ahold was able to meet analysts' expectations, maintain a

favorable trend, or turn a loss into a profit.  Consequently, the Complaint does not allege the

material misrepresentation required to state an underlying Section 10(b) claim arising from Mr.

Bell's alleged conduct.

Nor may the Complaint state a Section 10(b) claim against Mr. Bell by alleging that any

unlawful transaction *which Ahold was obliged to disclose* was concealed by the inclusion of the

€5 million, as SAB 99 may suggest.  In this regard, the Court cannot lose sight of basic Section

10(b) law, which SAB 99 fails to address.  Section 10(b) liability cannot arise unless there is a

positive duty to disclose.  *Gallagher*, 269 F.3d at 809; *Basic, Inc. v. Levinson,* 485 U.S. 224

(1988) (silence does not lead to 10b-5 liability absent duty to disclose).[30]  But there was no

generalized duty to disclose the Hunt-Wesson vendor allowance simply because investors might

find it significant or meaningful.  *Gallagher v. Abbott Laboratories, Inc.*, 269 F.3d 806, 809 (7th

Cir. 2001); *Backman v. Polaroid Corp*., 901 F.2d 10, 12 (1st Cir. 1990).  Nor did Ahold have a

duty to disclose the Hunt-Wesson allowance on the basis that it was illegal to recognize the

transaction.  To the contrary, there is no duty to disclose uncharged illegal or improper acts, even

if investors might find that information interesting or probative.  *See In re Citigroup, Inc. Sec.*

*Litig.,* 330 F. Supp. 2d 367, 377 (S.D.N.Y. 2004).  As one court explained,

> In other words, the fact that a corporation's employees engaged in illegal conduct may
> well be material to the reasonable investor for several obvious reasons, but the obligation
> to disclose uncharged illegal conduct does not arise from the materiality of this
> information alone.  Rather, in the present context, a duty to disclose uncharged illegal
> conduct arises when it is necessary to disclose this conduct under the terms of a statute or
> regulation, or when it is necessary to disclose this conduct in order to prevent statements
> the corporation does make from misleading the public.

---

[30]  SAB 99's failure to address Section 10(b) is but one reason why, if SAB 99 is proffered for the
proposition that a material misstatement for Section 10(b) liability purposes exists if a statement fails to
disclose something for which there is no duty to disclose, SAB 99 simply is wrong.

*Menkes v. Stolt-Nielsen S.A.,* No. 3:03 CV 409 (DJS), 2005 WL 3050970, *7 (D. Conn. Nov. 10, 2005).

Here, the Complaint does not allege that Ahold made any statement that was rendered false or misleading in any material respect as a result of the Hunt-Wesson vendor allowance. The only statements that are even remotely suggested in the Complaint are Ahold's financial statements. As explained above, those financials were not rendered materially false as a matter of law by the inclusion of the relatively tiny Hunt-Wesson vendor allowance. *See* Section V(B)(2)(i), *supra*. Therefore, there is no alleged material misstatement. Without a material misstatement, there is no underlying Section 10(b) claim for Mr. Bell to have aided or abetted.

### C.    The Complaint Should Be Dismissed Without Leave To Amend

While leave to amend is liberally granted under Fed. R. Civ. P. 15(a), it is properly denied if any amendment would be futile. *Baker v. Library of Congress*, 260 F. Supp. 2d 59, 68 (D.D.C. 2003) ("Because the Court agrees with defendants that plaintiff's proposed amendment would be futile, plaintiff's motion to file a second amended complaint is denied."). An amended complaint is futile if it merely restates the same facts as the original complaint in different terms, reasserts a claim on which the court previously ruled, fails to state a legal theory, or could not stand a motion to dismiss. *Adair v. Johnson*, 216 F.R.D. 183, 186 (D. D.C. 2003) (internal citations omitted).

Here, the SEC cannot amend to save any of its claims. The SEC cannot amend to save Claim 2 (false SEC filings of an issuer) or Claim 3 (false books and records of an issuer) because USF simply is not an issuer. The SEC cannot amend to save Claim 1 (that Mr. Bell knowingly rendered substantial assistance to a securities fraud) because it already has alleged that Mr. Bell was told that the USF letter was solely for internal purposes. The Complaint's allegation in this regard is binding on the SEC. *Fund For Animals, Inc. v. Norton*, 322 F.3d 728, 734 (D.C. Cir.

2003) (party's pleading is "admissible evidence in support of its opponent's cause.").  The SEC

cannot change course and plead that Mr. Bell was informed that there was an external purpose to

the letter.  Moreover, even if the SEC could so allege, it would still be left with a letter pertaining

solely to a company (USF) that did not issue any securities and did not make any public

statements.

 For all of these reasons, the Complaint should be dismissed without leave to amend.

## VI. <u>CONCLUSION</u>

 For the foregoing reasons, this case should be stayed.  If it is not stayed, it should be

transferred to the District of Maryland.  If this case is not stayed or transferred, the Complaint

should be dismissed for failure to state a claim.


    Respectfully submitted,


    /s/ Nancy A. Luque     
    Nancy A. Luque (DC Bar # 419757)
    Matthew G. Jacobs (*Pro Hac Vice* App. Pending)
    David Priebe (*Pro Hac Vice* App. Pending)
    Attorneys for Defendant Gary Bell
    DLA PIPER US LLP
    400 Capitol Mall, Suite 2400
    Sacramento, CA  95814
    (916) 930-3200
    (916) 930-3201 (fax)

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br><br>*Plaintiff,*<br><br>v.<br><br>GARY G. BELL, JOSEPH GRENDYS,<br>ANTHONY HOLOHAN, and MICHAEL SMITH,<br><br>*Defendants.* | Civil Action No. 1:07CV00120<br><br>ORAL ARGUMENT REQUESTED |

**AFFIDAVIT OF MATTHEW G. JACOBS IN SUPPORT OF GARY BELL'S MOTION TO STAY, OR IN THE ALTERNATIVE TO TRANSFER TO THE DISTRICT OF MARYLAND, OR IN THE ALTERNATIVE TO DISMISS FOR FAILURE TO STATE A CLAIM**

Matthew G. Jacobs, being first duly sworn, deposes and states as follows:

1.      I am a partner at DLA Piper US LLP, counsel for defendant Gary Bell in this action.  I make this Affidavit in support of Gary Bell's Motion to Stay, or in the Alternative to Transfer to the District of Maryland, or in the Alternative to Dismiss for Failure to State a Claim. I have personal knowledge of the following matters, and if called as a witness, could and would testify to them.

2.      In October 2004, Mr. Bell retained me to represent him in connection with an investigation by the Securities and Exchange Commission ("SEC") relating to allegations that vendors of U.S. Foodservice, Inc. ("USF") violated various securities laws by submitting false audit confirmation letters to USF's auditors.  In a very early conversation with one of the SEC attorneys working on the investigation that has since developed into this case, he kindly informed me that I should also be speaking with the United States Attorney's Office for the Southern District of New York ("USAO").  I then called that office and spoke with Assistant

1

U.S. Attorney James Cavoli, who told me that the USAO was conducting an investigation that paralleled the SEC's, and that that Mr. Bell was a target of the USAO's investigation, along with numerous other, similarly-situated, individuals who worked for USF vendors. (Mr. Bell retained me to represent him in the criminal investigation as well.) On November 16, 2004, I met with Mr. Cavoli at his office in Manhattan to discuss the case.

3.      On January 13, 2005, the USAO issued a press release in which it announced that it had filed criminal charges against nine individuals who were similarly-situated to Mr. Bell in that they were employees of USF vendors who had allegedly submitted false audit confirmation letters to USF. On the same date, the SEC issued a press release in which it announced that it had filed civil charges against those same nine individuals. The civil charges mirrored the USAO's criminal charges.

Almost ten months later, on November 2, 2005, the USAO issued an additional press release announcing that it had filed criminal charges against seven other individuals who were also employees of USF vendors who had allegedly submitted false audit confirmation letters to USF. The SEC issued a press release the same day announcing that it had filed civil charges mirroring the USAO's criminal charges. Each of the four press releases referenced in this and the preceding paragraph is attached to the Request for Judicial Notice filed concurrently with this Affidavit.

4.      Since meeting with Mr. Cavoli in November 2004, I have had several more conversations by telephone and in person with Assistant U.S. Attorneys ("AUSA") or Special Assistant U.S. Attorneys ("SAUSA") regarding Mr. Bell's status in their criminal investigation. (My understanding was that the Special Assistant U.S. Attorney, Alex Lipman, was on assignment to the USAO from the SEC.) Most recently, on January 18, 2007 – the same day the

SEC filed its Complaint in this matter – I spoke with SAUSA Lipman and AUSA Lawrence Gerschwer. They confirmed that Mr. Bell remains a present target of their investigation, which remains open and active.

5.      Based on my understanding of the nature and scope of the USAO's criminal investigation, my review of the Complaint in this action and the criminal and civil charges filed previously by the USAO and the SEC against individuals who are similarly-situated to Mr. Bell, I have concluded – and I doubt that the SEC or the USAO would deny – that there is a strong factual overlap between this civil case and the pending criminal investigation.

6.      In light of the pending criminal investigation, I would be remiss as a defense attorney if I did not advise Mr. Bell to assert his privilege against self-incrimination and decline to answer any questions posed to him in this case, either in discovery or at trial. In fact, given the overlap between the SEC's claims in this action and the matters at issue in the pending criminal investigation, I cannot imagine any substantive question that could be posed to Mr. Bell or any statements that Mr. Bell could make in this action that would not implicate his privilege against self-incrimination.

7.      On April 10, 2007, I spoke by telephone with two of the SEC attorneys handling this matter, Charles D. Stodghill and Matthew B. Greiner, in an effort to meet and confer on Mr. Bell's non-dispositive motions. I informed Messrs. Stodghill and Greiner that I intended to file a motion to dismiss or transfer pursuant to 28 U.S.C. section 1406, an alternative motion to transfer under 28 U.S.C. section 1404, and a motion to stay the action as to Mr. Bell until the resolution of the pending criminal investigation of Mr. Bell or the expiration of the criminal statute of limitations.

SA\8067800.2

8.    After discussing our respective positions for some time, we were unable to come to any agreement, and Messrs. Stodghill and Greiner informed me that they would oppose any motion to dismiss or transfer on the basis of venue, as well as any motion to stay.  However, after the telephone conference, and based in part on statements made by Messrs. Stodghill and Greiner, I decided not to bring a motion to dismiss or transfer under 28 U.S.C. section 1406, and to move instead for a stay and, in the alternative to transfer under 28 U.S.C. section 1404. Because Mr. Bell's motion to dismiss is a dispositive motion, I did not discuss that motion with Messrs. Stodghill and Greiner.

9.    During the same call, Messrs. Stodghill and Greiner also informed me that the SEC's action against Michael Resnick and Mark Kaiser currently pending in the District of Maryland had been stayed after the USAO moved to intervene and stay because of its parallel criminal investigation.  They also informed me that the private shareholder action against Royal Ahold in the District of Maryland was stayed after the court granted a similar motion to intervene and stay by the USAO.

I hereby declare and affirm under the penalty of perjury under the laws of the United States that the foregoing statements are true and correct.

_____
Matthew G. Jacobs

Subscribed and sworn
to before me this 13
day of April, 2007.

_____
Notary Public

My Commission Expires:

PAULA K. BORGENS
Commission # 1484427
Notary Public - California
Sacramento County
My Comm. Expires Apr 20, 2008

4

SA\8067800.2