# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF THE DISTRICT OF COLUMBIA

SECURITIES AND EXCHANGE
COMMISSION,

        Plaintiff,

        v.

GARY G. BELL, JOSEPH GRENDYS,
ANTHONY HOLOHAN, and
MICHAEL SMITH,

        Defendants.

)
)
)
)
)
)
)
)
)
)
)
)
)

Case No. 1:07-cv-00120-CKK

Judge Colleen Kollar-Kotelly

## <u>DEFENDANT JOSEPH GRENDYS'S MOTION TO DISMISS</u>

Pursuant to Federal Rules of Civil Procedure 12(b)(2), 12(b)(3), and 12(b)(6), defendant Joseph Grendys ("Mr. Grendys") hereby moves the Court for an order dismissing plaintiff Securities and Exchange Commission's ("SEC") Complaint against him on the grounds of lack of personal jurisdiction and improper venue or, in the alternative, on the ground that the SEC's Complaint fails to state a claim upon which relief can be granted.

***First***, venue does not properly lie in this District, because (a) none of the underlying conduct constituting Mr. Grendys's alleged wrongdoing occurred in this District, and (b) the SEC alleges no other contacts between Mr. Grendys and this District that would make venue proper. In the absence of statutory venue, or other relevant contacts (which do not exist), Mr. Grendys is not subject to *in personam* jurisdiction in this District. As such, the Court should dismiss the Complaint under Rules 12(b)(2) and 12(b)(3).

***Second***, and in the alternative, the Complaint fails to state a claim upon which relief can be granted, because the SEC has set forth no factual allegations supporting an assertion of intent

(or scienter) as to Mr. Grendys.  Not only is there no factual support for a claim of *actual* knowledge, but the Complaint lacks any factual basis for a claim that Mr. Grendys was "extremely reckless" in signing the 2002 audit confirmation letter that forms the basis of the SEC's Complaint against him.  As such, the Court should dismiss the Complaint against Mr. Grendys under Rule 12(b)(6).

## FACTUAL BACKGROUND

### General Allegations as to the Fraudulent Scheme

In its Complaint, the SEC alleges that U.S. Foodservice ("USF"), a company based in Columbia, Maryland, is a wholly owned subsidiary of a publicly-traded, Netherlands-based company known as Royal Ahold N.V. ("Royal Ahold").  Compl. ¶18.  According to the SEC, USF engaged in a fraudulent scheme to manipulate its earnings, primarily by artificially inflating "promotional allowance" income from third-party vendors (such as those for whom the defendants in this action worked).  *Id.*  In order to perpetrate the alleged fraud, USF personnel allegedly asked these vendors to sign false audit confirmation letters that supported the overstated "promotional allowance" income.  *Id.* ¶19.[1]  USF's outside auditors, in turn, reported these inflated earnings to USF's parent, Royal Ahold, which made public disclosures – including filings with the SEC – based on the false earnings numbers.  *Id.* ¶¶6-7.  After the fraud was detected in 2003, Royal Ahold had to restate its earnings in its various SEC filings.  *Id.*

### Specific Allegations as to Mr. Grendys

The SEC alleges that Mr. Grendys, an Illinois resident, was the owner of Koch Poultry, a company that sold frozen chicken commodities to USF.  *Id.* ¶16.  The SEC claims that Mr. Grendys knowingly provided substantial assistance to USF's fraudulent scheme by signing

---

[1] The SEC further alleges that USF encouraged certain vendors to sign the audit confirmation letters by stating, falsely, that the figures in the letters were just "internal numbers" for use by USF.  *Id.* ¶21.

and sending to USF's independent auditors, Deloitte & Touche, a materially false confirmation letter. *Id.* ¶33. Specifically, the SEC asserts that in connection with USF's fiscal year 2001 audit, USF sent Mr. Grendys a confirmation letter, dated January 24, 2002, that reflected, in part: (1) allowances earned during 2001 of $3,850,000; (2) an FY 2001 "balance due" of $3,184,275; and (3) a purchase volume of 45,000,000 pounds of chicken. *Id.* ¶34. The SEC alleges that Grendys signed and sent the letter to Deloitte & Touche without noting any "exceptions" (*Id.*), even though the foregoing numbers were materially inaccurate (*Id.* ¶35).

In an apparent effort to establish scienter, the SEC claims that on February 7, 2002, before he signed and returned the audit confirmation letter, Mr. Grendys received from USF a "side letter" that purported to "clarify" the January 24, 2002, audit confirmation letter. *Id.* ¶38. The so-called "side letter" stated that (1) Koch's year-end "balance due" was only $68,075.97, and (2) Koch had sold only 10,866,269 pounds of chicken to USF under the "program" during 2001. *Id.* ¶37. The SEC asserts that the side letter also stated that "any documented differences from the confirmation and actual activity during the time frame covered with the confirmation are not obligations of Koch Poultry." *Id.* ¶40.[2] The SEC alleges that Grendys did not disclose the information in the "side letter" to Deloitte & Touche. *Id.* ¶42.

Based on these allegations, the SEC asserts that Mr. Grendys had a "general awareness" that USF was engaged in illegal activity and that he was extremely reckless in failing to perceive

---

[2] Notably, the SEC fails to inform the Court that the "side letter" also stated explicitly that "[d]ifferences between the confirmation [letter] and Koch [internal] numbers ***will be covered through Frozen Farms*** [a third-party billing agency through which Koch Poultry sold product to, and distributed product through, USF]. *See* February 7, 2002, Letter from Bill Carter, Vice President Purchasing, U.S. Foodservice, to Mr. Joseph C. Grendys, attached as "Exhibit A." Likewise, the SEC neglects to point out that the audit confirmation letter never states explicitly that ***Koch Poultry*** owes any money to USF. *See* January 24, 2002, Letter from Mark P. Kaiser, Chief Marketing Officer, U.S. Foodservice, to Mr. Joe Grendys, Koch Poultry, attached as "Exhibit B." The Court may properly consider both of these documents, as they form the basis of the SEC's claims against Mr. Grendys and are quoted directly in the SEC's Complaint. *See Lipton v. MCI Worldcom, Inc.*, 135 F. Supp. 2d 182, 186 (D.D.C. 2001), and *Vanover v. Hantman*, 77 F. Supp. 2d 91, 98 (D.D.C. 1999) (citing *Greenberg v. Life Ins. Co. of Va.*, 177 F.3d 507, 514 (6th Cir. 1999)).

several "red flags," or suspicious events, surrounding the audit confirmation letter, including the fact that USF management asked him to sign and return a letter that Mr. Grendys knew, or was reckless in not knowing, (1) was materially false, and (2) would misstate USF's books and records and mislead USF's independent auditors.  *Id.* ¶43.[3]  The SEC alleges that these facts constitute "substantial assistance" to USF in the conduct of its fraudulent scheme.  *Id.*

## ARGUMENT

### I.    THE COMPLAINT FAILS TO ESTABLISH JURISDICTION OR VENUE IN THIS DISTRICT AND, AS SUCH, SHOULD BE DISMISSED.

#### A.    Mr. Grendys Is Not Subject To Either "General" Or "Specific" Jurisdiction In This District.

Nowhere in its Complaint does the SEC allege that Mr. Grendys has engaged in any activity that would subject him to *in personam* jurisdiction in the District of Columbia.  Instead, the SEC relies on a specialized venue provision set forth in the Securities Exchange Act of 1934 to establish *venue* in this District, which, once established, also confers *jurisdiction* in the District.  *See* Compl. ¶13.  According to this specialized venue provision:

> Any criminal proceeding may be brought in the district ***wherein any act or transaction constituting the violation occurred***.  Any suit or action to enforce any liability or duty created by this chapter or rules and regulations thereunder, or to enjoin any violation of such chapter or rules and regulations, may be brought in any such district or in the district wherein the defendant is ***found*** or is an ***inhabitant*** or ***transacts business***.

15 U.S.C. §78aa (emphasis added).  Thus, under §78aa, "a civil suit may be brought not only in any district where the defendant is found, or is an inhabitant or transacts business . . . but also in that district in which a criminal proceeding, based upon the same illegal conduct, could be

---

[3] In this respect, the SEC's reasoning is circular.  According to the SEC, the "red flag" was USF's request that Mr. Grendys sign and return the audit confirmation letter.  Why is this a "red flag?"  Because, according to the SEC, Mr. Grendys "should have known" that the letter was materially misleading.  Of course, that assertion *assumes* the very scienter ("extreme recklessness") that the "red flag" is supposed to prove.  The SEC fails to explain how the mere *existence* of the audit confirmation letter establishes that Mr. Grendys was "extremely reckless" in not knowing that the letter contained allegedly inaccurate information.

brought." *Investors Funding Corp. of New York v. Jones*, 495 F.2d 1000, 1002 (D.C. Cir. 1974). As such, §78aa essentially provides for both "general jurisdiction" (presence in the District) and "specific jurisdiction" (a claim arising out of particular conduct in the District).

In the case of Mr. Grendys, however, the SEC has not established either general or specific jurisdiction in this District. **First**, the SEC does not allege any facts that would support "general jurisdiction" under §78aa, because (a) Mr. Grendys is an inhabitant of **Illinois**, not of the District of Columbia; (b) Mr. Grendys has not been "**found in**" the District of Columbia; and (c) the SEC has not alleged that Mr. Grendys **transacts business in** the District of Columbia.

**Second**, the SEC fails to allege facts that would support "specific jurisdiction" under §78aa, because it has not shown any relevant connection between Mr. Grendys's conduct and the District of Columbia. As the SEC's Complaint, and the two documents quoted therein, make clear, USF personnel sent the allegedly misleading 2001 audit confirmation letter from USF headquarters in *Columbia, Maryland*, to Mr. Grendys in *Illinois*. *See* Exhibit B. All relevant communications between USF and Mr. Grendys then occurred between *Maryland* and *Illinois*, including the alleged "side letter" that Mr. Grendys received from USF. *See* Exhibit A. After Mr. Grendys signed the audit confirmation letter, he returned it to USF's outside auditors, who were based in *Baltimore, Maryland*. *See* Exhibit B. Even accepting all of the SEC's allegations at face value, there was **no connection between any of Mr. Grendys's relevant conduct and the District of Columbia**. As such, there is no basis for a claim of "specific jurisdiction" based on Mr. Grendys's interactions with USF.

**B.     Royal Ahold's Public Filings In The District of Columbia Are Not Relevant To A Proper Jurisdictional Analysis.**

Recognizing this problem, the SEC implies in its Complaint that because USF's fraudulent scheme affected **Royal Ahold's** SEC filings in the District of Columbia, Mr. Grendys

should, in effect, be charged with knowledge of, and involvement in, Royal Ahold's public filings in this District.  The case law does not support such an expansive reading of §78aa, however, and Mr. Grendy's "relationship" to Royal Ahold, if any, is simply too tenuous to confer venue and jurisdiction under that specialized venue provision.

### 1.    Case Law Cited in *SEC v. Daly*. [4]

For example, in *Investors Funding Corp of New York v. Jones*, 495 F.2d 1000 (D.C. Cir. 1974), the D.C. Circuit applied §78aa to **publicly-traded companies** who had failed to file SEC reports in compliance with §§13(a) and 15(d) of the Securities Exchange Act of 1934 and with various regulations promulgated thereunder.  495 F.2d at 1001 & 1003.  In other words, venue was proper in the District of Columbia, because the defendants themselves were **required by law** to file reports in the District of Columbia.  No such requirement applies to Mr. Grendys or to his privately-held company, Koch Foods.

In *SEC v. Savoy Industries, Inc.*, 587 F.2d 1149, 1154 (D.C. Cir. 1978), venue was not even at issue, because the defendant **conceded** the propriety of venue and jurisdiction in the District of Columbia.  In a footnote, however, the D.C. Circuit observed that even if the defendant had not so conceded, the SEC had alleged three separate grounds for venue in the District:  (1) defendant was **directly involved** in false filings of a publicly-traded company with the SEC in the District; (2) defendant made a telephone call **from the District** as part of the fraudulent scheme; and (3) where a **common scheme among all defendants** is alleged, proper venue as to one defendant establishes venue as to all.  *Id.* at 1154 n.12.  Although the D.C. Circuit did not actually *rule* on any of these venue theories, none of them is applicable here.

---

[4] Mr. Grendys is addressing the case law cited in this Court's ruling in *SEC v. Daly*, No. 05-55 (CKK) (D.D.C. Feb. 11, 2006) (Memorandum Opinion), because the Court relied upon that case law in finding venue to be proper as to Defendant Daly.  Mr. Grendys respectfully submits that the four cited cases do not support jurisdiction and venue as against Mr. Grendys under the unique facts of his case.

*First*, Mr. Grendys is not alleged to have had *any* dealings with Royal Ahold, the publicly-traded company that allegedly made misleading SEC filings, nor even to have known of Royal Ahold's existence.  *Second*, the SEC alleges no contact whatsoever between Mr. Grendys and the District of Columbia in the context of his dealings with USF.  *Third*, the SEC does not, and cannot, allege that Mr. Grendys was involved in any "common scheme" with his co-defendants, even assuming that venue is proper as to any of those individuals.  Indeed, the SEC's allegations as to each named defendant make clear that none even knew of the other's existence, much less of his alleged role in any "common scheme."  *See, e.g.*, Compl. ¶¶33-43 (failing to connect Mr. Grendys to any other defendant).

Likewise, *SEC v. National Student Marketing Corp.*, 360 F. Supp. 284 (D.D.C. 1973), is inapposite, because the defendants contesting jurisdiction and venue had allegedly participated *directly* in the preparation *and filing* of materially false documents required by law to be filed with the SEC, including Forms 8-K and annual reports.  360 F. Supp. at 291.  The District Court also found jurisdiction and venue to be proper under the "co-conspirator" theory of venue – which holds that venue is proper as to all defendants involved in a *common scheme* when venue is proper as to any one of them – because several co-defendants had committed numerous material acts in the District of Columbia in the course of the common scheme.  *Id.* at 291-92.

Here, however, the SEC alleges no "common scheme" uniting Mr. Grendys and his two remaining co-defendants, nor does the SEC allege that either of those co-defendants engaged in any relevant conduct in the District of Columbia.  As such, *National Student Marketing Corp.* simply cannot support an argument for jurisdiction and venue over Mr. Grendys.

Finally, *SEC v. Wallace*, 94 F. Supp. 2d 1 (D.D.C. 2000), is irrelevant in every respect. *First*, the defendants in *Wallace* allegedly committed *direct* violations of the securities laws by

making fraudulent statements, engaging in fraudulent securities transactions, and failing to register as an investment advisor.  *Id.* at 1.  ***Second***, the District Court once again relied on the "co-conspirator" theory of venue in finding that the misconduct of one co-defendant in the District of Columbia made venue proper as to other co-defendants engaged in the same scheme. *Id.* at 2.

Here, by contrast, there is no allegation of any ***direct*** violation of the securities laws; only an allegation that Mr. Grendys "aided and abetted" such violations.  Nor, as stated above, is there any allegation concerning a "common scheme" or conduct by a co-defendant in the District of Columbia.  Thus, *Wallace* is inapposite.

### 2.    Aiding and Abetting Case Law.

Even in the context of ***indirect***, "aiding and abetting" claims – *i.e.*, the type of claims that the SEC has advanced against Mr. Grendys – the case law appears to require a close connection between the defendant and the District in which venue is asserted.  For example, in *SEC v. Ernst & Young*, 775 F. Supp. 411 (D.D.C. 1991), the District Court found jurisdiction over E&Y's Dallas office to be proper in the District of Columbia where E&Y/Dallas signed audit opinions for a third party that it was required by law to sign, and it did so with the knowledge and intent that the third party would file the documents with the SEC in the District of Columbia.  775 F. Supp. at 412-13.  With respect to this holding, the District Court specifically found that "the ***act of filing*** in the District of Columbia constitutes the ***basis of the wrongdoing*** alleged in the complaint."  *Id.* at 413 (emphasis added).

In the case of Mr. Grendys, none of these preconditions obtains.[5]  *First*, Mr. Grendys did not prepare, execute, or submit any document that was required by law to be filed with the SEC in the District of Columbia.  Rather, he signed an audit confirmation letter for a ***non-publicly-traded*** company (USF) and sent the letter to a third-party auditor located outside of the District of Columbia (Deloitte & Touche).

*Second*, there is no allegation in the SEC's Complaint that Mr. Grendys signed the audit confirmation letter with any degree of knowledge or intent that any other party would file that letter with the SEC in the District of Columbia.  Indeed, there is no allegation that Mr. Grendys even knew of Royal Ahold's existence, its public filing requirements, or the possible incorporation of information from an audit letter directed toward USF into any of Royal Ahold's SEC filings.  In fact, as the SEC's Complaint makes clear, USF personnel told certain vendors (including Mr. Grendys) that the audit confirmation letter was for "internal use" only.  *See* Compl. ¶21.  In short, Mr. Grendys did not target any of his conduct toward the District of Columbia, even indirectly.

*Third*, the "basis of the wrongdoing" alleged in the Complaint is ***aiding and abetting***, not any substantive violation of the securities laws.  Because all of the conduct that allegedly ***constitutes*** the "aiding and abetting" (the "basis of the wrongdoing," in the words of the *Ernst & Young* court) occurred ***outside of*** the District of Columbia, and because neither Mr. Grendys nor his unrelated co-defendants are charged with any substantive securities law violation, there is no connection to the District of Columbia that would make venue (and, thus, jurisdiction) proper.

For all of the foregoing reasons, venue is not proper in this District under §78aa.  Without this special venue provision, *in personam* jurisdiction is also lacking.  As such, Mr. Grendys

---

[5] The *Ernst & Young* court also found venue proper, because E&Y "transacted business" in the District of Columbia through two local offices.  775 F. Supp. at 412.  As noted previously, the SEC has not alleged that Mr. Grendys "transacts business" in the District of Columbia, so this prong of the venue analysis is irrelevant.

respectfully requests that the Court dismiss the Complaint against him under Federal Rules of Civil Procedure 12(b)(2) and 12(b)(3) for lack of personal jurisdiction and improper venue.

## II.     IN THE ALTERNATIVE, THE COMPLAINT FAILS TO STATE A CLAIM UPON WHICH RELIEF CAN BE GRANTED AND, AS SUCH, SHOULD BE DISMISSED.

### A.     Scienter Standards Under An "Aiding And Abetting" Theory.

A district court should dismiss a complaint under Rule 12(b)(6) if "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson,* 355 U.S. 41, 45-46 (1957).  *See also Williams v. Amtrak*, 357 F.Supp.2d 1, 2 n.1 (D.D.C. 2003) (holding that "Rule 12(b)(6) dismissals cull *legally* deficient complaints").  In ruling on a 12(b)(6) motion, "the court need not accept as true inferences unsupported by facts set out in the complaint or legal conclusions cast as factual allegations." *McMillian v. District of Columbia*, 466 F. Supp. 2d 219, 222 (D.D.C. 2006).  In this case, the SEC has failed to allege any facts that would give rise to an inference of scienter, or intent, with respect to its "aiding and abetting" allegations against Mr. Grendys.  Because scienter is a critical element of the SEC's claims, the Complaint should be dismissed under Rule 12(b)(6).

In order to state a claim for "aiding and abetting" a violation of securities laws, the SEC must plead three things:  (1) the existence of a primary securities law violation; (2) conduct by an aider and abettor undertaken with the same degree of scienter required for the primary violation; and (3) "substantial assistance" by the aider and abettor in the achievement of the primary violation.  *See SEC v. Coffey*, 493 F.2d 1304, 1316 (6th Cir. 1974); *SEC v. Price Waterhouse*, 797 F. Supp. 1217, 1242 (S.D.N.Y. 1992).  In this Circuit, "extreme recklessness" may support the scienter requirement of aiding and abetting liability.  *Howard v. SEC*, 376 F.3d 1136, 1143 (D.C. Cir. 2004).  "Extreme recklessness" may be found only if the alleged aider and abettor

encountered "red flags," or "suspicious events creating reasons for doubt" that should have alerted him to the improper conduct of the primary violator, or if there was "a danger . . . so obvious that the actor must have been aware of [it]." *Id.* It is not enough, however, that the accused aider and abettor's action or omission is "derived from inexcusable neglect," because "extreme recklessness" is neither ordinary negligence nor "merely a heightened form of ordinary negligence." *Id.*

In the Complaint, the SEC bases its allegation of scienter entirely on the fact that Mr. Grendys received a "side letter" that contained sales volumes and promotional allowance figures that were different from the information contained in the FY2001 audit confirmation letter. Compl. ¶43. Such allegations contain no facts from which a reasonable inference of knowledge could arise, nor any facts that would support an "extreme recklessness" standard for Mr. Grendys's alleged scienter.[6]

### B.    No Knowledge Or Extreme Recklessness As To An Illicit Purpose.

In its Complaint, the SEC does not, because it cannot, allege that Mr. Grendys had any direct knowledge – or indirect knowledge based on "red flags" – that USF personnel intended to use the audit confirmation letter for illicit purposes. ***First***, while the SEC points out the differences between the "side letter" and the confirmation letter, the SEC does not allege that Mr. Grendys had any knowledge of USF's internal accounting standards, nor that he was "extremely reckless" in not understanding them. Without knowing how USF accounted internally for promotional allowances, Mr. Grendys was not in a position to know that the numbers contained in the audit confirmation letter were, according to USF's own accounting, false or misleading. As such, there can be no reasonable inference of scienter with respect to the

---

[6] For the purposes of this motion only, Mr. Grendys will accept as true the SEC's allegations regarding a primary violation and "substantial assistance" to that primary violation. Mr. Grendys otherwise denies or disputes all such allegations.

illicit purpose of the audit confirmation letter. *See SEC v. Lucent Technologies, Inc.*, No. Civ. 04-2315 (WHW), 2005 WL 1206841 (D.N.J. May 20, 2005) (granting Rule 12(b)(6) motion to dismiss claims of aiding and abetting securities laws violations against an employee who had no knowledge of her company's accounting standards) (copy attached hereto as "Exhibit C").

In *Lucent Technologies*, the SEC alleged that a Lucent Vice President of Sales knew, or was reckless in not knowing, that the side-agreements she arranged with vendors would result in fraudulent securities filings, in the form of improper revenue recognition. 2005 WL 1206841, at *1-2. The SEC also alleged that the VP withheld information about the side agreements from Lucent's finance department and, on occasion, affirmatively misrepresented facts relevant to these agreements. *Id.* at *2.

In dismissing the Complaint under Rule 12(b)(6), the *Lucent Technologies* court held that the facts alleged did not support an inference that the VP ***knew*** it was improper to recognize revenue under these circumstances or that the VP played any role in Lucent's decisions to recognize revenue in connection with the side agreements. *Id.* at *5. Instead, the court held that in the absence of allegations that the VP had ***knowledge*** of accounting principles, or of Lucent's revenue recognition policy, the SEC had not sufficiently pled either knowledge or reckless conduct. *Id.* at *5.

As in *Lucent Technologies*, the SEC has not alleged that Mr. Grendys knew, or was extremely reckless in not knowing, how USF accounted internally for promotional allowances from third-party vendors. Indeed, given that the "side letter" specifically cited Frozen Farms as the source of much of the debt allegedly owed to USF (*see* Exhibit A), there is no way that Mr. Grendys could know how USF accounted for products and funds that passed through Frozen Farms. Without that knowledge, no reasonable inference of illicit intent on Mr. Grendys's part

can arise.  *See, e.g., Howard v. SEC*, 376 F.3d 1136, 1145  (D.C. Cir. 2004) (rejecting the notion

that "common sense" alone can give rise to "red flags" of suspicious activity in the context of

securities filings).

Moreover, Mr. Grendys is two steps farther removed from the alleged misstatements at

issue in *Lucent Technologies*.  Whereas in *Lucent Technologies*, the alleged aider and abettor

was an officer of the company that committed the primary securities violation, Mr. Grendys is

not only ***not*** an employee of Royal Ahold (the primary violator), he is not even an employee of

USF, the subsidiary that perpetrated the fraud scheme.  If allegations of side agreements by a

***primary violator's officer*** are insufficient in the absence of personal knowledge of accounting

policies, then surely the SEC's allegations against Mr. Grendys, a stranger to USF and Royal

Ahold, are insufficient under Rule 12(b)(6).

***Second***, the SEC does not, because it cannot, allege that ***anyone*** made ***any*** statements to

Mr. Grendys to suggest that the audit letter was either (a) materially inaccurate, (b) designed to

overstate earnings, or (c) part of a scheme to submit fraudulent SEC filings.  Under such

circumstances, no reasonable inference of knowledge, or extreme recklessness, can arise.  *See*

*SEC v. Orr*, No. 04-74702, 2006 WL 542986, at *11-13 (E.D. Mich. Mar. 6, 2006) (dismissing

aiding and abetting claims against a vendor, where the primary violator put pressure on him to

confirm inflated allowance numbers but did not tell the vendor that the *purpose* of the false

figures was to cover "shortfalls" in expected earnings) (copy attached hereto as "Exhibit D").

In this case, the SEC does not, because it cannot, allege that anyone from USF ever *told*

Mr. Grendys *either* that the promotional allowance amounts set forth in the audit confirmation

letter were false *or* that they were "needed" to cover "shortfalls" in USF's earnings projections.

Moreover, unlike in *Orr*, there is no allegation that the primary violator (USF) put any type of

pressure on Mr. Grendys in order to induce him to sign the audit confirmation letter. As such, there is simply no rational basis for asserting that Mr. Grendys knew, or was reckless in not knowing, that USF was attempting to use the audit confirmation letter as part of a fraud scheme. If the "red flags" in *Orr* (including false figures and financial pressure to sign the letter) were insufficient to support scienter under Rule 12(b)(6), the ***absence*** of alleged red flags in this case surely compels the same conclusion.

      **C.**      **No Knowledge Or Extreme Recklessness As To Use Of The Letter.**

Nowhere in the SEC's Complaint are there any factual allegations regarding Mr. Grendys's knowledge, or extreme recklessness, with respect to the use that USF intended to make of the audit confirmation letter. As noted above, USF is not a publicly-traded company; that distinction belongs to its parent, Royal Ahold. Yet the SEC never alleges that Mr. Grendys had any contact whatsoever with Royal Ahold, nor does the SEC allege that Mr. Grendys had any knowledge – or that he was reckless in not knowing – that USF intended to use the audit letter as part of a public filing that Royal Ahold would make. In fact, what the SEC ***does*** allege is that USF told certain vendors (including Mr. Grendys) that the audit confirmation letters were for "internal use" only. How, then, could such allegations possibly give rise to a reasonable inference of scienter with respect a false SEC filing?

Even in *Orr*, where the vendor dealt directly with the publicly-traded company that made the allegedly false filings, the court found the scienter allegations to be lacking. How much more so here, where there is no allegation that Mr. Grendys even knew of Royal Ahold's existence, much less that USF personnel intended to use the audit confirmation letter as part of an allegedly false filing by Royal Ahold.

In sum, the Complaint fails to allege facts from which a reasonable inference of knowledge, or extreme recklessness, could arise.  In the absence of such allegations, the SEC has failed properly to allege scienter, a critical element of its aiding and abetting claims against Mr. Grendys and, thus, to state a claim upon which relief can be granted.

## **CONCLUSION**

For all of the foregoing reasons, defendant Joseph Grendys respectfully requests that the Court enter an Order dismissing the Complaint against him on the grounds of lack of personal jurisdiction and improper venue, under Federal Rules of Civil Procedure 12(b)(2) and 12(b)(3). In the alternative, Mr. Grendys respectfully requests that the Court dismiss the Complaint against him for failure to state a claim upon which relief can be granted, under Federal Rule of Civil Procedure 12(b)(6).

Respectfully submitted,

Joseph Grendys

by his counsel,
WINSTON & STRAWN LLP

  /s/ William M. Sullivan, Jr.
William M. Sullivan, Jr.
WINSTON & STRAWN LLP
1700 K Street, N.W.
Washington, DC 20006-5000
Phone:  (202) 282-5000
Fax:  (202) 282-5100
wsullivan@winston.com

## CERTIFICATE OF SERVICE

I hereby certify that on May 1, 2007, I electronically filed the foregoing MOTION TO DISMISS with the clerk of the court by using the CM/ECF system, which will send a notice of electronic filing to the following:

Charles Derrick Stodghill                    Bradley D. Simon
U.S. Securities and Exchange Commission      Simon & Partners LLP
100 F. Street, NE                            30 Rockefeller Plaza, 42nd Floor
Washington, DC 20549                         New York, NY 10012
stodghillc@sec.gov                           bradsimon@simonlawyers.com
Attorney for Plaintiff SEC                   Attorney for Defendant Michael Smith

Nancy Luque
DLA Piper LLP
1200 19th Street, NW
Washington, DC 20036
Nancy.luque@dlapiper.com
Attorney for Defendant Gary Bell


                                    /s/ William M. Sullivan, Jr.
                                    William M. Sullivan, Jr.

# Exhibit A

February 7, 2002

Mr. Joseph C. Grendys
Koch Poultry
4404 W. Berteau Ave.
Chicago, Illinois 60641

Dear Joe:

The purpose of this letter is to document and clarify the letter you received from Mark Kaiser dated January 24, 2002.

The purpose of Mark Kaiser's letter was to have you confirm Marketing and Merchandising Allowances offered by you to USF as of December 29, 2001.

Koch Poultry owes $68,075.97 to USF as of 12-29-01.

Specifically, as follows, any documented differences from the confirmation and actual activity during the time frame covered with the confirmation are not obligations of Koch Poultry and no payments will be requested of Koch Poultry now or in the future as part of the confirmation.

Confirmation
Balance due USF at 12-30-00
$1,650,000
Less payments/deductions made
Allowed during 2001
$2,315,725
Plus Allowances earned
During 2001
$3,850,000
Ending Balance due USF at
December 29, 2001
$3,184,275
Base program for Marketing
Programs $.05
Volume purchased during
Dec 31, 2000 to Dec 29, 2001
45,000,000

Koch Poultry
Balance due USF at 12-31-00
$0
Less payments/deductions made
allowed during 2001
$514,050.88
Plus Allowances earned
during 2001
$582,126.85
Ending Balance due USF at
December 29, 2001
$68,075.97
Base program for Marketing
Programs $.03
Volume purchased during
Dec 31, 2000 to Dec 29, 2001
10,866,269

Any promotional allowances from Dec 31, 2000 through December 29, 2001 are included in the above as per Koch totals.

Differences between the confirmation and Koch numbers will be covered through Frozen Farms, and in no circumstances will this be construed as a liability of Koch Poultry.

Bill Carter

Vice President Purchasing
U.S. Foodservice

# Exhibit B



*1-443-259-2035*

**Mark P. Kaiser**
Chief Marketing Officer
January 24, 2002

Mr. Joe Grendys
Koch Poultry
4404 West Bertiau Avenue
Chicago, IL 60641

Dear Mr. Grendys:

In connection with the audit of our financial statements of U.S. Foodservice, Inc. (USF) for the year ended December 29, 2001, please confirm directly with our auditors, Deloitte & Touche LLP, 100 South Charles Street 12th Floor, Baltimore, Maryland 21201 the following with respect to Marketing and Merchandising Allowances offered by you to USF as of December 29, 2001:

| | |
|---|---|
| Balance due to USF at December 30, 2000 | $ 1,650,000 |
| Less: Payments/deductions made/allowed during 2001 | (2,315,725) |
| Plus: Allowances earned during 2001 | 3,850,000 |
| Ending Balance due to USF at December 29, 2001 | $3,184,275 |

- The base corporate program for Marketing and Merchandising Allowance is $.05/lb.

- The volume purchased under the program from December 31, 2000 through December 29, 2001 was 45,000,000 pounds.

  Koch Poultry supported U.S. Foodservice with promotional allowances from December 31, 2000 through December 29, 2001 totaling $1,600,000.

- Amounts paid or to be paid are not contingent upon U.S. Foodservice performing any additional duties or responsibilities in the future.

- Please specify below any other additional terms or conditions not covered above:

_____

_____

_____

Your prompt attention to this request will be appreciated. Please reply via fax #703-332-7074 and mail the signed original for our permanent records. A self-addressed envelope is enclosed for your reply.

Yours very truly,

Mark Kaiser

**CONFIRMATION:**

**THE ABOVE INFORMATION IS CORRECT AS OF DECEMBER 29, 2001, except as noted below:**

**Signed:  Koch Poultry**

# Exhibit C

Westlaw.

Not Reported in F.Supp.2d                                                                          Page 1
Not Reported in F.Supp.2d, 2005 WL 1206841 (D.N.J.)
**(Cite as: Not Reported in F.Supp.2d)**

H

Briefs and Other Related Documents

S.E.C. v. Lucent Technologies Inc.D.N.J.,2005.Only
the Westlaw citation is currently available.
United States District Court,D. New Jersey.
SECURITIES AND EXCHANGE COMMISSION,
Plaintiff,
v.
LUCENT TECHNOLOGIES INC., Nina Aversano,
Jay Carter, Alice Leslie Dorn, William Plunkett, John
Bratten, Deborah Harris, Charles Elliot, Vanessa
Petrini, Michelle Hayes-Bullock, and David
Ackerman, Defendants.
**No. Civ. 04-2315(WHW).**

May 20, 2005.

Mark A. Adler, Larry Ellsworth, Charles E. Cain,
Washington, D.C., for Securities and Exchange
Commission.
Barry H. Evenchick, Walder, Hayden & Brogan,
P.A., Roseland, NJ, Carmen J. Lawrence, David B.
Hennes, Teresa M. Venezia, Ginny Edwards, Fried,
Frank, Harris, Shriver & Jacobson LLP, New York,
NY, for Defendant.

OPINION
WALLS, J.
**\*1** Defendant Alice Leslie Dorn moves to dismiss the
First, Third and Fourth Counts of the Complaint. The
motion is decided without oral argument pursuant to
Fed.R.Civ.P. 78.

FACTS AND PROCEDURAL BACKGROUND

Plaintiff SEC, by its Complaint alleges that: Lucent
Technologies Inc.  ("Lucent") fraudulently and
improperly recognized revenue and pre-tax income in
violation of generally accepted accounting principles
("GAAP") during its fiscal year 2000. As a result,
Lucent improperly overstated its pre-tax income that
fiscal year by sixteen percent. Lucent prematurely
recognized $511 million of revenue and $91 million
in pre-tax income in quarterly results during Lucent's
fiscal year 2000. The remaining $637 million in
revenue and $379 million in pre-tax income should
not have been recognized during Lucent's fiscal year
2000. The SEC alleges that Lucent's violations of
GAAP were due to the fraudulent and reckless

actions of the named individual defendants, officers,
executives and employees of Lucent. And, the GAAP
violations were also the result of deficient internal
controls which led to numerous accounting errors by
others.

The defendant Dorn was Lucent's vice president of
indirect sales for North America from November
1998 to December 2000. She reported directly to
another defendant, Nina Aversano, the president of
Lucent's North American sales and service provider
networks. According to plaintiff, in the first quarter
of Lucent's fiscal year 2000, Dorn and Aversano
began engaging in a pattern and practice of orally
granting two of Lucent's distributors, Anixter
International, Inc. ("Anixter") and Graybar Electric
Company ("Graybar"), certain rights and privileges
beyond those enumerated in their respective
distribution agreements. Granting Anixter and
Graybar these rights made it improper under GAAP
for Lucent to recognize revenue from sales to these
distributors at the time of the sale. More specifically,
the SEC alleges that Lucent violated FASB Concepts
Statement No. 5, which prohibits revenue recognition
unless and until realizable and earned, and FASB
Statement No. 48, which identifies circumstances
when revenues may not be recognized because they
are not sufficiently realizable or earned. In the past,
Lucent recorded transactions that exhibited such
uncertainties as consignment sales, with revenue
deferred until resale by the distributor. During
Lucent's fiscal year 1999 until the end of its fiscal
year 2000, however, Lucent modified its accounting
policy and began recognizing revenue upon delivery
to distributors. This change meant that Lucent
violated GAAP in several transactions because the
extra-contractual commitments made by Dorn to
distributors resulted in uncertainties surrounding
those transactions, so charges the SEC.

The SEC complains that despite knowing, or being
reckless in not knowing, that the verbal side
agreements made revenue recognition improper
under GAAP, Dorn failed to inform Lucent's finance
department of the side agreements and, on some
occasions, affirmatively misrepresented the facts to
members of Lucent's finance department.

**\*2** The SEC goes on to allege the following: Dorn
gave explicit extra-contractual assurances in
connection with five transactions. The first

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2005 WL 1206841 (D.N.J.)
(Cite as: Not Reported in F.Supp.2d)

transaction was a sale to Anixter of approximately $335 million of product over the course of Lucent's fiscal years 1999 and 2000 for resale to MCI/Worldcom. About this transaction, Dorn was told by an Anixter executive that its exposure was too great to take on more of Lucent's product without assurances that Anixter could sell the product to a customer other than MCI/Worldcom or could return the product to Lucent if not sold. In Dorn's presence, Aversano assured the executive that it would not be an issue. Dorn herself also gave assurances to Anixter executives that if a resale did not go through, Lucent would substitute the product that Anixter bought for another product that its customer might need, Lucent would find other customers for Anixter to sell the product to and, if that did not work, Anixter could return the product to Lucent. When Dorn was questioned by Lucent's chief accountant sometime in June or July of 2000, Dorn falsely told him that there were no verbal agreements or side deals that would indicate there were any rights of return beyond the provisions noted in the distributor agreements. Then in October or November 2000, Dorn acknowledged to an Anixter executive that commitments had been made to Anixter and that if Anixter could not sell the product, Anixter would not have to continue to carry it.

The second transaction was a sale to Anixter of approximately $38 million of product at the end of Lucent's first quarter of its fiscal year 2000. In connection with this sale, Dorn represented to several Anixter executives that Anixter would be able to sell the product, but that it could be returned to Lucent if it did not sell. Dorn explicitly told the executives that Aversano had authorized the right of return. Anixter was unable to sell the majority of the product and Lucent paid holding fees to Anixter until the inventory was returned to Lucent in September 2000.

Plaintiff further charges that the third transaction was a sale to Anixter of $89 million of product over the course of Lucent's second and third quarters of its fiscal year 2000 for resale to ICG Communications, Inc. ("ICG"). In connection with this sale, Dorn gave an Anixter executive assurances, including that it had the right to return the product if the sales did not work out. Dorn also agreed to give Anixter a holding fee to compensate it for each day the resale to ICG was delayed beyond the projected resale date, and to compensate it for any outstanding receivable balances from ICG. There were approximately $46 million in outstanding receivables from ICG and Lucent agreed to compensate Anixter for it.

The fourth transaction was a sale to Graybar of approximately $250 million of product over the course of Lucent's first through third quarters of its fiscal year 2000 for resale to U.S. West Communications, Inc. ("U.S.West"). In connection with this sale, Dorn made or authorized representations to Graybar employees. Dorn told Graybar executives that the Lucent product would be off Graybar's books by the end of the year, that Lucent would reconfigure the Lucent product and arrange its sale to another regional bell operating company if sales to U.S. West did not work out, and that Graybar would not get hurt in the transactions. Ultimately, nearly all of the product Graybar purchased in the second and third quarters of fiscal year 2000 was returned to Lucent.

**\*3** The fifth transaction was a sale to Graybar of approximately $61 million of product in Lucent's third quarter of fiscal year 2000 for resale to three local exchange carriers. Dorn told a Graybar executive that Graybar would not get hurt in the transaction, and that Lucent would help them sell the product to other customers if the transactions did not work out. The transactions did not work out and Graybar returned the product to Lucent.

The SEC complains that Dorn acted with knowledge or recklessly engaged in the fraudulent conduct described, and that as a result of her fraudulent conduct, Lucent violated GAAP. The SEC also alleges that Dorn knew, or was reckless in not knowing, that as a result of the fraudulent conduct, Lucent filed materially misleading forms 10-Q with the Securities and Exchange Commission for the first three quarters of its fiscal year 2000, and that revenue was improperly included in Lucent's October 23, 2000 unaudited financial statements that were filed with the Commission in a form 8-K on October 24, 2000. In December 2000, Lucent agreed to take back $352 million in inventory that Anixter and Graybar were unable to sell. Overall, Aversano and Dorn's fraudulent conduct resulted in Lucent materially overstating its pre-tax income for fiscal year 2000 by approximately seven percent.

Based on these allegations, plaintiff alleges four counts against Dorn. Count One of the Complaint alleges that Dorn violated Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act"), Rule 10b-5, and that she is also liable for aiding and abetting Lucent in violating such laws. Count Three alleges that Dorn aided and abetted Lucent in violating Section 13(a) of the Exchange Act, Rules 12b-20, 13a-11 and 13a-13 by causing Lucent to file

materially false and misleading financial statements. Count Four alleges that Dorn aided and abetted Lucent in violating Sections 13(b)(2)(A) and 13(b)(2)(B) of the Exchange Act by causing Lucent's books and records to be inaccurate and by assisting in Lucent's failure to maintain sufficient internal accounting controls. Count Five alleges that Dorn violated Section 13(b)(5) of the Exchange Act and Rule 13b2-1 by knowingly circumventing Lucent's system of internal accounting controls and knowingly falsifying, or causing to be falsified, Lucent's books and records. Dorn now moves to dismiss Counts One, Three and Four for failure to state a claim upon which relief can be granted.

### STANDARD FOR A RULE 12(b)(6) MOTION TO DISMISS

On a motion to dismiss pursuant to *Fed.R.Civ.P. 12(b)(6)*, a court is required to accept as true all allegations in the complaint and all reasonable inferences that can be drawn therefrom, and to view them in the light most favorable to the non-moving party. *Pinker v. Roche Holdings Ltd., 292 F.3d 361, 374 n. 7 (3d Cir.2002)*. The question is whether the claimant can prove any set of facts consistent with his or her allegations that will entitle him or her to relief, not whether that person will ultimately prevail. *Hishon v. King & Spalding, 467 U.S. 69, 73 (1984)*.

**\*4** While a court will accept well-pled allegations as true for the purposes of the motion, it will not accept unsupported conclusions, unwarranted inferences, or sweeping legal conclusions cast in the form of factual allegation. *Miree v. DeKalb County, Ga., 433 U.S. 25, 27 n. 2 (1977)*. Moreover, the claimant must set forth sufficient information to outline the elements of his claims or to permit inferences to be drawn that these elements exist. *Fed.R.Civ.P. 8(a)(2)*; *Conley v. Gibson, 355 U.S. 41, 45-46 (1957)*. The Court may consider the allegations of the complaint, as well as documents attached to or specifically referenced in the complaint, and matters of public record. *Sentinel Trust Co. v. Universal Bonding Ins. Co., 316 F.3d 213, 216 (3d Cir.2003)*; *see also* 5A Wright & Miller, Federal Practice & Procedure § 1357 at 299 (2d ed.1990).

"A 'document integral to or explicitly relied on in the complaint' may be considered 'without converting the motion [to dismiss] into one for summary judgment.'" *Mele v. Federal Reserve Bank of N.Y., 359 F.3d 251, 255 n. 5 (3d Cir.2004)* (citing *In re Burlington Coat Factory Sec. Litig., 114 F.3d 1410,* *1426 (3d Cir.1997)*). "Plaintiffs cannot prevent a court from looking at the texts of the documents on which its claim is based by failing to attach or explicitly cite them." *Id.*

### DISCUSSION

*I. Count One-Primary Liability*

Dorn's main challenge to the Complaint is that the SEC has failed to plead facts demonstrating that Dorn knew, or was reckless in not knowing, that any of the conduct she engaged in was improper from an accounting perspective. With regard to the requirement that a plaintiff plead facts demonstrating that a defendant acted with scienter, the Third Circuit has defined "scienter" in the context of securities fraud as "a mental state embracing intent to deceive, manipulate or defraud, or, at a minimum, highly unreasonable (conduct), involving not merely simple, or even excusable negligence, but an extreme departure from the standards of ordinary care, ... which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it." *In re Alpharma Inc. Sec. Litig ., 372 F.3d 137, 148 (3d Cir.2004)* (quoting *In re Ikon Office Solutions, Inc., 277 F.3d 658, 667 (3d Cir.2002)*). Rule 9(b) provides that, in the context of pleading fraud, "[m]alice, intent, knowledge, and other condition of mind of a person may be averred generally." As this Court has previously noted, the additional requirement of the Private Securities Litigation Reform Act of 1995 ("PLSRA") that "the complaint shall, with respect to each act or omission alleged to violate this chapter, state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind," *15 U.S.C. § 78u-4(b)(2)*, does not apply to actions brought by the SEC. *SEC v. Lucent Technologies, Inc., 2005 WL 771228, \*6 (D.N.J. April 6, 2005)*.

**\*5** To adequately plead scienter, regardless whether the PSLRA applies, plaintiffs "must allege facts that could give rise to a 'strong' inference of scienter." *Burlington Coat Factory, 114 F .3d at 1422*. A plaintiff must either "(1) identify circumstances indicating conscious or reckless behavior by defendants or (2) allege facts showing both a motive and a clear opportunity for committing the fraud." *Id.* As said, because the PSLRA does not apply, the SEC is exempt from the PSLRA's additional requirement of pleading scienter with particularity. *See In re*

Not Reported in F.Supp.2d                                                                                                    Page 4
Not Reported in F.Supp.2d, 2005 WL 1206841 (D.N.J.)
**(Cite as: Not Reported in F.Supp.2d)**

*Advanta Corp. Sec. Litig., 180 F.3d 525, 533-35 (3d Cir.1999)* (the PSLRA differs from the previous standard for pleading scienter only in that it requires that it be pled with particularity).

#### A. Conscious or Reckless Behavior

Dorn charges that only two of the paragraphs in the Complaint address scienter, that those allegations are conclusory, and that the SEC has not pled any facts to support the allegations. Dorn relies on *Burlington Coat Factory* where the circuit held that "[i]t is not enough for plaintiffs to allege generally that defendants 'knew or recklessly disregarded each of the false and misleading statements for which [they were] sued'; plaintiffs must allege facts that could give rise to a 'strong' inference of scienter." *114 F.3d at 1422* (citations omitted). The SEC counters that it has satisfied the requirements for pleading scienter, regardless of whether the Court evaluates the allegations under the "strong inference" standard articulated in *Burlington Coat Factory,* or under Rule 9(b) which allows scienter to be pled generally.

There are no allegations from which the Court could infer that Dorn had any knowledge of accounting principles or that she had any role in Lucent's decisions to recognize revenue in connection with the transactions Dorn executed. The SEC relies on *SEC v. Dunlap, 2002 WL 1007626, *6 (S.D.Fla. March 27, 2002),* for the proposition that persons who are not accountants can still be held liable when the companies they work for violate GAAP. The *Dunlap* court found that knowledge or recklessness could be inferred by virtue of the defendant's position with the company. *Id.* at *6, n. 8. The Third Circuit, however, has indicated its unwillingness to impute knowledge on the basis of one's position within a company in the context of pleading fraud in accordance with Rule 9(b): "[g]eneralized imputations of knowledge do not suffice, regardless of the defendants' positions within the company." *Advanta, 180 F.3d at 539.* Furthermore, while the SEC alleges that Lucent changed its accounting policy, thereby making the side agreements significant for revenue recognition purposes, the SEC does not allege, nor can the Court infer, that Dorn was aware of this change in policy and that it affected her business group. As to the SEC's allegation that Dorn made an affirmative misrepresentation to Lucent's chief accountant that there were no side agreements granting a right of return greater than what was already specified in the distributor agreements, this allegation does not give rise to the strong inference of scienter that is

required. Had the SEC alleged that Dorn possessed some knowledge of accounting principles and Lucent's change in accounting policy, then this allegation would be sufficient. Without such supporting factual allegations, however, the Court cannot stretch this allegation as far as the SEC wishes. That Dorn did not tell the chief accountant about the side agreements does not mean that she knew the agreements would be significant to how revenue from those transactions was recognized, and it would be unreasonable to infer such without additional factual allegations. While the SEC charges that Dorn did not need to be an accountant to realize that the side agreements would lead to improper revenue recognition, the SEC offers no compelling reason why this Court should charge regular business people with knowledge of accounting principles. For these reasons, the Court finds that the SEC has failed to adequately plead scienter by way of facts that provide strong circumstantial evidence of conscious misbehavior or reckless.

#### B. Motive and Opportunity

**\*6** Even though the SEC has failed to sufficiently plead scienter under the "conscious or reckless behavior" test, the Court must consider whether the SEC has adequately pled scienter under the "motive and opportunity" test articulated in *Burlington Coat Factory.* "Motive entails allegations that the individual corporate defendants stood to gain in a concrete and personal way from one or more of the allegedly false or misleading statements and wrongful nondisclosures." *Wilson v. Bernstock, 195 F.Supp.2d 619, 633 (D.N.J.2002).* Opportunity refers to "the means and likely prospect of achieving such concrete benefits by the means alleged." *Id.*

With regard to motive and opportunity, the SEC alleges:
In their drive to realize revenue, meet internal sales targets and/or obtain sales bonuses, Nina Aversano, Jay Carter, Leslie Dorn, William Plunkett, John Bratten, Deborah Harris, Charles Elliot, Vanessa Petrini, and Michelle Hayes-Bullock, in their respective capacities as officers, executives and employees of Lucent improperly granted, and/or failed to disclose, various side agreements, credits and other incentives (collectively "extra-contractual commitments") to induce Lucent's customers to purchase the company's products.

(Compl. at ¶ 3.) Dorn argues that the SEC has failed to sufficiently plead motive and opportunity because

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                              Page 5
Not Reported in F.Supp.2d, 2005 WL 1206841 (D.N.J.)
**(Cite as: Not Reported in F.Supp.2d)**

this sole allegation refers to reasons that courts have found insufficient to constitute scienter. In *In re Crown American Realty Trust Sec. Litig., 1997 WL 599299, *25 (W.D.Pa.Sep.15, 1997)*, the court found that the plaintiffs' allegations were tantamount to an assertion that the reason the defendant failed to disclose certain information was because of its desire to improve its financial situation to enhance its ability to finance further capital improvements. The court held that "such a motive, without more" was insufficient to plead scienter in compliance with Rule 9(b). *Id.* Moreover, in *Shields v. Citytrust Bancorp, Inc., 25 F.3d 1124, 1130 (2d Cir.1994)*, the court found that to allege motive "a plaintiff must do more than merely charge that executives aim to prolong the benefits of the positions they hold." The court cited approvingly *Ferber v. Travelers Corp., 785 F.Supp. 1101, 1107 (D.Conn.1991)* for the statement that "[i]ncentive compensation can hardly be the basis on which an allegation of fraud is predicated. On a practical level, were the opposite true, the executives of virtually every corporation in the United States could be subject to fraud allegations."

To rebut Dorn's argument, the SEC advances *Weiner v. The Quaker Oats Co., 129 F.3d 310, 318 n. 8 (3d Cir.1997)*, for the proposition that a desire to preserve one's job is a sufficient motive for purposes of scienter. In *Weiner,* the complaint alleged that "Quaker's management took advantage of specific opportunities to communicate with the investment community in order to inflate the price of Quaker stock, fend off a widely-rumored potential takeover, and preserve management's own jobs." The SEC's reliance on this case is misplaced. First, as the complaint alleged more than continued employment as the motive for the defendants actions, it would be misleading to say that a desire to keep a job alone is sufficient to show motive. Second, and even more significant is that the SEC did not allege that Dorn was motivated by a desire to remain employed, but rather a related desire to obtain a sales bonus. As the Second Circuit has recognized, however, incentive compensation is insufficient for purposes of pleading scienter under the motive and opportunity test. *Shields,* 25 F.3d at 1130. For these reasons, the SEC's allegations fall far short of satisfying the "motive and opportunity" test. *See Tuchman v. DSC Communications Corp., 14 F.3d 1061, 1068-69 (5th Cir.1994)* (allegation that defendants acted for the purpose of creating an artificially inflated picture of the company's financial condition, increasing market share, gaining competitive advantage, maintaining an inflated stock price, preserving defendants' positions, obtaining compensation for themselves, and/or

inflating the value of their shares and stock "does not set out facts sufficient to lead to a proper inference of scienter.").

**\*7** The SEC's failure to adequately plead scienter under either the "conscious or reckless behavior" test or the "motive and opportunity" test requires the Court to grant Dorn's motion to dismiss Count One of the Complaint.

## *II. Count One-Aiding and Abetting Liability*

In addition to alleging a primary violation of Section 10(b) and Rule 10b-5, the SEC also asserts a claim against Dorn for aiding and abetting liability for providing substantial assistance to Lucent in its primary violation of these laws. To state a claim for aiding and abetting, a plaintiff must show: (1) that there has been an underlying securities violation; (2) that the alleged aider-abettor had knowledge of that act; and (3) that the aider-abettor knowingly and substantially participated in the wrongdoing. *Monsen v. Consolidated Dressed Beef Co., Inc., 579 F.2d 793, 799 (3d Cir.1978)*. Dorn argues that the SEC has failed to allege facts that would support a finding that Dorn knowingly and substantially participated in Lucent's violation. Dorn relies on *Cammer v. Bloom, 711 F.Supp. 1264, 1299-1300 (D.N.J.1989)*. In *Cammer,* the defendant was charged with an aiding and abetting claim under Rule 10b-5. The plaintiff stock holders alleged that the company had improperly recognized revenue. In discussing the knowing and substantial participation element of aiding and abetting liability, the court found that the broad conclusory allegation that the defendant knowingly and recklessly participated in the issuance of false and misleading statements to the investing public to be insufficient. *Id.* It was alleged that the defendant was a director and outside attorney for the company and that he sold certain amounts of company stock during the class period. *Id.* In finding the allegations insufficient, the court said:

There are no allegations, for example, that Kagan, as part of his duties as a director, was on the audit committee of the Board of Directors. There are no allegations that he exercised any responsibility for the Company's day to day operations. Indeed nothing at all is alleged in the Amended Complaint from which it can be inferred that Kagan knew of or participated in the fraud.

*Id.* (footnote omitted). The court dismissed the claim against Kagan and granted the plaintiff leave to amend their complaint to "replead with particularity

Not Reported in F.Supp.2d                                                                                    Page 6
Not Reported in F.Supp.2d, 2005 WL 1206841 (D.N.J.)
**(Cite as: Not Reported in F.Supp.2d)**

any facts which would suggest Kagan had knowledge of, or involvement in, the accounting and reporting practices at Coated Sales." *Id.*

As in *Cammer,* no facts have been alleged here that would suggest that Dorn knowingly participated in Lucent's misstatement of revenue and income. Without allegations that show Dorn had knowledge of accounting principles or Lucent's policy regarding how and when revenue should be recognized in transactions such as the ones Dorn is alleged to have executed, the SEC has not sufficiently pled the third element of an aiding and abetting claim. For this reason, the SEC cannot maintain its Section 10(b) aiding and abetting claim against Dorn, and Dorn's motion to dismiss this claim is granted.

### III. Counts Three and Four

**\*8** Count Three alleges that Dorn aided and abetted Lucent in violating Section 13(a) of the Exchange Act and Rules 12b-20, 13a-11 and 13a-13 by causing Lucent to file materially false and misleading financial statements in forms 10-Q for the first three quarters of its fiscal year 2000 and in a form 8-K filed on October 24, 2000 with regard to Lucent's fourth quarter results. [FN1] Count Four alleges that Dorn aided and abetted Lucent's failures to keep accurate books, records, and accounts that fairly reflected Lucent's transactions and assets in violation of Section 13(b)(2)(A). Count Four also alleges that Dorn aided and abetted Lucent's failures to maintain an adequate system of internal accounting controls such that there could be a reasonable assurance that Lucent's financial statements would be prepared in conformity with GAAP in violation of Section 13(b)(2)(B).[FN2] The elements for these aiding and abetting claims are the same as those for a Section 10(b) claim: (1) a primary violation by Lucent, (2) the aider-abettor had knowledge of that act, and (3) the aider-abettor knowingly and substantially participated in the wrongdoing. *Monsen,* 579 F.2d at 799. Dorn challenges these claims on the ground that the SEC failed to allege any facts that would suggest that she knowingly and substantially participated in the misstatement of Lucent's financials, its failure to keep accurate books and records, or its failure to maintain an adequate system of internal controls. Because the SEC did not allege facts that would support an inference that Dorn knew it was improper to recognize revenue in the transactions she executed, the third element of its aiding and abetting claims has not been adequately pled. It follows then that Counts Three and Four must also be dismissed.

FN1. Section 13(a) and the rules referenced provide that an issuer of securities must file certain documents with the SEC and that such documents must contain certain information so as to not be misleading. Implicit in these provisions is the requirement that the information submitted be true and correct. *GAF Corp. v. Milstein,* 453 F.2d 709, 720 (2d Cir.1971).

FN2. Sections 13(b)(2)(A) and 13(b)(2)(B) provide:
(2) Every issuer which has a class of securities registered pursuant to section 78l of this title and every issuer which is required to file reports pursuant to section 78o(d) of this title shall-
(A) make and keep books, records, and accounts, which, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the issuer;
(B) devise and maintain a system of internal accounting controls sufficient to provide reasonable assurances that-
(i) transactions are executed in accordance with management's general or specific authorization;
(ii) transactions are recorded as necessary (I) to permit preparation of financial statements in conformity with generally accepted accounting principles or any other criteria applicable to such statements, and (II) to maintain accountability for assets;
(iii) access to assets is permitted only in accordance with management's general or specific authorization; and
(iv) the recorded accountability for assets is compared with the existing assets at reasonable intervals and appropriate action is taken with respect to any differences.

### CONCLUSION

Defendant Dorn's Motion to Dismiss is GRANTED. Counts One, Three and Four of the Complaint are dismissed without prejudice.

D.N.J.,2005.
S.E.C. v. Lucent Technologies Inc.
Not Reported in F.Supp.2d, 2005 WL 1206841 (D.N.J.)

Briefs and Other Related Documents (Back to top)

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                    Page 7
Not Reported in F.Supp.2d, 2005 WL 1206841 (D.N.J.)
**(Cite as: Not Reported in F.Supp.2d)**

• 2006 WL 481056 (Trial Motion, Memorandum and Affidavit) Reply Memorandum of Law is Support of Defendant Jay Carter's Motion to Dismiss, or, in the Alternative, Motion for Judgment on the Pleadings (Feb. 24, 2006)

• 2006 WL 481057 (Trial Motion, Memorandum and Affidavit) Defendant Michelle Hayes-Bullock's Reply Memorandum of Law in Further Support of Her Motion to Dismiss the Amended Complaint Pursuant to Fed. R. Civ. P. 9(b) and 12(b)(6) (Feb. 24, 2006)

• 2006 WL 379152 (Trial Motion, Memorandum and Affidavit) Securities and Exchange Commission's Memorandum of Law in Opposition to Defendant Carter's Motion to Dismiss the Amended Complaint or, in the Alternative Motion for Judgment on the Pleadings (Jan. 27, 2006)

• 2006 WL 379154 (Trial Motion, Memorandum and Affidavit) Plaintiff Securities and Exchange Commission's Memorandum of Law in Opposition to Defendant Michelle Hayes-Bullock's Motion to Dismiss the Amended Complaint (Jan. 27, 2006)

• 2005 WL 3771441 (Trial Motion, Memorandum and Affidavit) Memorandum of Law in Support of Defendant Jay Carter's Motion to Dismiss the Amended Complaint or, in the Alternative, Motion for Judgment on the Pleadings (Dec. 2, 2005)

• 2005 WL 3771443 (Trial Motion, Memorandum and Affidavit) Defendant Michelle Hayes-Bullock's Memorandum of Law in Support of Her Motion to Dismiss the Amended Complaint Pursuant to Fed. R. CIV. P. 9(b) and 12(b)(6) (Dec. 2, 2005)

• 2005 WL 3522052 (Trial Pleading) Answer of Defendant Alice Leslie Dorn (Nov. 4, 2005)

• 2005 WL 3171789 (Trial Pleading) Answer to Amended Complaint, Affirmative Defenses and Jury Demand of Nina Aversano (Oct. 20, 2005)

• 2005 WL 2898305 (Trial Pleading) Amended Complaint (Sep. 30, 2005)

• 2005 WL 2511122 (Trial Pleading) Answer, Affirmative Defenses and Jury Demand of Nina Aversano (Sep. 1, 2005)

• 2005 WL 3771436 (Trial Motion, Memorandum and Affidavit) Reply Memorandum of Law in Further Support of Defendant Alice Leslie Dorn's Motion to Dismiss the Fifth Claim in the Complaint (Jul. 11, 2005)

• 2005 WL 3771453 (Trial Motion, Memorandum and Affidavit) Plaintiff Securities and Exchange Commission's Memorandum of Law in Opposition to the Second Motion to Dismiss of Defendant Dorn (Jun. 27, 2005)

• 2005 WL 3771452 (Trial Motion, Memorandum and Affidavit) Memorandum of Law in Support of

Defendant Alice Leslie Dorn's Motion to Dismiss the Fifth Claim in the Complaint (Jun. 13, 2005)

• 2005 WL 3771454 (Trial Pleading) Answer and Affirmative Defenses of Defendant Jay Carter (Apr. 21, 2005) Original Image of this Document (PDF)

• 2005 WL 3771451 (Trial Motion, Memorandum and Affidavit) Plaintiff Securities and Exchange Commission's Memorandum in Support of Unopposed Motion for Distribution of Funds in Cris Account and Application for Appointment of Distribution Agent (Feb. 3, 2005)

• 2004 WL 3699027 (Trial Motion, Memorandum and Affidavit) Reply Memorandum of Law in Further Support of Defendant Alice Leslie Dorn's Motion to Dismiss the First, Third and Fourth Claims in the Complaint (Nov. 1, 2004) Original Image of this Document (PDF)

• 2004 WL 3699026 (Trial Motion, Memorandum and Affidavit) Plaintiff Securities and Exchange Commission's Memorandum of Law in Opposition to the Motion to Dismiss of Defendant Dorn (Oct. 25, 2004)

• 2004 WL 3699024 (Trial Motion, Memorandum and Affidavit) Defendant Michelle Hayes-Bullock's Reply Memorandum of Law in Further Support of Her Motion to Dismiss the Complaint Pursuant to Fed. R. Civ. P. 9(b) and 12(b)(6) (Oct. 19, 2004)

• 2004 WL 3699025 (Trial Motion, Memorandum and Affidavit) Reply Memorandum of Law in Support of Defendant Jay Carter's Motion to Dismiss (Oct. 19, 2004)

• 2004 WL 3699023 (Trial Motion, Memorandum and Affidavit) Memorandum of Law in Support of Defendant Alice Leslie Dorn's Motion to Dismiss the First, Third and Fourth Claims in the Complaint (Oct. 12, 2004) Original Image of this Document (PDF)

• 2004 WL 2559219 (Trial Motion, Memorandum and Affidavit) Plaintiff Securities and Exchange Commission's Memorandum of Law in Opposition to the Motions to Dismiss of Defendants Jay Carter and Michelle Hayes-Bullock (Sep. 24, 2004)

• 2004 WL 3699022 (Trial Motion, Memorandum and Affidavit) Memorandum of Law in Support of Defendant Jay Carter's Motion to Dismiss the Complaint (Sep. 13, 2004)

• 2004 WL 3699021 (Trial Motion, Memorandum and Affidavit) Defendant Michelle Hayes-Bullock's Memorandum of Law in Support of Her Motion to Dismiss Pursuant to Fed. R. Civ. P. 9(b) and 12(b)(6) (Jul. 29, 2004)

• 2004 WL 3699028 (Trial Pleading) Complaint for Permanent Injunction and Other Legal and Equitable Relief (Jul. 29, 2004)

• 2004 WL 2558565 (Trial Pleading) Complaint (May 17, 2004)

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                    Page 8
Not Reported in F.Supp.2d, 2005 WL 1206841 (D.N.J.)
**(Cite as: Not Reported in F.Supp.2d)**

• 2:04cv02315 (Docket) (May 17, 2004)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# Exhibit D

Westlaw.

Not Reported in F.Supp.2d                                                                    Page 1
Not Reported in F.Supp.2d, 2006 WL 542986 (E.D.Mich.), Fed. Sec. L. Rep. P 93,838
**(Cite as: Not Reported in F.Supp.2d)**

**C**
Briefs and Other Related Documents
S.E.C. v. OrrE.D.Mich.,2006.
United States District Court,E.D. Michigan, Southern
Division.
SECURITIES AND EXCHANGE COMMISSION,
Plaintiff(s),
v.
John Paul ORR, et al., Defendant(s).
**No. 04-74702.**

March 6, 2006.

Cheryl Scarboro, Elinor Sosne, Lucee Kirka, Peter H.
Bresnan, Reid A. Muoio, Timothy P. Peterson,
William H. Kuehnle, U.S. Securities and Exchange
Commission, Washington, DC, Julia C. Pidgeon,
U.S. Attorney's Office, Detroit, MI, for Plaintiff.
Andrew J. Broder, Payne, Payne, Bingham Farms,
MI, Lewis F. Murphy, Rebekah J. Poston, Richard E.
Brodsky, Steel, Hector, Russell C. Weigel, III,
Russell C. Weigel IIIAssoc., Miami, FL, Sean M.
Walsh, Cox, Hodgman, Troy, MI, David T.
McTaggart, Harry Frischer, Proskauer Rose, New
York, NY, Norman C. Ankers, Honigman, Miller,
Detroit, MI, for Defendants.

ORDER
ROBERTS, J.

## I. INTRODUCTION

***1** This matter is before the Court on three motions:
Defendant John Paul Orr's Motion to Dismiss the
Complaint; Defendant David N. Bixler's Motion to
Dismiss the Complaint; and, Defendant Kirkpatrick's
Motion to Dismiss. Argument on the motions was
heard on June 13, 2005. For the reasons stated below,
the Court GRANTS Defendant Kirkpatrick's motion
in part; GRANTS Defendant Bixler's motion in its
entirety; and, GRANTS Defendant Orr's motion in
part.

## II. BACKGROUND

This action is brought by the Securities and Exchange
Commission ("SEC"). The SEC alleges that a
number of Kmart employees and vendors participated
in schemes that led to Kmart overstating its revenues

and understating its expenses. Of the eight named
Defendants, only three remain: Defendants David C.
Kirkpatrick ("Kirkpatrick") and David N. Bixler
("Bixler"), who were employed by vendors who
contracted with Kmart Corporation ("Kmart"), and
Defendant John Paul Orr ("Orr"), who was a Kmart
employee. Plaintiff settled its claims against the other
named Defendants and a Final Judgment entered
against them on December 2, 2004.[FN1]

> FN1. The other named Defendants were
> Michael J. Frank, Albert M. Abbood, Darrell
> J. Edquist, Thomas L. Taylor, and Randall
> M. Stone.

Kirkpatrick, Bixler, and Orr are alleged to have acted
in concert with Kmart employees (and in Orr's case,
vendors) in prematurely reporting allowances earned
by Kmart under vendor contracts. Specifically, on its
Form 10-K [FN2] for the 2000 fiscal year [FN3] Kmart
allegedly reported vendor allowances that were to be
earned in the 2001 fiscal year, as earned in the 2000
fiscal year (hereinafter referred to as "pulling
forward" vendor allowances). Plaintiff alleges that
the actual terms of the payments were set forth in so-
called "secret side agreements" which were not
disclosed to Kmart's accounting department or its
independent auditor, Pricewaterhouse Coopers
("PwC").

> FN2. Although the parties do not state what
> a Form 10-K is, it is a financial report that
> issuers of securities are required to file
> periodically with the SEC.

> FN3. In the Complaint, Plaintiff says that
> Kmart's fiscal year ends the last Wednesday
> in January. Complaint, ¶ 15. However, at
> oral argument, counsel for Bixler said that
> Kmart's 2000 fiscal year ended January 31st.

Per Plaintiff, the practice of pulling forward vendor
allowances is contrary to generally accepted
accounting principles ("GAAP"), and resulted in
Kmart: 1) understating its cost of goods sold, and 2)
overstating its earnings in the years preceding
Kmart's bankruptcy filing in January 2002. Plaintiff
alleges that, collectively, the named Defendants'
misconduct caused Kmart's net income for the fourth

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                    Page 2
Not Reported in F.Supp.2d, 2006 WL 542986 (E.D.Mich.), Fed. Sec. L. Rep. P 93,838
**(Cite as: Not Reported in F.Supp.2d)**

quarter and fiscal year 2000 to be overstated by approximately $24 million (or 10%) when originally reported. Kmart restated its financial statements after filing for bankruptcy to correct these and other accounting errors. Individually, Plaintiff alleges that Kirkpatrick and Bixler each caused Kmart's 2000 fiscal year net income to be overstated by $3 million (or 1.2%), and that Orr caused an overstatement of $12.35 million (or 5%). Additionally, Plaintiff alleges that Orr caused Kmart's net income to be overstated by $2.5 million in the 1999 fiscal year.

In their motions to dismiss, Defendants contend that Plaintiff failed to allege facts implicating them in Kmart's alleged wrongdoing. Moreover, they contend that the collective and individual amounts that Kmart allegedly over-and understated revenues and costs in fiscal year 2000, is insignificant vis-à-vis Kmart's total sales revenues and sales costs, which were $37 billion and $29.7 billion, respectively.

### A. DEFENDANT KIRKPATRICK

**\*2** Defendant Kirkpatrick is a former sales manager for Coca Cola Enterprises, Inc. ("Coke"). He was Coke's National Sales Director in charge of the Kmart account during all relevant times and until January 2004, when he was asked to resign. In January 2001, Albert M. Abood ("Abood"), the Divisional Vice President of non-perishable products in Kmart's food and consumables division, allegedly contacted Kirkpatrick and said that his (Abood's) division needed $5 million from Coke to help cover a divisional shortfall. Plaintiff says Kirkpatrick agreed to pay $2 million to settle accounts for the 2000 calendar year, and to advance Kmart a $3 million vendor allowance for marketing services to be performed during the 2001 calendar year. Kirkpatrick and Abood memorialized the vendor allowance agreement in a marketing contract. Under the contract, the $3 million allowance would be deemed earned by Kmart when it sold 28, 169,000 cases of Coke. But, Coke would be entitled to a refund of any unearned portion, based on the number of cases Kmart actually sold.

When it filed its financial reports for the 2000 fiscal year, Plaintiff alleges that Kmart prematurely recognized the entire $3 million allowance as a reduction of its sales costs in the fiscal year 2000, instead of the fiscal year 2001. Plaintiff says Kmart carried out its deception by concealing the Coke contract and Kmart's potential repayment obligation from its accountants. As a result, Plaintiff says

Kmart's sales costs for fiscal year 2000 were understated (and its earnings were overstated) by $3 million.

Kirkpatrick is alleged to have assisted Kmart in its misrepresentation by: 1) executing two Vendor Allowance Tracking Systems ("VATS") forms containing false information, and 2) confirming them as accurate during an independent audit in February 2001. Per Plaintiff, VATS forms are relied upon by Kmart's accounting department as a summary of the basic terms of vendor allowances. Kmart bookkeepers input information from the VATS form into the company's computerized accounting system, where it is eventually posted to the general ledger.

Plaintiff alleges that the VATS forms Kirkpatrick signed off on were written as though the $3 million advance was used during 2000, and misrepresented the effective dates of the Coke contract. Specifically, VATS form 226003 stated that $2.25 million was allowed for "case display," for an "[a]greement effective from date 2/01/2000 to 12/31/2000." VATS form 226004 stated that $750,000 was allowed for "holiday display," for an "[a]greement effective from date 11/01/2000 to 12/31/2000." Def. Kirkpatrick, Exh. D.

To ensure proper accounting, Plaintiff alleges that the VATS forms should have reflected the true purpose of, and effective dates for, the $3 million allowance. Per Plaintiff, Abood and Kirkpatrick knew or were reckless in not knowing that the VATS forms misrepresented the true terms of the advance. Plaintiff says the true terms were disclosed in the parties' contract and a subsequent letter written by Kirkpatrick. In a letter dated March 28, 2001, Kirkpatrick referred to the $3 million allowance as the "2001 Direct Marketing Fund" and indicated that it would, per the recipient's request,[FN4] be settled against the two VATS forms signed by Kirkpatrick. However, Plaintiff alleges that neither the contract nor the letter was provided to Kmart's accounting department or PwC.

FN4. The recipient was Jim Kenny, whose position with Kmart is not known. The letter was also carbon copied to four other individuals who were only identified by name.

**\*3** Kirkpatrick asserts that the VATS forms that he signed were not inaccurate because Kmart did perform case display and holiday display activity

Not Reported in F.Supp.2d                                                                                    Page 3
Not Reported in F.Supp.2d, 2006 WL 542986 (E.D.Mich.), Fed. Sec. L. Rep. P 93,838
**(Cite as: Not Reported in F.Supp.2d)**

during the dates listed and, according to him, the amounts allowed reflect a fair value for those activities. Even though the allowance was not given for services performed during the dates listed on the VATS forms, Kirkpatrick essentially argues that it was within Kmart's discretion to account for the allowance as it wished so long as it fulfilled its sales obligation by the end of 2001, which he says it did. Moreover, Kirkpatrick states that the VATS forms themselves show that it was never the parties' practice to insert the dates of underlying agreements in the field requesting "effective dates." Rather, Kirkpatrick says the "effective dates" section merely referred to the dates of the activity Kmart chose to fund with the allowance. In any event, Kirkpatrick asserts that Plaintiff has not alleged any facts which suggest that he knew of or participated in Kmart's alleged concealment of the Coke contract or Kmart's repayment obligations under the contract.

## B. DEFENDANT BIXLER

During the relevant time, Defendant Bixler was a National Sales Director for Pepsi-Cola Company ("Pepsi"). He was in charge of Pepsi's beverage account with Kmart. In 1997, Kmart and Pepsi entered into a multi-year agreement, under which Pepsi paid Kmart allowances for sales and promotional activities. Towards the end of Kmart's 2000 fiscal year, Abood allegedly began to pressure Bixler for additional allowances that were not included in the contract. Plaintiff alleges that Abood threatened to give an additional 10 million cases of Kmart business to Pepsi's competitor-Coke-if Bixler did not agree.

In January 2001, Plaintiff says Bixler "agreed to 'advance' or 'prepay' $3 million worth of allowances to be earned by Kmart during calendar year 2001 under the Pepsi Contract." Complaint at ¶ 79. Bixler memorialized the agreement in a letter signed by both him and Abood and dated January 11, 2001. In the letter, Bixler referred to the allowance as a pre-payment for the "Feature Ad budget" for 2001:
The attached VATS Agreement # 219971 ($3,000,000) is to be applied to 2001 SVA Feature Ad Support.
The Feature Ad budget for 2001 will reflect a $3,000,000 pre-payment in January for 2001.

Def. Bixler, Exh. 1(b). Bixler also signed VATS form 219971, which stated that the $3 million payment was for an "[a]greement effective from date 1/1/01 to 1/31/01." Def. Bixler, Exh. 1(c). And, in the "special

comments" section of the form, he noted "Incremental R.O.P. Support-Feature Ad Payment." *Id.*

Plaintiff alleges that the VATS form executed by Bixler misrepresented the effective date of Pepsi's allowance agreement with Kmart and falsely stated that the allowance related to "Incremental R.O.P. Support," which is a special type of advertising activity that Plaintiff says was not covered by the Pepsi contract. Plaintiff contends that Bixler knew or was reckless in not knowing that the VATS form misrepresented the true terms of the allowance. It was Bixler's "side" letter, says Plaintiff, that included the true terms of the allowance. However, Plaintiff alleges that the letter was not provided to Kmart's accounting department or PwC. Bixler disputes Plaintiff's assertion and states that, in its complaint, Plaintiff acknowledges that he sent both the letter and the VATS form to Kmart,[FN5] but does not allege that he was responsible for the two being separated.

> FN5. The Complaint does not explicitly indicate where the letter and VATS were sent, or that they were sent together.

**\*4** During its audit of Kmart's 2000 financial statements, PwC contacted Bixler and requested that he provide written confirmation of the VATS form he executed. However, per Plaintiff, Bixler told one or more auditors that he was reluctant to execute a written confirmation. The Complaint does not indicate whether Bixler gave an explanation for his reluctance. Therefore, a meeting was arranged. Plaintiff alleges that Bixler met with an auditor from PwC and "convinced" the auditor that Kmart earned the $3 million allowance during the 2000 fiscal year. Plaintiff states in its complaint that the auditor subsequently documented the conversation with Bixler in his work papers.

Bixler asserts that Plaintiff's allegation regarding the PwC audit falls short because it is cursory and does not provide the content of his supposed statements. Furthermore, Bixler contends that the auditor's notes, which are referenced in Plaintiff's complaint, confirm that he accurately stated the terms of the allowance agreement. Neither party provides a copy of the auditor's notes. However, Bixler's attorney, Harry Frisher, states in an affidavit that he saw a copy of them during a visit to Plaintiff's office and caused them to be transcribed verbatim. Frisher Decl. at ¶ 5. Per Frisher, the auditor wrote with regard to the allowance that Bixler "confirmed verbally that these

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2006 WL 542986 (E.D.Mich.), Fed. Sec. L. Rep. P 93,838
**(Cite as: Not Reported in F.Supp.2d)**

amounts were accurate/valid allowances that were earned by K-mart during 2001." *Id.* Therefore, contrary to Plaintiff's allegations, Bixler asserts that the auditor's notes do not suggest that he made a false, inaccurate or misleading statement regarding when the allowance was earned.

Bixler also contends that Plaintiff failed to allege that the vendor advance was improper or unusual, or that he was involved in Kmart's reporting decision. Bixler asserts that the date of his letter is within the effective dates on the VATS form. In any event, he asserts that the effective dates section of the form is ambiguous. Plaintiff disputes Bixler's contention that the form was unclear about the meaning of the term "effective date," because the back side of the form explains that "effective date" means the date the agreement "starts and ends." Pl. Exh. F.

Lastly, Bixler asserts that Plaintiff failed to allege: 1) that he had knowledge that the VATS form would be used by Kmart as the basis for recording the transaction, or 2) the significance of the "effective date" and other statements on the form to Kmart's accounting department.


### C. DEFENDANT ORR

Defendant Orr is a former Kmart merchandiser. From October 1999 until he was terminated on February 15, 2001, Orr was Divisional Vice President of Kmart's photo division. Orr's responsibility was to decide which film and camera products and services to offer in the retail stores and how to display them. Plaintiff alleges that several vendor allowances, including one for $2.5 million for the 1999 fiscal year and several totaling $12.35 million for the 2000 fiscal year, were pulled forward at Orr's direction.


### i. $7 Million Kodak Advance

**\*5** Per Plaintiff, Orr met regularly with (unidentified) staff members. During those meetings he allegedly discussed pulling forward vendor allowances and reviewed schedules prepared by staff members which listed pull forward opportunities. Plaintiff alleges that Kmart's photo division projected a margin shortfall near the end of the 2000 fiscal year. Therefore, Plaintiff says that on January 31, 2001 (the last day of the 2000 fiscal year), one of Orr's subordinates asked an Eastman Kodak ("Kodak") salesman, Darrel Edquist, to advance $7 million worth of allowances to be earned throughout the 2001 calendar year.

Edquist allegedly agreed and confirmed it in a memo, to an unidentified individual, whom Plaintiff alleges "made clear" that the money was an advance of allowances to be earned in 2001 (hereinafter "the Edquist memo"). Edquist also signed VATS form 222946. Plaintiff alleges this form falsely listed the effective dates of the $7 million allowance as "01/01/01 to 01/31/01." Plaintiff says the false form was subsequently given to PwC in response to a request for confirmation of the allowance.

Orr contends that Plaintiff's allegations do not implicate him in any wrongdoing. Orr points out that the Edquist memo was dated February 19, 2001, four days after he (Orr) was terminated. Moreover, he points out that there are no allegations that he: 1) told his staff to pull forward the Kodak advance or knew that the participants intended to do so; 2) reviewed or approved the VATS form; 3) submitted or directed others to submit false information to Kmart's accounting department; 4) communicated or otherwise conspired with Kodak to defraud Kmart; 5) received the Edquist memo or communicated with Edquist about its contents; 6) acted unreasonably in recording transactions; 7) had the motive or opportunity to violate or aid and abet a violation of federal securities laws; or 8) knew, or was reckless in not knowing, the impact on Kmart's financial statements or that the Kodak advance violated Kmart policy.


### ii. $3.25 Million Kodak Advance

Plaintiff alleges that another $3.25 million advance was included in an allowance schedule that Orr reviewed and discussed with his staff towards the end of 2000 fiscal year. Per Plaintiff, all of the allowances on the schedule related to promotional and marketing activities for the 2001 calendar year and beyond. However, in order to pull the allowances forward, Plaintiff alleges that Orr directed his subordinates to execute a series of eight VATS forms totaling $3 .25 million.[FN6] Plaintiff says all of the VATS forms misrepresented the effective dates of the allowances in fiscal year 2000. Edquist allegedly co-signed two of the largest of the VATS forms, totaling $2.5 million, and set out the true terms in a memo written on January 31, 2001. Plaintiff says this "made clear" that the money was an advance of allowances to be earned by Kmart during the 2001 calendar year. Edquist allegedly sent the memo to Orr and his subordinates in February 2001, but it was not provided to Kmart's accounting department or independent auditors.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                    Page 5
Not Reported in F.Supp.2d, 2006 WL 542986 (E.D.Mich.), Fed. Sec. L. Rep. P 93,838
**(Cite as: Not Reported in F.Supp.2d)**

FN6. VATS numbers: 222920; 222921; 222922; 222924; 222935; 222936; 222947; and, 222985.

**\*6** Orr argues that Plaintiff again failed to allege that he received the memo or that he discussed its contents with Edquist or anyone else. Orr further contends that Plaintiff's allegations suffer the same deficiencies as those concerning the $7 million advance.

### iii. $2.5 Million Kodak Advance

At the end of the 1999 fiscal year (ending January 26, 2000), Plaintiff alleges that Kmart's photo division projected a profit shortfall. To address the expected shortfall, Plaintiff alleges that Orr asked Edquist for additional allowances to help the photo division make its numbers. When Edquist resisted, Orr allegedly threatened to sell the exclusive right to display product at the front of Kmart stores to a Kodak competitor, Fuji. Edquist allegedly relented and agreed to pay $2.5 million to secure Kodak's right to display product at the front of Kmart stores during the 2000 calendar year. Plaintiff alleges that Edquist further agreed to "paper" the transaction to enable Kmart to "take the money into income" immediately. Complaint, ¶ 39.

Per Plaintiff, Orr directed his subordinate to sign VATS number 197017 with Edquist. Plaintiff says the VATS form listed the effective dates of the allowance as "2/1/99 to 1/25/00," and stated that the allowance related to an "Annual Rolling Rack Program for 1999." Plaintiff says this information was false because the allowance actually related to activity scheduled for the 2000 calendar year. And, according to Plaintiff, Edquist stated in his own notes that Orr requested that Kodak complete the effective date and special comment sections on the VATS form so that it would appear that the payment was for work performed in 1999. As a consequence, Plaintiff alleges that Kmart's cost of goods sold was understated by $2.5 million in the 1999 fiscal year.

Orr argues that "pull forward" allegations for the 1999 fiscal year are not relevant, because Plaintiff's complaint centers on Kmart's alleged misrepresentations in its Form 10-K for the 2000 fiscal year. Orr also says the alleged misconduct relative to the 1999 fiscal year is not actionable because: 1) Plaintiff did not allege that Kmart's Form

10-K for the 1999 fiscal year was deficient in any way; 2) the alleged deficiency is immaterial relative to Kmart's reported net income for the 1999 fiscal year, which was $403 million; and 3) the allegations regarding the 1999 fiscal year predate the notice that was given in June 2000 (via the accounting memorandum discussed below) regarding Kmart's accounting policies, and Plaintiff did not allege that Orr received the notice.

### iv. $2.1 Million Fuji Advance

Per Plaintiff, in January 2001, Fuji agreed to pay a $2.1 million allowance to secure placement of its product at favorable locations within Kmart stores during the 2001 calendar year. Plaintiff alleges that the $2.1 million allowance was subsequently pulled forward with "Orr's knowledge and assistance," [FN7] via VATS form 222915. Plaintiff says this form misrepresented the effective date of the agreement as "01/31/01 to 01/31/01." [FN8] Plaintiff alleges that the Fuji allowance was on a list of pull forwards Orr reviewed and discussed with his staff.

FN7. Complaint, ¶ 56.

FN8. The Court presumes that the effective date listed in the Complaint is not a typographical error since Plaintiff listed the same date range in its brief.

**\*7** Orr argues that Plaintiff does not allege any supporting facts to substantiate its assertion that he knew and assisted in the alleged misrepresentation, except its claim that the true terms of the agreement with Fuji were included in a letter sent to Orr and one of his subordinates. Because no specific information is given regarding the contents of the letter and its date, Orr contends that reference to the letter is insufficient. Orr further contends that Plaintiff's allegations regarding the Fuji advance suffer from the same deficiencies as allegations regarding the Kodak advances.

### v. Accounting Memorandum

Plaintiff alleges that Kmart's accounting policies and procedures regarding vendor allowances were set forth in a memorandum dated June 26, 2000, which was "communicated" to Kmart officers and employees, including Orr. The memo stated in relevant part that "[a]llowances may only be recorded

Not Reported in F.Supp.2d                                                                Page 6
Not Reported in F.Supp.2d, 2006 WL 542986 (E.D.Mich.), Fed. Sec. L. Rep. P 93,838
**(Cite as: Not Reported in F.Supp.2d)**

in the period for which they are earned[,]" and that income must be matched to the period in which the expense is incurred. Complaint, ¶ 31. Orr says that Plaintiff's reliance upon this document to establish that he knowingly participated in the alleged fraud is misplaced because: 1) he was only listed as a carbon copy recipient; 2) the memo directed the accounting department to review it with merchandising personnel, but there is no allegation that Orr actually received, read or understood its application to Kmart's accounting policies; and 3) there is no allegation that Orr was responsible for determining how and when Kmart recognized revenue.

In sum, Orr asserts that Plaintiff failed to allege facts to establish that he participated in the alleged fraudulent conduct or that he was aware of it. Further, he contends that there are no allegations that he was familiar with Kmart's accounting practices or responsibilities or that he was in a position to affect those practices or responsibilities.

### D. MANAGEMENT LETTER

In addition to the individual allegations against Kirkpatrick, Bixler and Orr, Plaintiff alleges that a letter entitled, "Management's Responsibility for Financial Statement," ("management letter"), which included the Form 10-K for the 2000 fiscal year, was also affected by their alleged allowance misrepresentations. Kmart's Chief Operating Officer and Chief Financial Officer signed the management letter and purported to assure investors about the quality of Kmart's financial statements. However, Plaintiff alleges that Kirkpatrick, Bixler and Orr's misconduct rendered the letter false because it stated that Kmart's financial statements were prepared in accordance with GAAP, and that Kmart maintained comprehensive systems of internal controls designed to provide reasonable assurance that assets are safeguarded and transactions are executed in accordance with established procedures. Neither statement was true, says Plaintiff, because Kirkpatrick, Bixler and Orr caused allowance transactions to be recognized in a manner contrary to GAAP, and they helped circumvent Kmart's internal controls over allowances in a manner contrary to Kmart's policies and procedures.

**\*8** Based on the above allegations, Plaintiff asserts several claims against Defendants. Each Defendant is alleged to have violated: 1) or aided and abetted a violation of Section 10(b) the Securities Exchange Act of 1934 ("Exchange Act") [FN9] and Rule 10b-

5,[FN10] promulgated thereunder (Count I); 2) the books and records provision of Rule 13b2-1 [FN11] of the Exchange Act (Count II); 3) Section 13(b)(5) [FN12] of the Exchange Act (Count III); and 4) or aided and abetted a violation of the reporting provisions of the Exchange Act-Section 13(a),[FN13] Rule 12b-20,[FN14] Rule 13a-1,[FN15] and Section 20(e) [FN16] (Count V). Additionally, Orr is alleged to have violated, and Kirkpatrick and Bixler are alleged to have aided and abetted, a violation of Rule 13b2-2 [FN17] (Count IV). Defendants move to dismiss all claims.

FN9. 15 U.S.C. § 78j(b).

FN10. 17 C.F.R. § 240.10b-5.

FN11. 17 C.F.R. § 240.13b2-1.

FN12. 15 U.S.C. § 78m(b)(5).

FN13. 15 U.S.C. § 78m(a).

FN14. 17 C.F.R. § 240.12b-20.

FN15. 17 C.F.R. § 240.13a-1.

FN16. 15 U.S.C. § 78t(e).

FN17. 17 C.F.R. § 240.13b2-2.

### III. ANALYSIS

Defendants move to dismiss Plaintiff's complaint pursuant to FRCP 9(b) and 12(b)(6). When reviewing a Rule 12(b)(6) motion, the trial court "must construe the complaint liberally in the plaintiff's favor and accept as true all factual allegations and permissible inferences therein." *Gazette v. City of Pontiac,* 41 F.3d 1061, 1064 (6th Cir.1994); *see also Miller v. Currie,* 50 F.3d 373, 377 (6th Cir.1995). Because a Rule 12(b)(6) motion rests upon the pleadings rather than the evidence, "[i]t is not the function of the court [in ruling on such a motion] to weigh evidence or evaluate the credibility of the witnesses." *Miller, 50 F.3d at 377.* The court should deny a Rule 12(b)(6) motion "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of [her] claim which would entitle [her] to relief." *Gazette, 41 F.3d at 1064; see also Miller, 50 F.3d at 377; Vemco, Inc. v. Camardella,* 23 F.3d 129, 132 (6th Cir.1994). While this standard is decidedly liberal, it requires more than the bare assertion of legal conclusions. *In re DeLorean Motor Co.,* 991 F.2d 1236, 1240 (6th Cir.1993). Rather, the complaint must

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2006 WL 542986 (E.D.Mich.), Fed. Sec. L. Rep. P 93,838
(Cite as: Not Reported in F.Supp.2d)

Page 7

contain either direct or inferential allegations respecting all the material elements to sustain a recovery under some viable legal theory. *DeLorean, 991 F.2d at 1240.*

Notwithstanding the liberal standard required under FRCP 12(b)(6), when fraud is alleged FRCP 9(b) requires that the allegations "be stated with particularity." The particularity requirement of Rule 9(b) serves three purposes:
1) it ensures that allegations are specific enough to inform a defendant of the act of which the plaintiff complains, and to enable him to prepare an effective response and defense; 2) it eliminates those complaints filed as a pretext for the discovery of unknown wrongs-a 9(b) claimant must know what his claim is when he files; and 3) it seeks to protect defendant from unfounded charges of wrongdoing which injure their reputations and goodwill.

*Bovee v. Coopers & Lybrand C.P.A.,* 272 F.3d 356, 361-362 (6th Cir.2001)(*quoting Vennittilli v. Primerica, Inc.,* 943 F.Supp. 793, 798 (E.D.Mich.1996)). Consequently, "[c]onclusory allegations that a defendant's conduct was fraudulent are insufficient." *In re Air Crash Disaster at Detroit Metro. Airport v. Northwest Airlines, Inc.,* 737 F.Supp. 406, 407 (E.D.Mich.1989); *Bovee,* 272 F.3d at 361. "Instead, the complaint must describe the conduct that allegedly constitutes the fraud with some specificity." *Id.* "Plaintiffs may not simply rely on the proposition that Defendants must have known or should have known of, and participated in, the fraud." *Bovee,* 272 F.3d at 361.

**\*9** With these standards in mind, the Court considers each claim.

## A. SECTION 10(b) AND RULE 10b-5 (ANTIFRAUD) VIOLATIONS

In Count I, each Defendant is alleged to have either directly violated Section 10(b) and Rule 10b-5, or aided and abetted Kmart's violation. In order to state a claim for violation of Section 10(b) [FN18] and Rule 10b-5,[FN19] a plaintiff must allege: 1) a misrepresentation or omission, 2) of a material fact, 3) made with scienter, 4) justifiably relied on by plaintiff, and 5) proximately causing injury to plaintiff. *In re Comshare, Inc. Securities Litigation,* 183 F.3d 542, 548 (6th Cir.1999); *In re Federal-Mogul Corp. Securities Litigation,* 166 F.Supp.2d 559, 562 (E.D.Mich.2001).

FN18. Section 10(b), 15 U.S.C. § 78j(b) provides that it is unlawful:
To use or employ, in connection with the purchase or sale of any security ... any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.

FN19. Rule 10b-5, 17 C.F.R. § 240.10b-5 states that:
It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange,
(a) To employ any device, scheme, or artifice to defraud,
(b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or
(c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

"At the pleading stage, a plaintiff satisfies the materiality requirement ... by alleging a statement or omission that a reasonable investor would have considered significant in making investment decisions." *Ganino v. Citizens Utility Co.,* 228 F.3d 154, 161 (2nd Cir.2000). *See also Basic v. Levinson,* 485 U.S. 224, 231, 108 S.Ct. 978, 99 L.Ed.2d 194 (1987); *Helwig v. Vencor, Inc.,* 251 F.3d 540, 563 (6th Cir.2001). "[T]here must be a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." *TSC Industries, Inc. v. Northway, Inc.,* 426 U.S. 438, 449, 96 S.Ct. 2126, 48 L.Ed.2d 757 (1976)(footnote omitted). *See also Basic,* 485 U.S. at 231-232 (adopting *TSC* standard); *Helwig,* 251 F.3d at 563.

"Scienter" is defined as a "mental state embracing intent to deceive, manipulate or defraud." *In re Comshare,* 183 F.3d at 548 (*quoting Ernst & Ernst v. Hochfelder,* 425 U.S. 185, 193, 96 S.Ct. 1375, 47

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                    Page 8
Not Reported in F.Supp.2d, 2006 WL 542986 (E.D.Mich.), Fed. Sec. L. Rep. P 93,838
**(Cite as: Not Reported in F.Supp.2d)**

L.Ed.2d 668 (1976)) (quotation marks omitted). Scienter may be established through a showing of recklessness, which is "highly unreasonable conduct which is an extreme departure from the standards of ordinary care." *Id at 550* (citation and quotation marks omitted). And, "[w]hile the danger need not be known, it must at least be so obvious that any reasonable [person] would have known of it." *Id* (citation and quotation marks omitted).

Therefore, a plaintiff can meet its burden on the scienter element by pleading facts showing a "strong inference" of recklessness. *Bovee, 272 F.3d at 362.* The Sixth Circuit in *Helwig* stated that a strong inference is shown when there is "little room for doubt as to the misconduct." *251 F.3d at 553.* The *Helwig* Court explained that, for pleading purposes, "[i]nferences must be reasonable and strong-but not irrefutable[,] because "the task of weighing contrary accounts is reserved for the fact finder." *Id.* But, the plaintiff is only entitled to "the most plausible of competing inferences." *Id.* Neither mere negligence nor motive and opportunity alone is sufficient. *Bovee,* 272 F.3d at 549-550.

### i. DIRECT VIOLATION

#### a. Defendants Kirkpatrick and Bixler

**\*10** Defendants Kirkpatrick and Bixler argue that the allegations against them, even if presumed true, do not establish a direct violation of antifraud laws. The Court agrees.

Both Kirkpatrick and Bixler were representatives of third-party vendors who allegedly indirectly contributed to Kmart's filing with the SEC in which Kmart overstated its revenues for the 2000 fiscal year and understated its expenses. However, Plaintiff cites no authority for finding a direct violation when the alleged acts are as far removed as were Kirkpatrick and Bixler's. The fraud allegedly committed was Kmart's issuance of its Form 10-K for the 2000 fiscal year, which Plaintiff says misled investors regarding Kmart's actual revenues and expenses. There are no allegations, however, that either Kirkpatrick or Bixler were directly involved in the preparation or issuance of the Form 10-K. Rather, they are only alleged to have signed off on documents-the VATS forms-which ultimately were incorporated in the figures that went into the Form 10-K filed by Kmart.

Plaintiff contends that, although Kirkpatrick and Bixler's participation was indirect, their acts were responsible for "creating" a misrepresentation regarding Kmart's revenues and expenses. None of the cases cited in support by Plaintiff, however, involves third parties as peripheral as Kirkpatrick and Bixler. For instance, in *Carley Capital Group v. Deloitte & Touche, L.L.P.,* 27 F.Supp.2d 1324 (N.D.Ga.1998), defendant was the auditor and business consultant for the subject company. Though it was an outside organization, defendant did not operate at arms length. Defendant was in-house and actively participated in management of the company as a consultant. The *Carley* Court found that although defendant was a secondary party, it could be held primarily liable for an alleged Section 10(b) and Rule 10b-5 violation because it reviewed and approved certain public financial statements before they were issued and it specifically directed the inclusion of certain false or inaccurate information into those statements. The Court stated that defendants' alleged conduct was "[m]ore than mere participation, complicity, or assistance." 27 F.Supp.2d at 1334. "Plaintiffs essentially alleged that the Defendant was the author of the alleged misstatement." *Id at 1334-1335.*

A secondary party was similarly more than peripherally involved in *SEC v. Quattrone,* LR-18534, 2004 SEC Lexis 25 (Jan. 27, 2004), an administrative proceeding cited by Plaintiff as an example of direct violations brought against vendors. Pl. Exh. D. In *Quattrone,* ten people, including officers of the subject company and several of its vendors, were alleged to have directly violated Section 10(b) and Rule 10b-5 and aided and abetted violations. The vendors allegedly executed false audit confirmations that resulted in the company overstating its revenues over several years. However, the vendors were also party to a much larger scheme. The vendors and the company allegedly orchestrated a number of so-called "round-trip" transactions, whereby they circulated money between the company, a third-party customer, and a vendor in a manner that gave the false impression that the money exchanged was part of legitimate transactions, when in fact no goods were sold:

**\*11** In most instances, the customer and vendor in each circle shared a common owner. False paperwork, including purchase orders, invoices, and bills of lading, was created purporting to represent sales of various cheese products from Suprema to the customer, then from the customer to the vendor, and finally from the vendor back to Suprema. On each leg of the circle-Suprema to the customer, customer to the vendor, and vendor back to Suprema-checks were

Not Reported in F.Supp.2d                                                                                                Page 9
Not Reported in F.Supp.2d, 2006 WL 542986 (E.D.Mich.), Fed. Sec. L. Rep. P 93,838
**(Cite as: Not Reported in F.Supp.2d)**

circulated in purported payment for the transactions. Typically, the checks from Suprema to each vendor involved in the fraud were greater than the corresponding checks from the related customer back to Suprema. This difference in the checks represented a kick-back or "commission" paid to the common owners for their participation in the fraudulent scheme. Funds for the checks, including commissions, were drawn on Suprema's line of credit, which increased as Suprema's accounts receivable grew. With rare exception, no goods were actually sold, purchased, or exchanged in these transactions.

*Quattrone,* 2004 SEC Lexis 25, *3-4. The "round-trip" scheme, along with two other fraudulent schemes executed by the company, resulted in material misstatements in the company's filings with the SEC over four years. Notably, however, the vendors settled the claims brought against them. So, it was never actually determined that the SEC's direct 10(b) and Rule 10b-5 claims were viable.

In any event, there are no allegations that either Kirkpatrick or Bixler was involved in the preparation or issuance of Kmart's 10-K filing to the extent that the secondary parties in *Carley* and *Quattrone* were involved in their respective schemes. The Court has found no other authority and concludes that Plaintiff failed to state a direct violation under 10(b) and Rule 10b-5 against Kirkpatrick and Bixler.


                    b. Defendant Orr

Although Defendant Orr was a Kmart employee who was more directly involved with Kmart, there is no basis to hold him more culpable than Kirkpatrick and Bixler. Orr was the Divisional Vice President of Kmart's photo division during the relevant time. However, there are no allegations with respect to any of the allowances that he allegedly pulled forward that he was directly involved in the preparation or issuance of the Form 10-K for the 1999 or 2000 fiscal years. Like Kirkpatrick and Bixler, he is only alleged to have executed, or directed others to execute, VATS forms that were incorporated into Kmart's Form 10-K. No 10(b) or 10b-5 violation is stated against him.


        ii. AIDING AND ABETTING [FN20]


FN20. Private causes of action for aiding

and abetting under Section 10(b) and Rule 10b-5 are not permitted. *See Central Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.,* 511 U.S. 164, 114 S.Ct. 1439, 128 L.Ed.2d 119 (1994). However, because the SEC is not considered a private party, it is entitled to bring an aiding and abetting claim. 15 U.S.C. § 78t(e).

Pursuant to Section 20(e) of the Exchange Act, 15 U.S.C. § 78t(e), "a person may be held as an aider and abettor only if some other party has committed a securities law violation, if the accused party had a general awareness that his role was part of an overall activity that is improper, and if the accused aider-abettor knowingly and substantially assisted the violation." *SEC v. Coffey,* 493 F.2d 1304, 1316 (6th Cir.1974). To determine whether an alleged aider and abettor had a "general awareness" that his activity was improper, the Court must consider the surrounding circumstances and expectations of the parties. *SEC v. Washington County Utility District,* 676 F.2d 218, 226 (6th Cir.1982). "[T]he defendant must have knowledge of the wrongful character of the activity, not merely knowledge of the activity which led to the wrong." *Vidosh v. Holsapple,* 1987 WL 273164, *17 (E.D.Mich.1987).

**\*12** The Court finds that Plaintiff adequately alleged that the primary violation was committed by Kmart. Defendants contend, however, that the primary violation fails because the amounts attributed to them are immaterial as a matter of law when compared to Kmart's total sales revenues and costs. The Court is not persuaded that it is appropriate to make such a finding at this stage of the proceedings. Dismissal as a matter of law on the ground that a misstatement or omission is immaterial is not appropriate "unless [the statements or omissions] are so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their importance." *Ganino,* 228 F.3d at 162. *See Helwig,* 251 F.3d at 563.

Notwithstanding the arguably negligible amounts alleged against Defendants (individually and collectively),[FN21] there is no basis for the Court to find, as a matter of law, that no reasonable Kmart investor would have found that the alleged manipulation of revenues and costs by Defendants "significantly altered the 'total mix' of information available" about Kmart. *TSC Industries,* 426 U.S. at 449. It is settled that "there is no numerical benchmark for materiality." *SEC v. Kahn,* 2002 WL 1163723, *7 (N.D.Ill.2002). Indeed, the *Helwig*

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                    Page 10
Not Reported in F.Supp.2d, 2006 WL 542986 (E.D.Mich.), Fed. Sec. L. Rep. P 93,838
**(Cite as: Not Reported in F.Supp.2d)**

Court succinctly points out that "[m]ateriality is about marketplace effects, not just mathematics." *Helwig,* 251 F.3d at 563 (citations omitted). Therefore, to state a claim for aiding and abetting against Defendants in this case, Plaintiff only needs to plead sufficient facts to support a finding that they had a general awareness that their acts were part of overall activity that was improper, and that they knowingly provided substantial assistance in the violation.

> FN21. The Court makes no finding regarding whether it is appropriate for Plaintiff to aggregate the amounts alleged against Defendants.

### a. Defendant Kirkpatrick

Accepting Plaintiff's allegations against Kirkpatrick as true and construing all reasonable inferences in Plaintiff's favor, Plaintiff sufficiently pled an aiding and abetting claim. Plaintiff alleges that Abood advised Kirkpatrick during a meeting and through a subsequent e-mail that he needed $5 million to cover a profit shortfall for the 2000 fiscal year. Shortly thereafter, Kirkpatrick allegedly agreed to pay $2 million that was owed by Coke for the 2000 fiscal year, and to prepay an additional $3 million vendor allowance that would be earned during the 2001 fiscal year. However, Kirkpatrick executed two VATS forms totaling $3 million which, on their face, created the impression that the $3 million was tendered for an agreement that was performed during the 2000 fiscal year, because each listed effective dates during the 2000 fiscal year. Kirkpatrick is alleged to have later falsely confirmed the accuracy of the terms appearing on the face of the VATS forms with Kmart's auditors.

Reasonable jurors could infer from Kirkpatrick's alleged communications with Abood that he knew that Abood intended to report the $3 million advance as though it were earned in 2000. By signing off on the VATS forms, which were inaccurate on their face, and subsequently confirming their validity to Kmart's auditors, reasonable jurors could also find that Kirkpatrick acted knowingly and that his actions substantially assisted the overall scheme.

**\*13** Kirkpatrick alleges that the parties' course of dealing was such that the "effective dates" section on the VATS form was not used to reference the dates of the underlying agreement, but instead the dates of the activity Kmart chose to fund with the allowance.

Kirkpatrick's assertion, however, raises a question of fact which is not properly considered on a motion to dismiss.

Defendant Kirkpatrick's motion to dismiss this claim will be denied.

### b. Defendant Bixler

The facts pled against Defendant Bixler do not support Plaintiff's claim that Bixler had a general awareness that his alleged actions were part of an improper scheme or that he knowingly provided substantial assistance in the same. Unlike the allegations against Kirkpatrick, there are no direct allegations, or facts from which one could infer, that Bixler was aware of the purpose of Abood's demand for an increase in allowances. Plaintiff only alleges that Abood made his demand near the end of the 2000 fiscal year. Even when considered in conjunction with the remaining allegations, there is no basis to infer that the timing did or should have alerted Bixler to Abood's intentions.

Further, one cannot reasonably infer from the documents subsequently executed by Bixler that he was aware of Abood's intentions or that he knowingly provided substantial assistance. The effective dates listed on the VATS form-January 1, 2001 through January 31, 2001-are not inconsistent with Bixler's agreement with Abood. Per Plaintiff, Bixler agreed to give an immediate advance on allowances to be earned during the 2001 calendar year. Consistent with that agreement, Bixler indicated in the January 11, 2001 letter that the advance would be denoted by Pepsi as a pre-payment on the "Feature Ad" budget.[FN22] He also referenced the advance on the VATS form as a "Incremental R.O.P. Support-Feature Ad Payment." Although the VATS Bixler executed does not spell out the terms under which the allowance was given, it is not false on its face or inconsistent with the agreement made.[FN23]

> FN22. Plaintiff asserted during oral argument that Bixler's letter was not prepared in the ordinary course of business. However, Plaintiff did not make this allegation in the Complaint and it cannot reasonably be inferred.

> FN23. Note that, the Court "may consider the full text of the SEC filings, prospectus, analysts' reports and statements "integral to

the complaint," even if not attached, without converting the motion into one for summary judgment either *Fed.R.Civ.P. 56.*" *Bovee, 272 F.3d at 360-361*.

Plaintiff's claim that Bixler lied to the PwC auditor is also insufficient to establish his general awareness or knowing substantial assistance, because it is not pled with the requisite particularity. Plaintiff merely states that Bixler *"convinced* the PwC auditor during their face-to-face meeting that Kmart earned the $3 million allowance during the [fiscal year] 2000," and that the auditor documented the conversation in his "work papers." Complaint, ¶ ¶ 86, 88 (emphasis added). However, Plaintiff offers no facts to support its claim that Bixler "convinced" the auditor; that is, there are no allegations regarding what Bixler allegedly said or what the auditor indicated in his notes. Such conclusory allegations of fraud are insufficient under FRCP 9(b). *In re Air Crash Disaster*, 737 F.Supp. at 407; *Bovee*, 272 F.3d at 361.

The fact that Plaintiff did not give the auditor a copy of the January 11 letter also does not give rise to a reasonable inference that Bixler knew he was participating in accounting fraud. Plaintiff does not allege that Bixler knew or should have known that the auditor was not aware of the agreement. And, as stated, Plaintiff does not indicate what Bixler said during the meeting. If he disclosed the material terms of the agreement, the fact that he did not also give the auditor a copy of the letter memorializing it would be immaterial for purposes of determining whether Bixler was complicit in accounting fraud.

**\*14** Plaintiff's aiding and abetting claim against Bixler fails.

### c. Defendant Orr

Plaintiff adequately pleads aiding and abetting on two of the four pull forward transactions that Defendant Orr allegedly orchestrated. Orr is alleged to have pulled forward: 1) a $2.5 million vendor allowance from Kodak for the 1999 fiscal year; 2) a $7 million allowance from Kodak for the 2000 fiscal year; 3) a $3.25 million allowance from Kodak for the 2000 fiscal year; and 4) a $2.1 million allowance from Fuji for the 2000 fiscal year.

### 1. $7 Million and $2.1 Million Allowances

Plaintiff failed to state a claim against Orr for the $7

million and $2.1 million allowances. None of the allegations regarding the $7 million allowance implicates Orr. Plaintiff alleges that one of Orr's subordinates asked Kodak representative Darrel Edquist to advance $7 million worth of allowances to be earned during the 2001 calendar year. Per Plaintiff, Edquist then signed a VATS form that misrepresented the effective dates of the allowance, set forth the true terms of the agreement in a memo that "made clear" that the money was an advance of allowances to be earned throughout the 2001 calendar year, and confirmed the false VATS form with Kmart's auditor. Edquist allegedly sent a copy of his memo to one of Orr's subordinates, which Plaintiff says was never given to Kmart's accounting department or auditor.

There is a glaring absence of any allegation that Orr participated directly or that he directed the chain of events. Plaintiff does not even allege facts which indicate whether Orr was aware of the alleged actions of his subordinate and Edquist. The only allegation regarding Orr and the $7 million allowance is Plaintiff's assertion that the allowance was one of many pull forward opportunities listed on a schedule prepared by Orr's staff, which he reviewed during regular staff meetings. This assertion does not give rise to an inference of fraud by Orr and falls far short of the particularity requirement under FRCP 9(b).

Plaintiff's allegations regarding the $2.1 million Fuji advance similarly fail. The allegations are vague regarding what transpired and who was involved. Plaintiff alleges that the allowance was pulled forward "with Orr's knowledge and assistance." Complaint, ¶ 56. However, Plaintiff does not state how he knew about the pull forward or what actions he took which constitute assistance. Further, with regard to the VATS form that was allegedly falsified, Plaintiff simply says that "the parties" executed the form, without identifying the alleged parties. Complaint, ¶ 57. It is not alleged, and there is no basis for the Court to presume, that Orr was one of those parties. Moreover, Plaintiff only offers the conclusory allegation that the VATS form misrepresented the effective date of the agreement. Plaintiff does not plead supporting facts indicating what the effective date really was or that the funds were not, indeed, earned on the date indicated. In the same vein, Plaintiff alleges that the "true terms" of the agreement with Fuji were set forth in a letter sent to Orr and one of his subordinates. However, Plaintiff does not state what the true terms of the agreement were, when the letter was sent, or by whom.

Not Reported in F.Supp.2d                                                                                          Page 12
Not Reported in F.Supp.2d, 2006 WL 542986 (E.D.Mich.), Fed. Sec. L. Rep. P 93,838
**(Cite as: Not Reported in F.Supp.2d)**

**\*15** These allegations do not meet the threshold requirements of either FRCP 12(b)(6) or 9(b). And, contrary to Plaintiff's assertion during oral argument, Plaintiff's general allegation that all of the pull forwards attributed to Orr were "[a]t Orr's direction" is also insufficient to meet the particularity requirements of FRCP 9(b), particularly where (as here) the specific allegations do not bear out the claim. Complaint, ¶ 34.

### 2. $2.5 Million Allowance

Unlike the $7 million and $2.1 million advances discussed above, Plaintiff explicitly alleges direct involvement and intentional misrepresentations by Orr in the alleged pull forward of $2.5 million from Kodak into the 1999 fiscal year. Orr allegedly directed Edquist to falsify the VATS forms so that it would appear that the funds were earned during the 1999 fiscal year, and that the funds were applied to programs conducted in 1999. Complaint, ¶ ¶ 40-41.

These allegations, the truth of which must be presumed, sufficiently allege that Orr had a general awareness of the impropriety of his actions, that he proceeded knowingly, and that the actions constituted substantial assistance in the overall scheme to defraud investors regarding Kmart's actual revenues and expenses in the 1999 fiscal year. Orr contends that Plaintiff's allegations are insufficient because Plaintiff does not allege that the Form 10-K for the 1999 fiscal year was deficient. Plaintiff does allege, however, that Orr's actions caused the Kmart's cost of goods sold to be understated in the 1999 fiscal year. Complaint, ¶ 42.

### 3. $3.25 Million in Kodak Allowances

Plaintiff alleges that Orr directed subordinates to execute eight VATS forms totaling $3.25 million in vendor allowances from Kodak, for the purpose of pulling the allowances forward. Complaint, ¶ 53. Plaintiff further alleges that each of the VATS forms misrepresented the effective dates of the allowances as falling within Kmart's 2000 fiscal year. *Id.*

The Court finds that these allegations adequately plead that Orr deliberately directed subordinates to execute VATS form so that it would appear that promotional and marketing allowances were received before they actually were. Orr correctly points out that Plaintiff did not expressly allege that he directed his subordinates to misrepresent the dates on the

forms, only that he directed them to execute the forms. However, it is alleged that Orr directed them to execute the VATS forms for the purpose of pulling forward allowances. By definition, a pull forward could only occur if the dates were falsified. Consequently, the Court finds that reasonable jurors could infer that Orr did effectively direct his subordinates to misrepresent the dates on the VATS forms.

As with the $2.5 million allowance, Plaintiff sufficiently alleged that Orr had a general awareness of the impropriety of his actions, that he proceeded knowingly, and that the actions constituted substantial assistance in the overall scheme to defraud investors regarding Kmart's actual revenues and expenses in the 2000 fiscal year. Defendant's motion to dismiss Plaintiff's aiding and abetting claim with regard to the $2.5 and $3.25 million allowances is denied.

### B. RULE 13b2-1 AND SECTION 13(b)(5) (BOOKS AND RECORDS) VIOLATIONS

**\*16** In Counts II and III, Plaintiff alleges that Defendants directly violated Rule 13b2-1 and Section 13(b)(5) by causing the falsification of Kmart's books and records, and by knowingly circumventing Kmart's internal accounting controls.

Section 13(b)(2)(A) requires that issuers of securities subject to the Exchange Act's reporting provisions "make and keep books, records, and accounts, which, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the issuer." 15 U.S.C. § 75m(b)(2)(A). Consistent with that requirement, Rule 13b2-1 prohibits one from falsifying any corporate book, record or account subject to the provisions of the Exchange Act:
No person shall directly or indirectly, falsify or cause to be falsified, any book, record or account subject to Section 13(b)(2)(A) of the Securities Exchange Act.

17 C.F.R. § 240.13b2-1. Similarly, Section 13(b)(5) of the Securities Exchange Act, 15 U.S.C. § 78m(b)(5), provides that "[n]o person shall knowingly circumvent or knowingly fail to implement a system of internal accounting controls or knowingly falsify any book, record, or account" that one is required to prepare under the Exchange Act.

Unlike Section 10(b) and Rule 10b-5 claims, no showing of scienter is required to establish a violation of Rule 13b2-1. *SEC v. McNulty,* 137 F.3d

Not Reported in F.Supp.2d                                                                                                                Page 13
Not Reported in F.Supp.2d, 2006 WL 542986 (E.D.Mich.), Fed. Sec. L. Rep. P 93,838
**(Cite as: Not Reported in F.Supp.2d)**

732, 740-741 (2nd Cir.1998); *SEC v. Lowy,* 2003 U.S. Dist. Lexis 8918, *68-69 (E.D.N.Y.2003). Plaintiff must, however, show that the defendant acted unreasonably. *Lowy,* 2003 U.S. Dist. Lexis 8918, at *69.

#### i. Defendants Kirkpatrick and Orr

Plaintiff sufficiently pled these claims against Defendants Kirkpatrick and Orr. Plaintiff alleges that Kirkpatrick falsified two VATS forms, which were incorporated into Kmart's Form 10-K filing for the 2000 fiscal year, and that he falsely confirmed the forms as accurate when Kmart's auditor's inquired. Plaintiff, likewise, alleges with regard to the $2.5 million and $3.25 million allowances, that Orr directed subordinates to falsify VATS forms. These false VATS forms allegedly caused Kmart to understate its cost of goods sold for the 1999 (Orr only) and 2000 (Orr and Kirkpatrick) fiscal years.

These allegations are sufficient to support a claim that Kirkpatrick and Orr knowingly caused Kmart's books and records to be falsified, and that they knowingly circumvented Kmart's internal accounting controls. Defendants' motion to dismiss these claims is denied.

#### ii. Defendant Bixler

Both claims fail against Defendant Bixler. As discussed more fully above, Plaintiff failed to plead facts supporting its contention that Bixler falsified documents or caused any documents to be falsified, or that he knowingly circumvented Kmart's internal accounting controls.

#### C. RULE 13b2-2 VIOLATION

Rule 13b2-2 prohibits officers and directors from making false or misleading statements to an accountant or omitting material facts relative to the preparation of financial statements and states in relevant part:

**\*17** (a) No director or officer of an issuer shall, directly or indirectly:

(1) Make or cause to be made a materially false or misleading statement to an accountant in connection with; or

(2) Omit to state, or cause another person to omit to state, any material fact necessary in order to make statements made, in light of the circumstances under which such statements were made, not misleading, to an accountant in connection with:

(i) Any audit, review or examination of the financial statements of the issuer required to be made pursuant to this subpart; or

(ii) The preparation or filing of any document or report required to be filed with the Commission pursuant to this subpart or otherwise.

(b)(1) No officer or director of an issuer, or any other person acting under the direction thereof, shall directly or indirectly take any action to coerce, manipulate, mislead, or fraudulently influence any independent public or certified public accountant engaged in the performance of an audit or review of the financial statements of that issuer that are required to be filed with the Commission pursuant to this subpart or otherwise if that person knew or should have known that such action, if successful, could result in rendering the issuer's financial statements materially misleading.

(2) For purposes of paragraphs (b)(1) and (c)(2) of this section, actions that, "if successful, could result in rendering the issuer's financial statements materially misleading" include, but are not limited to, actions taken at any time with respect to the professional engagement period to coerce, manipulate, mislead, or fraudulently influence an auditor:

(i) To issue or reissue a report on an issuer's financial statements that is not warranted in the circumstances (due to material violations of generally accepted accounting principles, generally accepted auditing standards, or other professional or regulatory standards);

(ii) Not to perform audit, review or other procedures required by generally accepted auditing standards or other professional standards....

17 C.F.R. § 240.13b2-2.

#### i. Defendants Kirkpatrick and Bixler

Plaintiff acknowledges that Rule 13b2-2 can only be directly violated by officers and directors of the subject corporation. However, it contends that Defendants Kirkpatrick and Bixler aided and abetted Kmart employee Abood's violation of the Rule. As a vice president in Kmart's food and consumables division, which Plaintiff characterizes as a major business division within Kmart, Plaintiff contends that Abood was an officer within the meaning of the Exchange Act. Defendants do not dispute Plaintiff's characterization of Abood's position. However, they contend that Plaintiff failed to state a claim of aiding

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                                   Page 14
Not Reported in F.Supp.2d, 2006 WL 542986 (E.D.Mich.), Fed. Sec. L. Rep. P 93,838
**(Cite as: Not Reported in F.Supp.2d)**

and abetting against them under Rule 13b2-2.

With regard to Kirkpatrick, Plaintiff alleges that: 1) Abood violated Rule 13b2-2 by signing a false VATS form that was provided to PwC during its audit; 2) Kirkpatrick co-signed the false VATS form, which he knew or was reckless in not knowing was false; and 3) Kirkpatrick falsely confirmed the VATS form as accurate when PwC inquired during its audit. Plaintiff contends that these allegations are sufficient to state a claim of aiding and abetting. The Court agrees. Plaintiff indisputably alleged a primary violation by Abood.[FN24] *See* Complaint, ¶ 70, 76. And, the allegations that the VATS forms listed effective dates that Kirkpatrick knew to be false and that Kirkpatrick confirmed the false information in the forms when PwC inquired, are sufficient to support Plaintiff's contention that Kirkpatrick had a general awareness that his actions were part of an overall scheme by Abood that was improper, that he acted knowingly, and that his actions substantially assisted Abood's scheme.

> FN24. For the reasons stated, the Court finds that Plaintiff adequately pled facts establishing the requisite materiality of the falsity.

**\*18** Plaintiff contends that it has adequately alleged that Bixler also aided and abetted a violation of Rule 13b2-2 by Abood because it alleges that Bixler co-signed a false VATS form, misrepresented the terms of the allowance to a PwC auditor, and failed to provide the auditor with a copy of the letter he wrote which included the terms of his agreement with Abood. Plaintiff's claim fails, however, because Plaintiff has not alleged facts to support its claim that the VATS form Bixler executed was false or that he misrepresented the terms of the allowance during his meeting with PwC auditors. Further, there are no allegations that indicate that Bixler was aware that Kmart's auditor did not already have a copy of the letter, which was co-signed by Kmart employee Abood, or that Bixler played any part in concealing the letter from PwC.

### ii. Defendant Orr

Because Orr was a vice president in Kmart's photo division, Plaintiff contends that he was an officer within the meaning of the Exchange Act. Therefore, Plaintiff alleges that Orr directly violated Rule 13b2-2 by "causing the falsification" of the VATS form for

the $7 million vendor allowance advance from Kodak that was, in turn, provided to PwC during the 2000 fiscal year audit. Plaintiff's claim fails, however, because Plaintiff does not adequately allege that Orr directly or indirectly falsified the $7 million VATS form or that he submitted it to PwC. As discussed above, Plaintiff only alleges that Edquist and one of Orr's subordinates falsified the form, and that Edquist confirmed its allegedly false terms when PwC inquired. There are no allegations that Orr directed his subordinate or Edquist's actions, or that he was even aware of them.

### D. SECTION 13(a) and RULES 12b-20 and 13a-1 (REPORTING) VIOLATIONS

Section 13(a) [FN25] of the Exchange Act, 15 U.S.C. § 78m(a) and SEC Rules 12b-20,[FN26] 17 C.F.R. § 240.12b-20, and 13a-1, 17 C.F.R. § 240.13a-1,[FN27] promulgated thereunder, require issuers of registered securities to file various reports relative to those securities and to supplement them as necessary to ensure that they are not misleading. Plaintiff alleges that each Defendant aided and abetted Kmart's violation of these reporting provisions. Plaintiff asserts that Kmart committed the primary violation by filing a Form 10-K that contained materially false and misleading financial statements.

> FN25. Section 13(a) states in relevant part: Every issuer of a security registered pursuant to section 78l of this title shall file with the Commission, in accordance with such rules and regulations as the Commission may prescribe as necessary or appropriate for the proper protection of investors and to insure fair dealing in the security-
> (1) such information and documents (and such copies thereof) as the Commission shall require to keep reasonably current the information and documents required to be included in or filed with an application or registration statement filed pursuant to section 78l of this title, except that the Commission may not require the filing of any material contract wholly executed before July 1, 1962.
> (2) such annual reports (and such copies thereof), certified if required by the rules and regulations of the Commission by independent public accountants, and such quarterly reports (and such copies thereof),

Not Reported in F.Supp.2d                                                                                               Page 15
Not Reported in F.Supp.2d, 2006 WL 542986 (E.D.Mich.), Fed. Sec. L. Rep. P 93,838
**(Cite as: Not Reported in F.Supp.2d)**

as the Commission may prescribe.

FN26. Rule 12b-20 states:
Every issuer having securities registered ... shall file an annual report on the appropriate form authorized or prescribed therefor for each fiscal year after the last full fiscal year for which financial statements were filed in its registration statement. Annual reports shall be filed within the period specified in the appropriate form.

FN27. Rule 13a-1 states:
Every issuer having securities registered ... shall file an annual report on the appropriate form authorized or prescribed therefor for each fiscal year after the last full fiscal year for which financial statements were filed in its registration statement. Annual reports shall be filed within the period specified in the appropriate form.

### i. Defendants Kirkpatrick and Orr

Plaintiff has adequately stated a claim for violation of the reporting provisions by Kirkpatrick (for the $3 million allowance) and Orr (for the $2.5 and 3.25 million allowances) for the reasons stated with regard to Plaintiff's claim that they aided and abetted Kmart's violation of Section 10(b) and Rule 10b-5. Both are alleged to have knowingly executed or caused to be executed VATS forms that misrepresented the date that funds received for vendor allowances were earned.

### ii. Defendant Bixler

As with the other claims against Bixler, this reporting provision claim against Bixler fails as well because Plaintiff failed to plead facts showing that Bixler made any misrepresentations on the VATS form.

### VI. CONCLUSION

**\*19** For the reasons stated, Defendants' respective motions are decided as follows:
A. Defendant Kirkpatrick
The Court:
1. GRANTS Kirkpatrick's motion to dismiss Plaintiff's claim of a direct violation of Section 10(b) and Rule 10b-5 in Count I, but DENIES his motion on the claim of aiding and abetting violation of those provisions.

2. DENIES Kirkpatrick's motion to dismiss Count II (violation of Rule 13b2-1);
3. DENIES Kirkpatrick's motion to dismiss Count III (violation of Section 13(b)(5));
4. DENIES Kirkpatrick's motion to Dismiss Count IV (violation of Rule 13b2-2); and
5. DENIES Kirkpatrick's motion to Dismiss Count V (violation of Section 13(a), Rule 12b-20, Rule 13a-1, and Section 20(e)).
B. Defendant Bixler
The Court GRANTS Defendant Bixler's motion in its entirety.
C. Defendant Orr
The Court:
1. GRANTS Orr's motion to dismiss Plaintiff's claim of a direct violation of Section 10(b) and Rule 10b-5 in Count I; GRANTS the motion on the claim of aiding and abetting violation of those provisions with regard to the $7 million and $2.1 million allowances, and; DENIES the motion on the claim of aiding and abetting violation of those provisions with regard to the $2.5 and $3.25 million allowances.
2. GRANTS Orr's motion to dismiss Count II (violation of Rule 13b2-1) with regard to the $7 million and $2.1 million allowances, but DENIES Orr's motion on the remaining allowances ($2.5 and $3.25 million);
3. GRANTS Orr's motion to dismiss Count III (violation of Section 13(b)(5)) with regard to the $7 million and $2.1 million allowances, but DENIES Orr's motion on the remaining allowances ($2.5 and $3.25 million);
4. GRANTS Orr's motion to Dismiss Count IV (violation of Rule 13b2-2); and
5. GRANTS Orr's motion to Dismiss Count V (violation of Section 13(a), Rule 12b-20, Rule 13a-1, and Section 20(e)) with regard to the $7 million and $2.1 million allowances, but DENIES Orr's motion on the remaining allowances ($2.5 and $3.25 million).

IT IS SO ORDERED.

E.D.Mich.,2006.
S.E.C. v. Orr
Not Reported in F.Supp.2d, 2006 WL 542986 (E.D.Mich.), Fed. Sec. L. Rep. P 93,838

Briefs and Other Related Documents (Back to top)

• 2006 WL 1036777 (Trial Pleading) Defendant David Kirkpatrick's Answer to the Complaint and Jury Demand (Mar. 21, 2006) Original Image of this Document (PDF)

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                    Page 16
Not Reported in F.Supp.2d, 2006 WL 542986 (E.D.Mich.), Fed. Sec. L. Rep. P 93,838
**(Cite as: Not Reported in F.Supp.2d)**


• <u>2004 WL 3122324</u> (Trial Pleading) Complaint
(Dec. 2, 2004) Original Image of this Document
(PDF)
• <u>2:04cv74702</u> (Docket) (Dec. 2, 2004)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.