## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | Case No. 1:07-cv-00120-CKK |
| GARY G. BELL, JOSEPH GRENDYS, ANTHONY HOLOHAN, and MICHAEL SMITH, | ) ) ) ) | Judge Colleen Kollar-Kotelly |
| Defendants. | ) ) | |

## REPLY BRIEF IN SUPPORT OF
## JOSEPH GRENDYS'S MOTION TO DISMISS

Plaintiff SEC's Opposition to Mr. Grendys's Motion to Dismiss does little more than repeat the allegations of the SEC's Complaint – a Complaint that fails to establish jurisdiction, venue, or any cognizable "aiding and abetting" claim against Mr. Grendys – and cite case law that is either irrelevant to the issues before this Court or simply unhelpful to the SEC.

*First*, the SEC does not cite, nor can Mr. Grendys find, any case where a District of Columbia District Judge upheld jurisdiction and venue in the face of a 12(b)(2) and 12(b)(3) challenge by a third-party vendor whose conduct had no connection either to the District or to the "issuer" who allegedly filed false and misleading documents within the District. Indeed, such a holding would not comport with constitutional due process standards.

*Second*, the SEC has not pled facts that would give rise to a ***reasonable*** inference of scienter as to Mr. Grendys and has, instead, tried to plead around the truth by ignoring the explicit language of the only piece of "evidence" it cites on the issue of scienter. Furthermore,

while the SEC tries to avoid its burden of pleading knowledge by citing the language of "extreme recklessness," it has pled *no facts* to support this standard of scienter.

At base, the SEC has not shown a legal basis for the Court's exercise of jurisdiction over Mr. Grendys or a factual basis for its aiding and abetting claims. Consequently, Mr. Grendys respectfully requests that the Court dismiss the Complaint in its entirety.

## ARGUMENT

## I. THE SEC HAS NOT PLED, AND CANNOT PLEAD, FACTS SUPPORTING JURISDICTION AND VENUE AS TO MR. GRENDYS.

In its Opposition, the SEC does not cite *any* case law that Mr. Grendys did not already address, and distinguish, in his Motion to Dismiss. *Compare* Pltf's Opp. at 7-9 *with* Motion to Dismiss at 6-8. Nor does the SEC disavow *any* of the Complaint allegations demonstrating that none of Mr. Grendys's conduct occurred in, or even implicated, the District of Columbia. *See* Motion at 9. Instead, the SEC simply asserts that "any non-trivial act in the forum district which helps to accomplish a securities law violation is sufficient to establish venue" and that Royal Ahold's SEC filings constitute such an act. *See* Pltf's Opp. at 7.

While the SEC's contention may hold true as to Royal Ahold, however, it is irrelevant as to Mr. Grendys, because the SEC pleads no facts suggesting any contact or connection between Royal Ahold and Mr. Grendys. Indeed, the SEC's Complaint makes clear that (a) all of Mr. Grendys's dealings were with a *non-publicly-traded company* (USF); (b) there are no facts to suggest that Mr. Grendys knew of Royal Ahold's legal status, or even of its existence; and (c) the alleged "wrongdoing" set forth in the Complaint is *aiding and abetting* as to

Mr. Grendys, not any false filing on the part of Royal Ahold. *See* Cmplt., ¶¶33-43. Under this set of facts, venue (and, thus, jurisdiction) as to Mr. Grendys cannot be sustained.[1]

In an effort to salvage its venue argument, the SEC asserts that *SEC v. Ernst & Young*, 775 F. Supp. 411 (D.D.C. 1991), is "directly on point." Pltf's Opp. at 8. Perhaps, but not in a way that helps the SEC. The aiding and abetting defendant in *Ernst & Young* was a professional accounting firm retained directly by a ***publicly-traded company*** for the purpose of drafting an audit opinion that the defendant ***knew and intended*** would be filed in the District of Columbia. 775 F. Supp. at 412-13. Indeed, as the District Court held in that case, it was "the ***act of filing*** in the District of Columbia [that] constitute[d] the ***basis of wrongdoing***" alleged in the complaint. *Id.* at 413 (emphasis added). In this case, none of these conditions exists. *See* Motion at 8-9. Thus, *Ernst & Young* does not support venue as to Mr. Grendys.

Finally, the SEC cites this Court's unpublished Memorandum Opinion in *SEC v. Daly* in support of its venue argument. That opinion is inapposite for at least two reasons. ***First***, the ruling regarding statutory venue under 15 U.S.C. §78aa is *dictum*, as the pro se plaintiff in *Daly* (a) did not challenge venue under Rule 12(b)(3), and (b) had already answered the SEC's complaint when he moved for a discretionary transfer of venue under 28 U.S.C. §1404(a). Thus, the statutory venue issue now before the Court was not properly before the Court in *Daly*.

***Second***, none of the case law on which the court relied in support its venue opinion presents facts similar to those at issue here, as Mr. Grendys explained in detail in his Motion to

---

[1] Indeed, given the lack of any contact between Mr. Grendys and the District of Columbia – as well as the absence of any "conspiracy" allegation that might make Mr. Grendys liable for the actions of any alleged co-conspirators – the exercise of jurisdiction over Mr. Grendys would not comport with constitutional due process standards. *See, e.g., Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 471 (1985) (holding that due process precludes subjecting an individual to the judgments of a forum with which he or she has not purposely established meaningful contacts, ties, or relations), and *Asahi Metal Ind. Co. v. Superior Court*, 480 U.S. 102, 109 (1987) (holding that the exercise of personal jurisdiction over a non-resident defendant comports with due process only where the defendant has "purposely availed" himself of the privilege of conducting activities in the forum).

Dismiss. *See* Motion at 6-8. In a nutshell, because those venue cases relied on direct violations of the securities laws, direct contacts with the District of Columbia, and/or a "common scheme" among co-defendants, they are irrelevant to the case against Mr. Grendys, which shares none of those attributes.

In sum, the SEC does not cite, and Mr. Grendys cannot find, any reported case in which a court rejected a Rule 12(b)(3) motion in the context of a third party who had no contact with the primary violator and no contact with the District of Columbia. For all of these reasons, Mr. Grendys respectfully submits that the Court should dismiss the SEC's Complaint under Rules 12(b)(2) and 12(b)(3) on the grounds of lack of personal jurisdiction and improper venue.

## II. THE SEC HAS NOT PLED, AND CANNOT PLEAD, FACTS SUPPORTING AN INFERENCE OF SCIENTER AS TO MR. GRENDYS.

### A. The SEC Concedes That It Must Plead Facts Establishing Mr. Grendys's Scienter In Order To State A Claim.

In its Opposition, the SEC disputes Mr. Grendy's recitation of the elements of an aiding and abetting claim. *See* Pltf's Opp. at 11. According to the SEC's formulation, in order to state an aiding and abetting claim, the SEC had to plead facts showing that (1) another party committed a primary securities law violation; (2) Mr. Grendys had a general awareness that his role was part of an overall activity that was improper; and (3) Mr. Grendys knowingly and substantially assisted in the primary violation. Pltf's Opp. at 11. Because this Circuit defines "general awareness" as "knowledge of wrongdoing" (*Howard v. SEC*, 376 F.3d 1136, 1142 (D.C. Cir. 2004) (*citing Investors Research Corp. v. SEC*, 628 F.2d 168, 178 & n.61 (D.C. Cir. 1980)), the SEC, by its own admission, had to plead facts showing scienter with respect to both the second *and* the third prongs of the aiding and abetting "test" ("general awareness" and

"knowing" assistance).[2]  Under either standard available in this Circuit – actual knowledge or "extreme recklessness" – the SEC has failed to do so.

### B.    The SEC Has Pled No Facts Raising A Reasonable Inference Of Knowledge.

In its Opposition, the SEC makes crystal clear its belief that Mr. Grendys *knowingly* participated in USF's alleged wrongdoing.  *See* Pltf's Opp. at 8 ("the Commission's claims against Mr. Grendys are predicated upon his *knowingly* having provided substantial assistance to USF executives"), 12 ("the side letter shows that Grendys *understood* the numbers he confirmed to [the auditors] were not correct"), 13 ("Mr. Grendys was *aware* that he was providing false information to USF's auditors"), and 15 ("Mr. Grendys was *aware* that USF was falsely presenting its PA income and PA accounts receivable information <u>and</u> lying about it to its auditors") (emphasis added to all).  In support of this theory, the SEC cites four alleged facts, none of which supports any reasonable inference of actual knowledge.

### 1.    Two Factual Allegations are Irrelevant to Actual Knowledge.

The first two allegations are wholly irrelevant to the scienter issue.  *First*, the SEC alleges that Mr. Grendys sent the January 24, 2002, audit confirmation letter directly to USF's outside auditor, Deloitte & Touche.  Pltf's Opp. at 12.  Even assuming the truth of the allegation, it is irrelevant, because it has nothing to do with whether Mr. Grendys's knew of an underlying "primary violation."  Moreover, to the extent that the SEC is implying that Mr. Grendys knew of a false *public* filing, the implication is unsupported, because Deloitte & Touche was, according

---

[2] In light of the SEC's formulation, the SEC is incorrect in asserting that only the second prong of the aiding and abetting claim is at issue in Mr. Grendys's Motion to Dismiss.  *See* Pltf's Opp. at 11 n.8.  The SEC's Opposition also calls into question the viability of the first aiding and abetting prong, a "primary violation."  According to the SEC, Mr. Grendys did *not* aid and abet a securities fraud; instead, he allegedly aided and abetted a *concealment* of a fraud from USF's auditors.  *See* Pltfs' Opp. at 5.  Nowhere in its Complaint, however, does the SEC ever allege "concealment" as a primary violation of the securities laws.  Thus, the SEC has not properly pled a primary violation that Mr. Grendys allegedly aided and abetted, which serves as an independent grounds for dismissal of the Complaint.  *See Silverman v. Weil*, 662 F. Supp. 1195 (D.C. Cir. 1987) (holding that an aiding and abetting claim must specifically refer to the primary violations allegedly aided or abetted) (*citing Reingold v. Deloitte Haskins & Sells*, 599 F. Supp. 1241, 1269-70 (S.D.N.Y. 1984)).

to the letter itself, the auditor of *USF*, a non-publicly-traded company. In short, there are simply no factual allegations to support an inference that Mr. Grendys knew of any possible public disclosure of the audit confirmation letter.

*Second*, the SEC alleges that various figures set forth in the audit confirmation letter were false. Again, this fact, standing alone, is irrelevant to an assessment of Mr. Grendys's scienter, because neither the letter itself, nor the circumstances surrounding its conveyance to Mr. Grendys, in any way suggests that Mr. Grendys knew the letter contained false information.[3] The truth or falsity of the letter simply does not speak to Mr. Grendys's state of mind when he reviewed it.

### 2.    The Lone Relevant Factual Allegation Does Not Support an Inference of Actual Knowledge.

The only factual allegation in any way relevant to scienter is the SEC's claim that the so-called side letter "contradicts" the audit confirmation letter. *See* Pltfs' Opp. at 11. Based on this allegation, the SEC argues that because Mr. Grendys "obtained" the side letter after receiving the audit confirmation letter, he must have known that the audit confirmation letter was "false." At this point, the disingenuousness of the SEC's allegation becomes patent, as neither the actual language of the audit confirmation letter, nor related sworn testimony, provides any factual support for a reasonable inference of actual knowledge.

*First*, as Mr. Grendys noted in his Motion to Dismiss, the SEC fails to inform the Court that the so-called "side letter," on which the SEC's entire case rests, states explicitly that "[d]ifferences between the confirmation [letter] and Koch [internal] numbers [as reflected in the

---

[3] Indeed, the fact that no one at USF ever suggested to Mr. Grendys either that the letter contained false information or that USF had some improper purpose for requesting his signature, combined with the fact that no one at USF ever threatened or cajoled Mr. Grendys into signing the letter, distinguishes Mr. Grendys's case from those where the courts denied motions to dismiss on scienter grounds. *See, e.g., SEC v. Lucent Tech., Inc.*, No. Civ. 04-2315 (WHW), 2005 WL 1206841 (D.N.J. May 20, 2005) (denying dismissal as to defendant who was alerted to the improper purpose of the form he signed).

'side letter'] *will be covered through Frozen Farms*," a third-party billing agency through which Koch Poultry sold product to, and distributed product through, USF. *See* Motion at 3 n.2 and Exhibit A thereto. Likewise, the SEC neglects to point out that the audit confirmation letter itself never states explicitly that *Koch Poultry* owes any money to USF. *See* Motion at 3 n.2 and Exhibit B thereto. In other words, these two letters, taken together, state that any difference between the "PA accounts receivable" amounts on the audit confirmation letter and on the "side letter" are debts of *Frozen Farms*, not of Koch Poultry. There is no allegation anywhere in the SEC's Complaint that Mr. Grendys *knew* that this statement was false. Instead, the Complaint simply ignores the language about Frozen Farms entirely.

*Second*, the SEC fails to inform the Court that William Carter, the USF executive who signed the "side letter," testified under oath, at trial, that he told Mr. Grendys that Frozen Farms had been covering, and would continue to cover, all accounts receivable amounts not owed by Koch Poultry, including any non-Koch amounts set forth in the audit confirmation letter.[4] This testimony is entirely consistent with the language of the "side letter," on whose existence the SEC's entire case rests.

---

[4] *See* Transcript of Testimony of William Carter in *United States of America v. Mark Kaiser*, 04 Cr. 733 (TPG), United States District Court, Southern District of New York, October 25, 2006, at 1758:11-1760:18 (describing the set-up of Frozen Farms as a third-party billing agency designed to allow mark-ups between what Koch Poultry charged Frozen Farms and what Frozen Farms charged USF distribution houses), 1761:19-24 (stating that Mr. Grendys would not sign the audit confirmation letter unless he "kn[e]w where the money was going to come from[, a]nd *Frozen Farms* is what I told him"), and 1991:10-1992:2 (describing how USF used Frozen Farms to "shelter" income and remit to USF the difference between the price Frozen Farms paid to Koch Poultry and the price USF paid to Frozen Farms) (copy of pertinent pages attached hereto as "Exhibit A") (emphasis added).

Mr. Carter is the only USF employee who dealt directly with Mr. Grendys with respect to both of the letters at issue, and his transcribed testimony is a public record. As such, the Court may properly consider this evidence in ruling on Mr. Grendys's Motion to Dismiss. *See EEOC v. St. Francis Xavier Parochial School*, 117 F.3d 621, 624 (D.C. Cir. 1997) (holding that the court may consider matters of public record when ruling on a motion to dismiss without converting it into one for summary judgment). *See also Lipton v. MCI WorldCom, Inc.*, 135 F. Supp. 2d 182, 186 (D.D.C. 2001).

In sum, the SEC's Complaint contains *no factual allegations* from which a reasonable inference of actual knowledge may arise, because the SEC does not allege that Mr. Grendys *knew* that both the language of the "side letter," and the statements of Mr. Carter, relating to Frozen Farms were false.[5]

### 3.    One "Allegation" is Merely a Legal Conclusion.

The fourth allegation is not a factual allegation at all, but simply a bald conclusion that the existence of the side letter proves that Mr. Grendys "knew" that the numbers in the audit confirmation letter were false. *See* Pltf's Opp. at 12-13. As explained above, however, the SEC has failed to plead any inherent "contradiction" between the two documents, much less that Mr. Grendys *knew* of such a contradiction. *See supra* at 6-7. As such, the SEC's "actual knowledge" conclusion is without any factual foundation and is not a "reasonable inference" from the sole relevant fact that the SEC pleads on the issue of scienter.

### C.    The SEC Has Pled No Facts Supporting a Claim of "Extreme Recklessness."

Despite repeated claims that Mr. Grendys *knew* he was engaging in improper conduct, the SEC tries to ease its pleading burden by citing "extreme recklessness" as an accepted standard of scienter in this Circuit. *E.g.,* Pltf's Opp. at 11. No matter, for the SEC has failed to level a single factual allegation that would support this standard.

---

[5] The SEC's two case citations are irrelevant to the scienter issue here. In *SEC v. Stansbury Holdings Corp.*, Civil Case No. 06-cv-00088, 2007 WL 552248 (D. Colo. Feb. 20, 2007), the defendant was the President and CEO of the company whose property was allegedly over-valued, and the SEC alleged that he personally knew specific facts proving that the actual value of the property was much lower than its publicly-reported value. 2007 WL 552248 at *1-*2. Moreover, the SEC charged the defendant with a direct violation of the securities laws, and the finding on that violation was dispositive of a separate aiding and abetting claim. *Id.* at *2 & *6.

In *SEC. v. Intelliquis Int'l, Inc.*, No. 2:02-CV-674 PGC, 2003 WL 23356426 (D. Utah Dec. 11, 2003), the motion at issue was one for summary judgment, and the individual defendant (Orton) failed even to respond. 2003 WL 23356426 at *1. More importantly, Orton, who was a finance professional, had failed to inquire when a distributor informed Orton's unqualified assistant that, rather than owing the audited company $3.2 million as claimed, the distributor actually owed only $7,000.00. *Id.* at *7. This blatant neglect of professional standards, along with numerous other "red flags" regarding the conduct of the corporate defendant and violations of GAAP, led to summary judgment on a primary violation theory and on a corollary charge of aiding and abetting. *Id.* at *8 & *14.

In its Opposition, the SEC asserts that "extreme recklessness" may be found "if the alleged aider and abettor encountered 'red flags,' or 'suspicious events creating reason for doubt' that should have alerted him to the improper conduct of the primary violator." Pltf's Opp. at 11. Citing its Complaint, the SEC then asserts that such "red flags" or "suspicious events" include:

> that USF management explicitly encouraged him to sign and send to USF's independent auditors an audit confirmation letter that Grendys knew, or was reckless in not knowing, was (1) materially false, and (2) would misstate USF's books and records and mislead USF's independent auditors.

Pltf's Opp. at 7 (*citing* Complaint ¶43).

As Mr. Grendys noted in his Motion to Dismiss, this passage reflects an absurd circular logic. *See* Motion at 4 n.3. *First*, USF's request cannot, itself, be a "red flag," unless it was accompanied by some statement or conduct that alerted Mr. Grendys to the alleged falsity of the audit confirmation letter. But the SEC alleges no such thing anywhere in its Complaint.

*Second*, when the SEC's asserts that Mr. Grendys "should have known" that the letter was false, the SEC simply *assumes* the very scienter that the "red flag" letter is supposed to prove. That is, the SEC nowhere explains how the mere *existence* of the audit confirmation letter establishes that Mr. Grendys was "extremely reckless" in not knowing that the letter allegedly contained false information.

Furthermore, despite later claiming that "the Complaint . . . alleges that Mr. Grendys encountered 'red flags' and other 'suspicious events creating reasons for doubt' demonstrating that USF and its management were engaged in misconduct" (Pltf's Opp. at 13), the SEC does not list a *single one* of these purported "red flags," nor does the SEC cite to *any* allegation in its Complaint that reflects such a "red flag." And to add to the irony, in both of the cases that the SEC cites in support of its "red flag" argument, the courts *dismissed* claims against the

defendants, even in the face of "red flag" allegations far beyond those at issue here. *See Howard v. SEC*, 376 F.3d 1136, 1142-43 (D.C. Cir. 2004) (dismissing claims against the defendant, a Senior Vice President of the company allegedly engaged in improper conduct, despite the presence of numerous "red flags," where there was no evidence that the defendant knew the company's conduct was illegal), and *SEC v. Morris*, No. Civ. A. H-04-3096, 2005 WL 2000665 (S.D. Tex. Aug. 18, 2005) (dismissing securities fraud allegations against a company CFO, even where the SEC had pled facts demonstrating that the CFO knew of the accounting changes at issue, knew that they would affect the company's reported income, and was present when company executives made misleading statements about the change to securities analysts).[6]

In sum, the SEC cites absolutely no "red flags" or other surrounding circumstances that would have, in the absence of extreme recklessness, alerted Mr. Grendys to any improper conduct at USF. In fact, as evidenced by the so-called side letter's reference to Frozen Farms, and by Mr. Carter's testimony on that same subject, the exact opposite is true: Mr. Grendys had no reason to suspect any wrongdoing at USF. This reasonable inference defeats the SEC's unreasonable inference of scienter via "extreme recklessness" and mandates dismissal of the SEC's complaint under Rule 12(b)(6).

### D.    The Relevant Case Law That The SEC Cites Fully Supports Dismissal.

In a last-ditch effort to salvage an inadequate Complaint, the SEC purports to distinguish two key cases that Mr. Grendys cited in his Motion to Dismiss and introduces others where dismissal was denied. The SEC misuses all of these cases.

---

[6] In a throwaway footnote, the SEC asserts that the audit confirmation letter contradicts any USF claim that the figures in the letter were for "internal use only." *See* Pltf's Opp. at 13 n.10. Not only does the SEC not allege that Mr. Grendys ever received such information from USF, but even if the SEC had so alleged, the inference they draw is not a reasonable one, because USF is not a publicly-traded company. Thus, figures reported to USF's auditors would presumably *not* be for public consumption and, as such, would be "internal" to USF. Once again, the SEC makes leaps of logic before it looks for more reasonable inferences.

*First*, the SEC cites *Ponce v. SEC*, 345 F.3d 722, 737 (9th Cir. 2003), for the proposition that aiding and abetting is properly pled where the defendant was "reckless in not recognizing the misleading nature of statements" he made. Pltf's Opp. at 15. The defendant in Ponce, however, was a CPA and the retained independent auditor of the company under investigation. 345 F.3d at 725. In his testimony at an SEC hearing, Ponce admitted that he was fully aware of serious problems in a methodology that he had used for valuing certain license designs, but he consciously chose not to change the methodology, even though the numbers it generated "may not be correct." *Id.* at 731. On review of an SEC administrative determination, the Ninth Circuit found that because Ponce had failed to act when he knew that his certification of financial statements with an improper valuation methodology could mislead the public, the SEC's ruling was not an abuse of discretion. *Id.* The procedural posture and the facts of *Ponce* bear no resemblance to those existing or alleged here.

*Second*, the SEC cites *SEC v. Apolant*, 411 F. Supp. 2d 271, 277 (E.D.N.Y. 2006), for the proposition that aiding and abetting was properly pled where the defendant knew that his statements were misleading, even if literally true. Pltf's Opp. at 15. Not only is there no such allegation by the SEC in this case, but the amended complaint in *Apolant* alleged that Apolant made the statements at issue ***knowing*** them to be false,[7] ***knowing*** of the underlying fraudulent scheme, and ***knowing*** that the purpose of the false statements was to mislead the investing public. 411 F. Supp. 2d at 277. There are no such allegations in this case.

*Third*, the SEC goes to great lengths to distinguish the holding of *SEC v. Orr*, No. 04-74702, 2006 WL 542986 (E.D. Mich. Mar. 6, 2006), and to suggest that Mr. Grendys is "more

---

[7] Specifically, the SEC alleged that while Apolant drafted press releases stating that a legitimate businessman controlled the company at issue, Apolant worked directly with the organized crime figure who controlled the company behind the scenes. 411 F. Supp. 2d at 277. As such, Apolant allegedly had direct knowledge of the false and misleading nature of his statements.

like" defendant Kirkpatrick (a vendor who failed to obtain a 12(b)(6) dismissal) than like defendant Bixler (a vendor who succeeded). Pltf's Opp. at 13-14. The SEC is wrong. In *Orr*, the SEC specifically alleged that Abood (an executive of K-Mart, the primary violator) told Kirkpatrick, both orally and in writing, that K-Mart needed to cover a $5 million "profit shortfall" for fiscal year 2000. 2006 WL 542986 at *2 & *12. In response, Kirkpatrick agreed to advance K-Mart $3 million in promotional allowances to be earned in *2001*, but signed two documents indicating that the $3 million had been earned in *2000*, thereby allowing K-Mart to book revenue that it had not yet earned and, thus, to inflate reported revenues in FY 2000. *Id.*

Here, by contrast, there is absolutely no allegation that any USF employee ever suggested to Mr. Grendys that there was any ulterior motive, or improper purpose, in asking Mr. Grendys to sign the audit confirmation letter. Indeed, even though defendant *Bixler* – unlike Mr. Grendys – faced pressure and threats to sign similar documents, the court *dismissed* aiding and abetting charges against him, because Abood had not suggested any "improper purpose" to him. *Id.* at *3 & *13. The court also found unpersuasive the SEC's argument that Bixler had obtained a *side letter* that he had not shared with K-Mart's auditors. As the court succinctly noted, the SEC did "not allege that Bixler knew or should have known that the auditor was not aware of the letter." *Id.* at *13. Likewise, there is no allegation in the SEC's Complaint that Mr. Grendys knew, or should have known, that the auditors were not privy to the "side letter," a pleading omission that completely undermines the SEC's claim that Mr. Grendys aided and abetted a *concealment* of USF's underlying fraud.

*Fourth*, the SEC asserts that Mr. Grendys "fundamentally misstate[d] the Court's decision in *SEC v. Lucent Technologies, Inc.*, 363 F. Supp. 2d 708 (D.N.J. 2005)." Pltf's Opp. at 15 n.12. No, he didn't. Rather, the SEC cites the wrong case. Mr. Grendys properly cited the

court's opinion located at 2005 Westlaw 1206841. As Mr. Grendys explained in his Motion to Dismiss, *Lucent Technologies* is extremely persuasive authority for a dismissal of the SEC's aiding and abetting claims against him in this case. *See* Motion at 12-13.

At base, the pleading deficiencies in the SEC's Complaint are insurmountable. There are simply no factual allegations that would support a reasonable inference that Mr. Grendys knew of any underlying fraudulent scheme, knew that USF was improperly inflating its earnings, or, indeed, knew that anything improper was occurring at USF. As in *Lucent Technologies*, there is no allegation that Mr. Grendys had any knowledge of accounting principles, that he knew how USF accounted for funds that it accrued through the "shelter" of Frozen Farms, or that he knew USF and its auditors were reporting information to a publicly-traded company. Under these circumstances, it is not surprising that the SEC does not cite a single case upholding an aiding and abetting claim against a third party based on allegations even remotely similar to those leveled here. In fact, the case law compels the opposite conclusion.

## III.    ANY ATTEMPT TO AMEND THE COMPLAINT WOULD BE FUTILE.

In the concluding paragraph of its Opposition, the SEC requests an opportunity to amend its Complaint if the Court finds it deficient. *See* Pltfs' Opp. at 16. Mr. Grendys respectfully submits that the Court should deny this request. Although leave to amend may be "freely given" under certain circumstances, those circumstances do not obtain here.

Through the course of its investigation – and that of the U.S. Attorney's Office in Manhattan – the SEC has already obtained more than sufficient information from Mr. Grendys, from USF, and from third parties (such as USF's auditors, Deloitte & Touche) – including documents, witness statements, and sworn testimony – to craft a comprehensive Complaint. If, despite all of this pre-suit discovery, the SEC was unable to draft a Complaint containing

sufficient factual allegations to survive a motion to dismiss, there is no reason to believe that it could do so on the next go-round.

Put simply, the facts pled in the SEC's Complaint – combined with the language of the two letters and the confirmatory testimony of William Carter – do not support a reasonable inference either of actual knowledge or of "extreme recklessness." No amount of artful pleading can alter that outcome, nor should the Court encourage the SEC to attempt to plead around the truth. Because amendment would be futile, the Court should deny any request to replead and grant a dismissal with prejudice.

## CONCLUSION

The SEC has not pled facts to support jurisdiction, venue, or an aiding and abetting claim against Mr. Grendys. Consequently, Mr. Grendys respectfully requests that the Court dismiss the SEC's Complaint with prejudice under Rules 12(b)(2) and 12(b)(3) or, in the alternative, under Rule 12(b)(6).

Respectfully submitted,


  /s/ Kurt Stitcher
Kurt Stitcher
LEVENFELD PEARLSTEIN, LLC
2 North LaSalle Street, Suite 1300
Chicago, Illinois 60602
Phone: (312) 476-7597
Fax: (312) 346-8434
kstitcher@lplegal.com

### CERTIFICATE OF SERVICE

I hereby certify that on June 29, 2007, I electronically filed the foregoing REPLY IN SUPPORT OF MOTION TO DISMISS with the clerk of the court by using the CM/ECF system, which will send a notice of electronic filing to the following:

Charles Derrick Stodghill
U.S. Securities and Exchange Commission
100 F. Street, NE
Washington, DC 20549
stodghillc@sec.gov
Attorney for Plaintiff SEC

Bradley D. Simon
Simon & Partners LLP
30 Rockefeller Plaza, 42nd Floor
New York, NY 10012
bradsimon@simonlawyers.com
Attorney for Defendant Anthony Holohan

Nancy Luque
DLA Piper LLP
1200 19th Street, NW
Washington, DC 20036
Nancy.luque@dlapiper.com
Attorney for Defendant Gary Bell

Matthew G. Jacobs
DLA Piper LLP
400 Capitol Mall, Suite 2400
Sacramento, California 95814
Matthew.jacobs@dlapiper.com
Attorney for Defendant Gary Bell


/s/ Kurt Stitcher
Kurt Stitcher

# EXHIBIT "A"

6apekaiF.txt

1605

6apekai1                    Trial
1    UNITED STATES DISTRICT COURT
1    SOUTHERN DISTRICT OF NEW YORK
2    ------------------------------x
2
3    UNITED STATES OF AMERICA,              New York, N.Y.
3
4                    v.                     (S1) 04 Cr. 733 (TPG)
4
5    MARK KAISER,
5
6                    Defendant.
6
7    ------------------------------x
7
8
8                                           October 25, 2006
9                                           10:00 a.m.
9
10
10   Before:
11
11                    HON. THOMAS P. GRIESA,
12
12                                           District Judge
13
13
14                        APPEARANCES
14
15   MICHAEL J. GARCIA
15        United States Attorney for the
16        Southern District of New York
16   BY:  JASON SABOT
17        LAWRENCE GERSCHWER
17        ALEX LIPMAN
18            Assistant United States Attorneys
18
19   MAYOR, BROWN, ROWE & MAW LLP
19        Attorneys for Defendant
20   BY:  RICHARD MORVILLO
20        PETER WHITE
21        DANIEL T. BROWN
21        HEATHER H. MARTIN
22
23        - also present
24   Brian Harkins, FBI case agent
24   Gary Smith, Government paralegal
25

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1728

6apzkai4                Lee - recross
1    A.  That issue is the Heritage letter.
2    Q.  Is that what he said to you?
3    A.  I believe that is based on the Heritage letter.
4    Q.  Thank you.
5             MR. MORVILLO:  I don't have anything further.
6             MR. SABOT:  No redirect, your Honor.
7             THE COURT:  All right, you may step down, and we'll
8    have the next witness.
9             MR. GERSCHWER:  Your Honor, the government calls
10   William Carter.

Page 1

6apekaiF.txt

```
11      WILLIAM CARTER,
12           called as a witness by the government,
13           having been duly sworn, testified as follows:
14   DIRECT EXAMINATION
15   BY MR. GERSCHWER:
16                THE COURT:  Go ahead.
17                MR. GERSCHWER:  Thank you, your Honor.
18   Q.  Mr. Carter, how old are you?
19   A.  46 years old.
20   Q.  And what do you currently do for a living?
21   A.  I'm a buyer for stainless aluminum and plastic products.
22   Q.  Are you married, sir?
23   A.  Yes, sir, I am.
24   Q.  For how long have you been married?
25   A.  19 years.
```
                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

1729

6apzkai4                    Carter - direct
```
1    Q.  Mr. Carter, why are you here today?
2    A.  Two years ago I pled guilty to conspiracy to commit fraud
3    and to fraud in U.S. Food Service accounting -- in the U.S.
4    Food Service accounting scandal.
5    Q.  You say U.S. Food Services.  Is that where you were working
6    at the time?
7    A.  When I pled guilty I wasn't working there any longer, but
8    that's where I was working when it happened, yes, sir.
9    Q.  When you participated in this conspiracy to commit fraud?
10   A.  Yes, sir.
11   Q.  In simple terms, what kind of fraudulent scheme were you
12   involved in?
13   A.  Vendor confirmations were sent out from others in our
14   office, and I convinced vendors to sign vendor confirmations
15   for inflated numbers that were due to U.S. Food Service.
16   Q.  And what is your understanding of the effect that that had
17   on U.S. Food Services reported earnings?
18   A.  That it incorrectly inflated the earnings reports.
19   Q.  Now, you said you were involved in a conspiracy.  Who else
20   at USF were you conspiring with to do this?
21   A.  Tim Lee and Mark Kaiser.
22   Q.  And, basically, what did you do as your role in this fraud?
23   A.  Well, I was given a list of vendors to get contacts for,
24   and I would call the vendors ahead of time and tell them the
25   confirmation letters were coming, to sign the confirmation
```
                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

1730

6apzkai4                    Carter - direct
```
1    letters and to return them unless they had a question, then to
2    call me.
3    Q.  Okay.  I'm sorry, we'll come back to that in more detail.
4    A.  Okay.
5    Q.  You mentioned Tim Lee and Mark Kaiser.  Do you see Mr.
6    Kaiser in the courtroom today?
7    A.  Yes, sir.
8                MR. WHITE:  Stipulate to his identification, your
9    Honor.
10               MR. GERSCHWER:  Okay, your Honor.
11   Q.  Now, you said a few minutes ago, Mr. Carter, that you
12   pleaded guilty.  What did you plead guilty to?
13   A.  Conspiracy to commit fraud and to fraud.
14   Q.  And are you testifying today pursuant to an agreement with
15   the government?
```
                            Page 2

6apekaiF.txt

18  if this is when the women went to the restroom or at some
19  point, I said to him, I said we can't do this any more; we
20  can't put the vendors in this position.  And honestly my sub
21  text was, I don't want to be put in this position to force
22  people to sign these letters again.
23          And he told me, don't you worry about it, it's not going
24  to be an issue, we're not going to have to do that next year.
25  It's not going to be a problem.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1757

6apzkai4                Carter - direct
1   Q.  Did Mr. Lee explain to you why it wouldn't be a problem?
2   A.  No.  He just said it wasn't, and to be honest I was very
3   relieved at the prospect secretary of not having to see that
4   situation again.
5   Q.  Now, Mr. Carter, did U.S. Food Service at that time have a
6   code of conduct?
7   A.  Yes, sir.
8   Q.  Were people at your position expected to periodically
9   attest that you acted within that code of conduct?
10  A.  Yes, sir.
11  Q.  And had you signed such documents prior to early 2002?
12  A.  Yes, sir, I had.
13  Q.  After this conversation with Mr. Kaiser about Pactiv and
14  the subsequent conversation you had with Mr. Lee about
15  misgivings, did you have to sign such a document?
16  A.  Yes, sir.
17  Q.  In prior years, had you had any doubts about the truth of
18  what you were signing?
19  A.  I wasn't worried about it, but this year when I got it I
20  think there were questions -- you know, have you observed or
21  have your participated in any irregular accounting practices.
22  And I'm not an accountant, but I knew that what we had done was
23  an irregular accounting practice, yet I signed the code of
24  conduct that I wasn't aware of any.
25  Q.  And so that wasn't true when you signed it?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1758

6apzkai4                Carter - direct
1   A.  No, sir.
2   Q.  Can you -- I think you have in front of you government
3   exhibit 124H?
4   A.  Yes, sir.
5   Q.  And that's --
6               THE COURT:  124 what?
7               MR. GERSCHWER:  124H.  And that is in the jury's
8   binders if they want to turn to it.
9   Q.  Do you have that, Mr. Carter?
10  A.  Yes, sir, I do.
11  Q.  This is from you to a Mr. Joseph Grendys?
12  A.  Yes, sir.
13  Q.  That's Koch Poultry?
14  A.  Yes, sir.
15  Q.  Why did you send Mr. Grendys this letter in February of
16  2002?
17  A.  This is actually a vendor that initially was assigned to
18  Brian Spears.  Mr. Grendys told Brian that he wouldn't sign it.
19  Tim Lee was out of town and Brian brought it to me.
20              THE COURT:  I'm not hearing you.
21              THE WITNESS:  I'm sorry.
22              THE COURT:  Start over.

Page 15

6apekaiF.txt
```
23          THE WITNESS:  Yes, sir.
24          THE COURT:  What happened?
25          THE WITNESS:  This was originally a vendor who was
```
SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1759

6apzkai4                    Carter - direct
```
 1    assigned to Brian Spears.  Mr. Grendys told Mr. Spears that he
 2    wouldn't sign the letter.  And Mr. Lee was out of town, so
 3    Mr. Spears came to me after hours one night and asked me what
 4    to do, and I took responsibility for talking to Mr. Grendys.
 5          Mr. Grendys wasn't interested in signing the letter,
 6    and was concerned that his company was going to be held
 7    responsible for monies listed in the letter.  And the only way
 8    I could get him to sign the confirmation letter was to sign a
 9    letter that he drafted, which was this letter.
10    Q.  Now, let's go to the very last paragraph of this letter
11    down at the bottom, and it says:  Differences between the
12    confirmation and Koch numbers will be covered through Frozen
13    Farms, and in no circumstances will this be construed as a
14    liability of Koch Poultry.
15          Mr. Carter, what is Frozen Farms?
16    A.  Frozen Farms was a third-party billing agency for U.S. Food
17    Service.
18    Q.  What is a third-party billing agency?
19    A.  The original concept was that U.S. Food Service would get
20    vendors to bill their product at a net price, all the program
21    taken out.
22          THE COURT:  All the what taken?
23          THE WITNESS:  All the program monies taken out.  So at
24    a net price the vendors would bill U.S. Food Service, only they
25    billed this Frozen Farms, and then Frozen Farms would add the
```
SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1760

6apzkai4                    Carter - direct
```
 1    program money in.  That way they would bill the branches, and
 2    immediately U.S. Foods Service would have the difference
 3    between what the vendors billed Frozen Farms and what Frozen
 4    Farms billed the branches, and they'd have the money
 5    immediately in terms of the program money, instead of having to
 6    wait for a vendor to pay us, when it made sense or when it was
 7    their time quarterly or whatever to pay it.  And it gave U.S.
 8    Food Service the ability to change the amount of money, the
 9    amount of difference between the net price of the goods and
10    what was billed to the branches.
11    Q.  So, Frozen Farms would bill U.S. Food Services branches for
12    the product?
13    A.  Yes, sir.
14    Q.  And then, basically, at an inflated price?
15    A.  Yes.
16    Q.  And Frozen Farms would then collect that money in order to
17    turn it over to USF corporate?
18    A.  Yes, sir.
19    Q.  That's in Colombia, Maryland at that time?
20    A.  Yes, sir.
21    Q.  And what did you refer to the money that would collect in
22    the third-party billing agency as, did you refer --
23          THE COURT:  Take a little stretch, take a little
24    stretch, ladies and gentlemen.  Okay, thank you.
25    Q.  Did you have a term that you used to refer to the money
```
SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300
Page 16

6apekaiF.txt

1761

6apzkai4                    Carter - direct
1   that was building up in these third-party billing agencies?
2   A.   There were different terms used over time.  Buckets is one
3   term that was used, that was collected at the third-party
4   billing agencies.
5   Q.   This money was different than the promotional allowances
6   that, for example, Koch Poultry would pay to U.S. Food Service?
7   A.   Yes.
8   Q.   Did it make any sense, Mr. Carter, for Joe Grendys of Koch
9   Poultry to be confirming an amount of money that that letter
10  indicates would be covered by Frozen Farms?
11            MR. WHITE:  Your Honor, I don't know that he can
12  speculate as to Mr. Grendys.  Perhaps it's just I misunderstood
13  the question.
14            THE COURT:  Well, look, if he can answer it, fine.  If
15  he can't, he'll say he can't.
16  Q.   You prepared this letter, right, Mr. Carter?
17  A.   No.  Mr. Grendys prepared the letter and gave it to me to
18  sign.  It was prepared after much discussion.
19            And one of the points that Mr. Grendys had -- not only
20  he was concerned to have a letter that said that he wouldn't
21  owe the money, he wanted to know where the money was going to
22  come from.  And Frozen Farms is what I told him because I
23  didn't know any place else to tell him where the money was
24  going to come from.
25            Now, did Frozen Farms have that much money collected,
            SOUTHERN DISTRICT REPORTERS, P.C.
                    (212) 805-0300

1762

6apzkai4                    Carter - direct
1   especially for that?  We got the money from Frozen Farms and
2   Private Brands and all the third-party billing agencies every
3   month.  There wasn't that much money there.
4   Q.   So it didn't make sense?
5            THE COURT:  So it what?
6   Q.   So it did not make sense?
7   A.   It wouldn't make sense to someone who understood how Frozen
8   Farms worked that that much money would be there.
9   Q.   And you put that in there, or Mr. Grendys put that in there
10  to satisfy Grendys' concerns about signing the confirm?
11  A.   That's the reason it was in there, yes, sir.
12  Q.   Did you become familiar, in the course of this, the 2001
13  audit, with some of the numbers that vendors were being asked
14  to confirm?
15  A.   In 2001 some of the vendors sent me copies of confirmations
16  or told me the numbers over the phone.
17  Q.   Including vendors whose programs you were familiar with?
18  A.   Yes, sir.
19  Q.   Did the numbers make any sense to you, Mr. Carter?
20  A.   They were inflated.
21  Q.   Okay, let's move onto the next year.
22            You've already testified, Mr. Carter, that at the end
23  of this process you told Mr. Lee you didn't want to be involved
24  in this process any more.  Did it come to pass the next year
25  you were involved again?
            SOUTHERN DISTRICT REPORTERS, P.C.
                    (212) 805-0300

1763

6apzkai4                    Carter - direct
1   A.   Yeah.  Tim had me in a meeting about something else with
2   some other people and asked me to stay back and, you know, out
3   of the blue to me, 'cause I thought we weren't going to do this
                    Page 17

6arekaiF.txt
13    confirmation letter that had been sent to Koch Poultry?
14         MR. WHITE:  I think I may be able to ask a few
15    questions that would clarify, your Honor.
16         THE COURT:  Okay.  Please do.
17    Q.  Is the column on the left, sir, the numbers that were taken
18    from the confirm letter that was sent --
19         THE COURT:  Okay, look, I didn't read it carefully.
20         MR. WHITE:  I thought maybe I might have missed it,
21    too, so I should ask.
22    Q.  Is the column on the left the numbers, as you understand
23    it, the numbers that were from the confirm letter that Mr. --
24    that was sent out by Mr. Kaiser to Mr. Grendys in January?
25    A.  Those are the -- yes, those are the same numbers.
              SOUTHERN DISTRICT REPORTERS, P.C.
                     (212) 805-0300

                                                              1990
      6AREKAI1            Carter - cross
 1    Q.  Okay.  And have you just been comparing 124H with 124I?
 2    A.  Yes.
 3    Q.  The numbers on the right, the column on the right, are
 4    those the numbers that Mr. Grendys was saying were the actual
 5    numbers for Koch Poultry for the year?
 6    A.  That's what it looks like.  Yes, sir.
 7    Q.  And were those numbers ever shared with Mr. Kaiser?
 8    A.  Not to my knowledge.
 9    Q.  Did Mr. Lee ever see this letter that's 124H?
10    A.  I don't remember.
11    Q.  Do you know whether or not Mr. Lee approved it?
12    A.  I thought when he approved the first such letter that
13    implicitly he approved me to send other letters like that.
14    Q.  Is this the one where I believe you told White & Case that
15    Mr. Lee had told you to tell Mr. Grendys that the volume would
16    be there next year if Mr. Grendys signed the confirm letter?
17    Do you remember making that comment?
18    A.  I don't remember -- I don't remember it specifically.  It
19    sounds like it was right there.  I know that we were coming
20    into some new business with Koch Poultry.  I just don't
21    remember that conversation specifically.
22    Q.  So would it be fair to say that whether it was this vendor
23    or another vendor that Mr. Lee -- you understood from Mr. Lee
24    that if you needed to, you could use sort of the quid pro quo
25    rate of volume to get these confirm letters signed?
              SOUTHERN DISTRICT REPORTERS, P.C.
                     (212) 805-0300

                                                              1991
      6AREKAI1            Carter - cross
 1    A.  I think he encouraged me never to do that directly, but
 2    it's my belief that that -- in any of these vendor discussions
 3    or relationships, that always existed.  It was implicit, I
 4    guess.
 5    Q.  Did Mr. Kaiser ever tell you to do that?
 6    A.  No, sir.
 7    Q.  At the bottom of this letter it talks about the Koch
 8    numbers being covered through Frozen Farms.  Do you see that?
 9    A.  Yes.
10    Q.  And is Frozen Farms what was called at U.S. Foodservice a
11    VASP, or a value added service provider?
12    A.  Yes, sir.
13    Q.  And who was the person who ran Frozen Farms?
14    A.  It changed, but I think at the time it was Brady Schofield.
15    Q.  And was this one of these entities that would buy product
16    from the people like Koch Poultry and shelter some income for
17    putting it back into the U.S. Foodservice distribution channel
                          Page 14

6arekaiF.txt

```
18  for resale?
19  A.  Yes.
20  Q.  Was Koch Poultry distributing product through Frozen Farms
21  at this time?
22  A.  It was billing through, not so much distributing through.
23  Frozen Farms didn't take physical possession but I think
24  billing was going through there at the time, yes, sir.
25  Q.  But there would be this sheltered income of some amount
```
                    SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300

                                                                    1992

6AREKAI1              Carter - cross
```
 1  from Koch Poultry due to the fact it went through Frozen Farms?
 2  A.  Yes, sir.
 3  Q.  Yesterday I showed you a ConAgra Hunt-Wesson agreement that
 4  was modified in late 2001.  Do you remember that?
 5  A.  I remember you showed it to me.  I don't remember it.  Do I
 6  have to remember any details about it?
 7          MR. WHITE:  May I approach, your Honor.
 8  Q.  I'm handing you what has already been admitted as 23287A,
 9  Kaiser Exhibit.  I don't believe it's in the binders, and I'm
10  not going to ask you to go over what you went through
11  yesterday.
12          But just to refresh your memory, that's the document
13  that had the upfront payment that there was no circumstance
14  where you would have to pay it back; do you remember that?
15  A.  Yes.
16  Q.  Now, I can't remember if I asked you:  Was Mr. Kaiser
17  involved in the negotiation of that agreement?
18  A.  I don't remember him to be.
19  Q.  Now, if you could look at Government Exhibit 124G, sir, in
20  the first government binder again.  It's already admitted.
21  A.  Yes, sir.
22  Q.  Is this a letter sent to Hunt-Wesson by you on February 5,
23  2002?
24  A.  It's a letter that somebody at Hunt-Wesson sent me and I
25  signed and sent back to them.
```
                    SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300

                                                                    1993

6AREKAI1              Carter - cross
```
 1  Q.  That's the second time I've had it exactly backwards.
 2          So this is a letter that was initially sent to you by
 3  a Mr. Bell at Hunt-Wesson?
 4  A.  Yes, sir.
 5  Q.  And was Mr. Bell your business contact at Hunt-Wesson?
 6  A.  He was really Ms. Curtin's contact, but he had had concerns
 7  about it and she had referred him to me.  And I had ended up
 8  talking to him and then discussing the possibility of a letter
 9  like this, and he sent this and I signed it.
10          MR. WHITE:  Okay.  Your Honor, I'm not sure that this
11  was admitted yesterday.  It's marked as a government exhibit.
12  I would move it now, if it hadn't been admitted already.
13          MR. GERSCHWER:  It's in.
14          MR. WHITE:  Okay.
15  Q.  And had you discussed this letter with Mr. Bell before it
16  was sent?
17  A.  Again, I don't remember if I discussed the specifics of it,
18  but I was expecting it when he sent it to me, a letter to this
19  effect.
20  Q.  Who approved the form for this letter, if anyone?
21  A.  I'm not sure what you mean, who approved it.  I signed it.
22  Q.  Did you ever discuss it with -- did you ever discuss this
```
                              Page 15