## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

SECURITIES AND EXCHANGE
COMMISSION,

    Plaintiff,

    v.

JOSEPH GRENDYS, *et al.*,

    Defendants.

Civil Action No. 07-120 (CKK)

## MEMORANDUM OPINION
(January 04, 2012)

Plaintiff Securities and Exchange Commission ("SEC") filed the Complaint alleging

Defendant Joseph Grendys and three co-Defendants aided and abetted violations of the Securities

and Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. § 78a *et seq.*  Mr. Grendys is the only

remaining defendant in this action, and has filed the instant [63] Motion for Summary Judgment

and [67] Motion to Strike.[1]  Both motions are fully briefed.  Upon consideration of the pleadings,

the relevant authorities, and the record before the Court, for the reasons stated below,

Defendant's motions are DENIED.

## I. EVIDENTIARY ISSUES

Before reaching the substance of Defendant's motions, the Court will briefly address the

evidentiary issues raised in Defendant's Motion to Strike.  In its motion, Defendant raises a

number of issues with Plaintiff's Statement of Genuine Issues of Material Fact and Response to

---

[1] Defendant Michael Smith consented to entry of judgment against him on April 5, 2007 (ECF No. [3]), Defendant Gary G. Bell consented to entry of judgment against him on October 19, 2007 (ECF No. [33]), and Defendant Anthony Holohan consented to entry of judgment against him on February 22, 2010 (ECF No. [48]).

Defendant's Statement of Alleged Undisputed Facts.  In setting forth the dispositive motions

schedule, the Court instructed the parties that they were expected to fully comply with Local

Civil Rule 7(h), and that the Court may strike pleadings not in conformity with this Rule.

Scheduling and Procedures Order, ECF No. [61], at 1.  Defendant takes issue with a number of

features of Plaintiff's submission, including (1) its length; (2) that it fails to cite to the record; (3)

that the SEC's citations to the record are incorrect; (4) that the SEC's responses do not contradict

the proffered facts; and (5) that the SEC's own Statement contains immaterial facts.

First, although lengthy, the Court notes that the first forty two pages of Plaintiff's

Statement are in fact responses to the 127 allegedly undisputed facts identified by Defendant in

support of his motion. *See* Pl.'s Stmt. and Resp. Stmt., ECF No. [65-1].  The remaining twenty

pages outline facts the SEC claims are undisputed. *Id.*  Given the complicated factual history of

the case, the Court does not find the length to be an independent basis for striking the Statement.

Second, Defendant argues the SEC fails to cite evidence in the record when disputing

Defendant's proffered facts.  It is unclear how the SEC could cite to the record to support a claim

that a particular fact is "immaterial," nor does the Court find it was necessary for the SEC to

provide records cites to support its claim that Mr. Grendys' testimony is self-serving.

Additionally, many of the responses the Defendant complains about are non-factual because the

"facts" asserted by Defendant was not factual in nature. *See* Resp. Stmt. ¶ 109 (disputing

Defendant's characterization of the side letter as simply a "more detailed letter").  Defendant is

correct that in many case the SEC's Response Statement cites to its own Statement, rather than

directly to the record.  However, given that the SEC's statement in turn provides direct citations

to the record, the cross-reference simplified the Response and did not impede the Court's or

2

Defendant's ability to discern the basis for the SEC's response.

Third, Defendant claims the SEC "egregiously" asserts disputes using incorrect record citations. Just because Defendant disagrees with the SEC's reading of deposition testimony or any other portion of the record is not surprising, and does not make the SEC's citations incorrect, much less "egregiously so." A dispute regarding the interpretation of a witness's testimony is a matter for the trier of fact, not the basis for a motion to strike.

Fourth, Defendant argues that the SEC's "response" to the Defendant's proffered facts does not contradict the underlying fact, and in many cases simply provides additional "clarifying" information. The Court does not fault the SEC for providing contextual information that does not contradict the underlying fact when in many cases the Defendant's "fact" is exaggerated, or makes some value judgment with which the SEC disagrees. *See* Resp. Stmt. ¶ 47 (disputing the Defendant's characterization of "promotional allowances" as "monies accrued"). Moreover, the Defendant is simply incorrect that the SEC's Response does not contradict the proffered fact. For example, in paragraphs 48 and 49, the Defendant alleges it is undisputed that Mr. Grendys did not know how USF accounted for promotional allowances from Frozen Farms, or anything about USF's internal accounting generally. The SEC responds with deposition testimony indicating USF employees told Mr. Grendys how USF purportedly used money from Frozen Farms against accounts receivables owed by Koch Poultry, indicating Mr. Grendys had at least some knowledge of USF's internal accounting procedures. The SEC also responds that this is not a "fact" because the only basis for it is Mr. Grendys' self-serving testimony. The SEC's evidence, if true, directly contradicts the "fact" claimed by the Defendant. Defendant may not agree with the SEC's argument, but that is not a basis for striking it.

3

Fifth, Defendant contends the Court should strike the SEC's Statement because it contains "immaterial and irrelevant assertions." In its Response Statement, the SEC makes the same claim as to many of the "facts" offered by Defendant. In the end, if a "fact" is not a fact, or is immaterial to the case at hand, the Court will simply ignore it. To the extent the Defendant argues various facts are irrelevant to the resolution of his motion, he can and has argued as such in the summary judgment pleadings. The Court finds that the SEC substantially complied with Local Civil Rule 7(h), and there is no basis for striking the SEC's Statement and Response to Defendant's Statement.

## II. BACKGROUND

During the relevant time period, Defendant Joseph Grendys was the President and Chief Executive Officer of Koch Poultry. Def.'s Stmt. ¶ 11.[1] Although privately owned, Koch Poultry undergoes annual audits. Id. at ¶ 72. In 1989, Koch Poultry began selling commodity and value-added chicken products to and through U.S. Foodservice's ("USF") predecessor companies. Resp. Stmt. ¶ 13. USF was a food service and distribution company that purchased food and food-related products from vendors and resold the products to end users. Def.'s Stmt. ¶ 3. USF also functioned as a distributor, delivering products purchased from vendors to end users. Id. Prior to April 2000, USF was a publicly-owned company, with its shares traded on the New York Stock Exchange. Pl.'s Stmt. ¶ 3. In April 2000, USF was acquired by Royal Ahold, N.V., a Netherlands-based, publicly held company whose shares were registered with the SEC and traded on the New York Stock Exchange. Def.'s Stmt. ¶¶ 1-2, 50. Mr. Grendys was aware of Royal

---

[1] In most instances the Court shall cite only to one party's Statement of Material Facts ("Stmt.") unless a statement is contradicted by the opposing party, in which case the Court may cite Plaintiff's Response to the Statement of Material Facts ("Resp. Stmt."). The Court shall also cite directly to evidence in the record, where appropriate.

Ahold's acquisition of USF, but the parties dispute how much Mr. Grendys knew about Royal Ahold and the relationship between Royal Ahold and USF after the acquisition. Resp. Stmt. ¶¶ 51-54. Mark Kaiser was the Executive Vice President of Purchasing and Procurement, and later the Chief Marketing Officer for USF. *Id.* at ¶ 7. Timothy Lee was the Executive Vice President of Purchasing, and William Carter was the Vice President of Purchasing at USF. Def.'s Stmt. ¶¶ 8-9. Brian Spears served as USF's Vice President of Market Based Products for the purchasing department. *Id.* at ¶ 10.

Throughout the history USF's relationship with Koch Poultry, Mr. Grendys was the lead salesperson and main point of contact at Koch. Def.'s Stmt. ¶ 24. Mr. Spears and Mr. Lee were Mr. Grendys' primary points of contact with USF. *Id.* at ¶ 25. Koch Poultry sold products to USF, and also used USF as a distributor of products sold directly to end users. *Id.* at ¶ 16. Koch sold two types of chicken products to USF: commodity chicken products and value-added chicken products. Resp. Stmt. ¶ 13. When Koch Poultry sold commodity chicken products to USF, Koch paid USF "promotional allowances." Def.'s Stmt. ¶ 19. Promotional allowances were in essence rebates that vendors like Koch Poultry paid to USF for purchases USF made from the vendors. *Id.* at ¶ 20. In the case of commodity chicken products, promotional allowances were paid as a certain number of pennies per pound of chicken purchased by USF. *Id.* Koch Poultry did not have a contract in place with USF regarding the amount or timing of payment for promotional allowances, though at least some vendors did have contracts in place. Resp. Stmt. ¶ 21. Rather, Koch's payment of promotional allowances was based on an oral agreement between Mr. Grendys and Mr. Lee, made several years prior to 2002. Def.'s Stmt. ¶ 23. At least after 1999, some vendors would pre-pay promotional allowances to USF; that is,

remit promotional allowances for products USF had not yet purchased. During this time period, Koch Poultry did not pre-pay promotional allowances, although Koch would sometimes provide estimated payment for promotional allowances earned but not yet invoiced by USF. Resp. Stmt. ¶ 22.

In its dealings with Koch Poultry and other vendors, USF often utilized "value added service providers," known as VASPs. VASPs, like Frozen Farms, were established by USF to purchase commodity meat products from vendors and then re-sell those products to USF with a markup. Def.'s Stmt. ¶¶ 5, 32. The markup Frozen Farms applied to the products before selling them to USF varied over time, depending on market conditions. *Id.* at ¶ 33. USF would in turn resell the products at a markup to end users. *Id.* at ¶ 5. At least in part, the purpose of the VASP was to allow USF to charge a higher price to customers whose contracts were based on the price USF was charged to purchase the product. *Id.* at ¶ 34. Frozen Farms and other VASPs would then remit a portion of the markup to USF. *Id.* at ¶ 36. A large percentage of Frozen Farms' remittances to USF were often paid immediately before or after the end of a fiscal quarter or year. *Id.* at ¶ 37. Koch Poultry sometimes sold products through Frozen Farms to USF, and sometimes directly to USF. Grendys Dep. 34:14-19, 35:4-10. The parties dispute how much Mr. Grendys knew about the operation of Frozen Farms, including Frozen Farms' markups and remittances to USF. Resp. Stmt. ¶¶ 43-48.

Deloitte & Touche LLP ("D&T") was the auditing and accounting firm providing auditing services to USF. Def.'s Stmt. ¶ 6. In early 2002, D&T commenced the audit of USF's books for the fiscal year ending December 29, 2001 ("FY 2001 Audit"). *Id.* at ¶ 55. As part of the audit, D&T sent audit confirmation letters to select USF vendors, including Koch Poultry. *Id.*

at ¶ 56. D&T created the template for the letters, but USF selected what financial information to include in the letters, and who at the vendors would receive the letters. *Id.* at ¶¶ 57-58. USF represented to D&T that the amounts listed in the letters had been negotiated with and agreed upon by the vendors. *Id.* at ¶ 59.

Before the audit confirmation letters were sent to the vendors in 2002, Mr. Lee directed his subordinates, including Mr. Carter and Mr. Spears, to call the vendors receiving letters to inform them that the letters were coming, and to ask the vendors to sign and return the letters as quickly as possible. Def.'s Stmt. ¶ 60. Mr. Carter and Mr. Spears were further instructed to tell the vendors that if they had any questions about the letters, the vendors should call Mr. Lee or someone else at USF, not D&T. *Id.* at ¶ 61. Mr. Spears made the relevant call to Mr. Grendys, and on or about February 2, 2002, Mr. Grendys received an audit confirmation letter dated January 24, 2002. *Id.* at ¶¶ 62-63. Mr. Grendys previously received and signed audit confirmation letters concerning billings and promotional allowances owed between July 1, 1999 to April 1, 2000, and April 1, 2000 to December 30, 2000. Pl.'s Exs. 9, 10. Contrary to the representations made by USF, Mr. Grendys had not negotiated the terms of the amounts listed in the FY 2001 letter with USF prior to receiving the letter. Def.'s Smt. ¶ 64. The FY 2001 letter asked Mr. Grendys "[i]n connection with the audit of our financial statements," to "please confirm directly with our auditors . . . the following with respect to Marketing and Merchandising Allowances offered by you to USF as of December 29, 2001." Pl.'s Ex. 11. The letter then set forth a chart containing the following financial information

| | |
|---|---|
| Balance due to USF at December 30, 2000 | $ 1,650,000 |
| Less: Payments/deductions made/allowed during 2001 | (2,315,725) |
| Plus: Allowances earned during 2001 | 3,850,000 |
| Ending Balance due to USF at December 29, 2001 | $ 3,184,275 |

*Id.* at 1.  The letter further provided that the "base corporate program for Marketing and Merchandising Allowance" was $.05/lb, the volume purchased under the program for FY 2001 was 45,000,000 pounds, and that Koch Poultry "supported U.S. Foodservice with promotional allowances" for FY 2001 totaling $1,600,000.  *Id.*  The letter also asserted the amounts paid or to be paid were not "contingent upon U.S. Foodservice performing any additional duties or responsibilities in the future."  *Id.*  The second page of the letter provided space for Mr. Grendys to specify any other additional terms not covered above.  *Id.* at 2.  The line above the space provided for Mr. Grendys' signature read "CONFIRMATION: THE ABOVE INFORMATION IS CORRECT AS OF DECEMBER 29, 2001, except as noted below."  *Id.*

Upon receiving the letter, Mr. Grendys became concerned that the amounts listed in the letter were inaccurate.  Grendys Dep. 88:17-89:8.  Mr. Grendys found the numbers in the letter to be considerably higher than the amounts Mr. Grendys believed Koch Poultry actually owed USF.  *Id.* at 89:18-90:5.  Mr. Grendys states he believed the information below the chart was "basically correct."  Def.'s Stmt. ¶ 73.  Specifically, Defendant argues the $0.05/lb promotional allowance rate, described in the letter as the "base corporate program," reflecting the combination of (1) his oral agreement with Mr. Lee; and (2) special promotional allowances provided during FY 2001.  *Id.* at ¶ 74.  In light of his concerns, Mr. Grendys contacted USF, and initially spoke with Mr. Spears, informing him that the data contained in the letter was inconsistent with Koch Poultry's records.  *Id.* at ¶ 80.  Because he was not familiar with the letter, Mr. Spears informed Mr. Grendys that he would look into the matter and get back to him.  *Id.* at ¶¶ 81-82.  Mr. Grendys testified that Mr. Spears called him back, and stated that the "numbers were right because it was being billed through Frozen Farms or something."  Grendys Dep. 93:11-15.  The parties agree

8

that Mr. Spears told Mr. Grendys that the numbers reflected both Koch Poultry's promotional allowances due to USF, and the remittances Frozen Farms owed to USF on account of the markup Frozen Farms made on products purchased from Koch and sold to USF. Def.'s Stmt. ¶ 89. Mr. Spears did not make any threats or promises in an attempt to induce Mr. Grendys to sign the letter. *Id.* at ¶ 91. Mr. Grendys resisted this explanation, and asked to have "somebody call me and explain to me because this doesn't make sense to me." Grendys Dep. 93:11-15. Mr. Spears indicated he would have Mr. Carter call Mr. Grendys. *Id.* at 97:3-5.

Mr. Carter called Mr. Grendys, with Mr. Spears present in the room during the conversation. Def.'s Stmt. ¶ 95. Mr. Carter provided the same explanation as Mr. Spears: that the amounts reflected the total of Frozen Farms' markups and the payments made by Koch Poultry. Grendys Dep. 97:8-19. Mr. Carter purportedly explained that the amounts credited to Koch's account included the "4 or $500,000" paid by Koch, and the rest was paid by Frozen Farms. *Id.* at 97:15-98:7. Mr. Carter also testified he told Mr. Grendys in effect that "the business would be there" if Mr. Grendys signed the Audit Confirmation Letter. Carter Dep. 94:15-95:4. Mr. Grendys testified that given Mr. Carter's explanation, "[n]ever did I have even a thought, inkling, one iota or ounce of feeling that this was not 100,000 percent correct, never." Grendys Dep. 98:15-18. Nevertheless, Mr. Grendys requested Mr. Carter send him an outline of what they had discussed before Mr. Grendys would agree to sign the Audit Confirmation Letter. *Id.* at 100:12-18. That evening, Mr. Carter faxed Mr. Carter a letter referencing the Audit Confirmation Letter, and stating "this letter is to confirm that any monies shown as due will be covered through Frozen Farms and that there are no monies due from Koch Poultry as of 12/31/01." Pl.'s Ex. 13. Mr. Grendys rejected the letter from Mr. Carter, and offered to write up

9

an alternative letter reflecting their conversation. Grendys Dep. 101:8-16. Later that same

evening, Mr. Grendys drafted what the Court will refer to as the "side letter." *Id.* at 102:1-21.

The letter was addressed to Mr. Grendys from Mr. Carter, with the stated intention to "document

and clarify" the Audit Confirmation Letter sent to Mr. Grendys. Pl.'s Ex. 12. The side letter

stated "any documented differences from the confirmation and actual activity during the time

frame covered with the confirmation are not obligations of Koch Poultry," and that "no payments

will be requested of Koch Poultry now or in the future." *Id.* Specifically, the letter sets forth the

following:

| Confirmation | Koch Poultry |
|---|---|
| Balance due USF at 12-30-00<br>$1,650,000 | Balance due USF at 12-31-00<br>$0 |
| Less payments/deductions made<br>Allowed during 2001<br>$2,315,725 | Less payments/deductions made<br>allowed during 2001<br>$514,050.88 |
| Plus Allowances earned<br>During 2001<br>$3,850,000 | Plus Allowances earned<br>during 2001<br>$582,126.85 |
| Ending Balance due USF at<br>December 29, 2001<br>$3,184,275 | Ending Balance due USF at<br>December 29, 2011<br>$68,075.97 |
| Base program for Marketing<br>Programs $.05 | Base program for Marketing<br>Programs $.03 |
| Volume purchased during<br>Dec 31, 2000 to Dec 29, 2001<br>45,000,000 | Volume purchased during<br>Dec 31, 2000 to Dec 29, 2001<br>10,866,269 |

*Id.* The side letter further indicated any promotional allowances accrued were included in the

totals, and any differences between the confirmation and Koch numbers would be "covered

through Frozen Farms, and in no circumstances will this be construed as a liability of Koch

Poultry." *Id.* Mr. Grendys claims he believed the difference between the allowance amounts

owed in the "confirmation" and "Koch" columns would be covered by the remittances Frozen

Farms would make based on the mark-up it applied to Koch's products. Grendys Dep. 110:16-

111:4. Mr. Grendys emailed the letter to Mr. Carter, who signed and faxed it back to Mr.

Grendys. Def.'s Stmt. ¶¶ 109-116. Mr. Grendys then signed and faxed the Audit Confirmation

Letter to D&T that same evening. Grendys Dep. 127:4-10. In the following fiscal year, Koch's

sales to USF increased from $80 million to $118, with $33 million attributable to BC Rogers,

another chicken vendor acquired by Koch. Resp. Stmt. ¶ 124.

As part of the FY 2002 audit performed in early 2003, D&T followed a similar procedure

to verify promotional allowance income, although Koch Poultry did not receive an audit

confirmation letter for FY 2002. Def.'s Stmt. ¶ 123. During the FY 2002 audit, D&T received

two different audit confirmation letters from the same vendor, Heritage Bag Company, which

triggered an internal investigation. Kesler Dep. 66:13-68:12. The investigation revealed material

misstatements by USF in the recording of promotional allowances, including the overstatement

of promotional allowance income for FY 2000 through FY 2002 in the amount of $856 million.

Pl.'s Ex. 18 at 4. The SEC filed the instant Complaint in January 2007 against Mr. Grendys and

three other representatives from USF vendors that allegedly signed and submitted false and

misleading audit confirmation letters to D&T.

## III. LEGAL STANDARD

"The court shall grant summary judgment if the movant shows that there is no genuine

dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R.

11

Civ. P. 56(a).

> A party asserting that a fact cannot be or is genuinely disputed must support the assertion by:
>
> (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials); or
>
> (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

Fed. R. Civ. P. 56(c)(1). "If a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact as required by Rule 56(c), the court may . . . consider the fact undisputed for purposes of the motion." Fed. R. Civ. P. 56(e). When considering a motion for summary judgment, the court may not make credibility determinations or weigh the evidence; the evidence must be analyzed in the light most favorable to the nonmoving party, with all justifiable inferences drawn in his favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). "If material facts are at issue, or, though undisputed, are susceptible to divergent inferences, summary judgment is not available." *Moore v. Hartman*, 571 F.3d 62, 66 (D.C. Cir. 2009) (citation omitted).

The mere existence of a factual dispute, by itself, is insufficient to bar summary judgment. *See Liberty Lobby*, 477 U.S. at 248. "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Id.* For a dispute about a material fact to be "genuine," there must be sufficient admissible evidence that a reasonable trier of fact could find for the nonmoving party. *Id.* The Court must determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law."

*Id.* at 251-52. "If the evidence is merely colorable, or is not sufficiently probative, summary judgment may be granted." *Id.* at 249-50 (internal citations omitted). The adverse party must "do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Conclusory assertions offered without any factual basis in the record cannot create a genuine dispute. *See Ass'n of Flight Attendants-CWA v. U.S. Dep't of Transp.*, 564 F.3d 462, 465-66 (D.C. Cir. 2009).

## IV. DISCUSSION

The Complaint alleges three violations of securities law by Defendant: (1) aiding and abetting violation of Section 10(b) of the Exchange Act and Exchange Act Rule 10b-5; (2) aiding and abetting violation of Section 13(a) of the Exchange Act; and (3) aiding and abetting violations of Sections 13(b)(2)(A)-(B) and 13(b)(5) and Exchange Act Rule 13b2-1.[1] Rule 10(b)(5) provides it is unlawful for any person "by the use of any means or instrumentality of interstate commerce," to "employ any device, scheme, or artifice to defraud." 17 C.F.R. § 240.10b-5. Specifically, the SEC alleges Defendant aided and abetted a scheme to materially inflate the operating income recorded by USF in its financial statements, which were included in Royal Ahold's SEC filings and other public statements. Section 13(a) of the Exchange Act provides that issuers of securities registered with the SEC must file with the Commission certain annual and quarterly reports. 15 U.S.C. § 78m(a). In this case, the SEC alleges Defendant aided and abetted Royal Ahold's filing of a materially false and misleading annual report (Form 20-F), which included the inflated operating income reported by USF. Finally, Sections 13(b)(2)(A)-(B) and 13(b)(5) require issuers to (1) keep books and records that "in reasonable

---

[1] All statutes and regulations cited by the Court refer to the version in effect during the relevant portion of 2002.

13

detail, accurately and fairly reflect" the transactions and assets of the issuer; (2) maintain a system of internal accounting controls sufficient to meet certain proscribed standards; and (3) that no person shall knowingly circumvent the internal controls or falsify the required books. 15 U.S.C. § 78m(b). The SEC alleges Defendant aided and abetted Royal Ahold's failure to keep accurate records and circumvent the system of internal controls that verified the accuracy of those records.

A.   *Aiding and Abetting Liability*

In this Circuit, to prove aiding and abetting, the SEC must show:

(1) another party has committed a securities law violation ("primary violation");

(2) the accused aider and abetter has a general awareness that his role was part of an overall activity that was improper; and

(3) the accused aider and abetter knowingly and substantially assisted the principal violation.

*Investors Research Corp. v. SEC*, 628 F.2d 168, 178 (D.C. Cir. 1980). This test "strikes the correct balance between the public interest in enforcing the securities laws and the danger of unduly burdening" the companies governed by the securities laws. *Id.* For purposes of this motion, Defendant does not dispute the SEC has met its burden to prove a primary violation. Def.'s Mot. at 23. However, Defendant argues that under the second element, the SEC must prove Defendant had "actual knowledge" of the primary violation, rather than a "general awareness" of overall improper activity. The Court previously rejected this argument in denying Defendant's [16] Motion to Dismiss. *See* 09/28/08 Mem. Opin., ECF No. [36], at 8. Despite Defendant's assertion that the Court's prior Order is incorrect (*see* Def.'s Reply at 9), the Court declines to revisit the issue. The SEC provides sufficient evidence to raise a genuine dispute as to whether Defendant actually knew of the primary violation, and thus summary judgment is

inappropriate regardless of what scienter standard the Court employs.

In terms of the final element, substantial assistance, the parties agree that the SEC must show Defendant "in some sort associate[d] himself with the venture, that he participate[d] in it as something that he wishe[d] to bring about, that he [sought] by his action to make it succeed." *Zoelsch v. Arthur Andersen & Co.*, 824 F.2d 27, 36 (D.C. Cir. 1987) (quoting *Nye & Niessen v. United States*, 336 U.S. 613, 619 (1949)) (internal quotation marks omitted) *abrogated on other grounds by Morrison v. Nat'l Australia Bank Ltd.*, 130 S.Ct. 2869 (2010). In other words, the primary violation must be a "direct or reasonably foreseeable result" of the aider and abettor's conduct. *SEC v. Johnson*, 530 F. Supp. 2d 325, 337 (D.D.C. 2008).

Defendant attempts to inject an additional requirement into the aiding and abetting standard by contending that the Exchange Act provides only for aiding and abetting a primary violation, rather than aiding and abetting some other party's aiding and abetting of a primary violation. In Defendant's view, in counts two and three, the SEC has only alleged that Mr. Grendys aided and abetted USF's aiding and abetting of Royal Ahold's violations of the Exchange Act. The SEC does dispute Defendant's construction of the statute, but rather argues "the Commission's Complaint alleges that Defendant is liable for aiding and abetting Ahold's (not USF's) violations by helping USF, Ahold's wholly-owned subsidiary, to conceal a fraudulent scheme." Pl.'s Opp'n at 22.

Defendant obfuscates the issue by cloaking what is in essence a purported factual dispute as a legal dispute regarding the "Congressional intent" of the statute. Defendant fails to cite a single case from any jurisdiction rejecting an aiding and abetting claim on the basis the plaintiff alleges aiding and abetting a secondary violation, rather than a primary violation of the statute.

15

*See* Def.'s Mot. at 21-22.  Contrary to Defendant's argument, the SEC need not allege Mr.

Grendys "directly" aided and abetted Royal Ahold's violations; the statute requires only that the

SEC show Mr. Grendys provided "substantial assistance," which is a factual question, not a

question of statutory construction or intent.  *See* Exchange Act § 20(e); 15 U.S.C. § 78t(e).  The

wording of the statute itself "limit[s] the SEC's ability to construct endless chains of 'aiding and

abetting' liability for persons who do not substantially assist the primary violation," (Def.'s Mot.

at 21), without requiring the Court to read into the statute the requirement that the defendant

interact "directly" with the primary violator, as Defendant seeks here.  Regardless of whether Mr.

Grendys submitted information directly to Royal Ahold, or interacted only with USF, if his

conduct provided "substantial assistance" to Royal Ahold's primary violations under the standard

both parties agreed to in their briefs, then Mr. Grendys is liable for aiding and abetting under the

plain language of § 20(e).  If Mr. Grendys' conduct was as indirect and remote from the primary

violations as Defendant alleges, then the claims will fail for lack of a genuine dispute as to Mr.

Grendys' "substantial" assistance to the primary violations.

As explained below, the SEC has provided sufficient evidence to defeat summary

judgment.  The record demonstrates a reasonable trier of fact could conclude that Defendant not

only had a general awareness, but actual knowledge of the primary violations alleged by the SEC.

Moreover, the record indicates there is a triable issue of fact as to whether the Defendant

provided substantial assistance to the primary violators.

    B.    *Defendant's Knowledge of the Primary Violations*

Defendant initially argues that there is no genuine dispute that Mr. Grendys had no

knowledge of the primary violations underlying the SEC's aiding and abetting charges.

Although the SEC need only show facts sufficient for the trier of fact to find Mr. Grendys had a

general awareness of the primary violations, as explained below, the SEC has shown that a

reasonable trier of fact could conclude Mr. Grendys had actual knowledge of the primary

violations in this case.  In essence, Defendant's motion relies on two arguments: (1) Mr. Grendys

did not know USF's financial statements would be publicly disclosed by Royal Ahold; and (2)

Mr. Grendys did not know the information contained in the audit confirmation letter was false.

Without knowledge of the first, Mr. Grendys would have lacked actual knowledge of the primary

violation underlying counts one and two of the Complaint.  Without knowledge of the second,

Mr. Grendys would have lacked actual knowledge of the primary violations underlying counts

one, two, and three.

        In support of these contentions Defendant relies almost entirely on his own deposition

testimony avowing he had no knowledge of the scheme to defraud, and that he was simply

"duped" by USF's employees.  Def.'s Mot. at 31.  Such self-serving testimony, even if

uncontested, "does not resolve the issue and make summary judgment appropriate."  *Stewart v.*

*Credit Bureau, Inc.*, 734 F.2d 47, 54 (D.C. Cir. 1984).

> In evaluating a motion for summary judgment a court should weigh . . . the need
> for cross-examination . . . in relation to the evidentiary materials, the general
> desirability of demeanor testimony, the . . . access to proof by the opposing party
> to the movant and the desirability that the case receive the full exploration of a
> trial. In this case, a factfinder could choose not to believe [defendant's]
> self-serving, albeit plausible, assertions.

*Id.*  Defendant's claim that this testimony is "uncontroverted," (Def.'s Mot. at 31), is meaningless

in this case where the extent of Defendant's knowledge is "known for sure only to [Defendant],

[and] there is no way for [Plaintiff] to directly rebut" Defendant's testimony. *Id.*  Therefore, as

explained below, to the extent Defendant relies on his own testimony to establish "undisputed

facts," and the SEC provides evidence (albeit circumstantial) in the record to suggest otherwise, summary judgment is not appropriate.

   1.    Public Disclosure of USF's Financial Statements

   With regards to the issue of Mr. Grendys' knowledge of the public disclosure of USF's Financial Statements, the SEC notes that Mr. Grendys was the principal contact at Koch for dealings with USF since 1989 (Pl.'s Stmt. ¶¶ 7-8), and for at least six years USF was a publicly traded on the New York Stock Exchange (*id.* at ¶¶ 1, 3). Mr. Grendys became aware of Royal Ahold's acquisition of USF around the time the transaction was finalized. *Id.* at ¶ 8. Mr. Grendys provides no explanation as to why he assumed USF was acquired by a private, rather than a publicly reporting company. Furthermore, the Audit Confirmation Letter indicated the D&T was performing an audit in connection with USF's "financial statements," and that the letter was to be sent directly to D&T, not USF. Taken together, a reasonable trier of fact could conclude that Mr. Grendys knew USF was acquired by a publicly reporting company, and thus the information provided in the Audit Confirmation Letter would be incorporated into publicly disclosed financial statements, the primary violation that forms the basis for counts one and two. As in *Stewart*, the Court finds "the record manifests enough possibility" that Defendant did have actual knowledge of primary violations "to justify allowing [the SEC] to rebut [Defendant's] assertion in the only meaningful manner under these circumstances–by cross-examination at trial." 734 F.2d at 54-55. Whether Mr. Grendys knew the information would eventually be disclosed as part of Royal Ahold's financial reporting, or whether he truly believed it would be used for "internal purposes only" is a matter for the trier of fact to resolve.

2.   Falsity of the Audit Confirmation Letter

Defendant argues there is no evidence to support the claim that Mr. Grendys knew the information provided to D&T in the Audit Confirmation Letter was in fact false or misleading. In support of this point, Defendant emphasizes his purported lack of understanding of USF's internal accounting procedures. However, Mr. Grendys' knowledge of USF's internal procedures is irrelevant if there is sufficient evidence to infer Mr. Grendys knew the audit confirmation letter was false or misleading as a matter of general business and accounting procedures. In other words, if the SEC can show Mr. Grendys knew that attributing income to the wrong vendor violated basic accounting principles, then there is a genuine dispute as to whether Mr. Grendys knew what he was reporting to D&T was problematic, regardless of how USF internally accounted for income from vendors. There is ample evidence in the record from which the trier of fact could reasonably conclude Mr. Grendys knew the information he was providing in the Audit Confirmation Letter was false or misleading. Prior to the year in question, Mr. Grendys signed and returned similar letters properly accounting for Koch's promotional allowances with USF. *See* Pl.'s Exs. 9-10. Mr. Grendys experienced the audit process in connection with Koch Poultry. Pl.'s Stmt. ¶ 49. Perhaps most importantly, the existence of the side letter itself supports the inference that Mr. Grendys knew the Audit Confirmation Letter was inaccurate. Despite repeated assurances from personnel at USF, Mr. Grendys refused to sign the Audit Confirmation Letter until after the side letter was drafted and signed. The text of the side letter indicates it was intended to "clarify" the Audit Confirmation Letter, and specifically states Koch Poultry would not be responsible for the outstanding amounts the Audit Confirmation Letter stated Koch still owed to USF. From this letter alone, the trier of fact could conclude Mr.

19

Grendys knew he was providing false or misleading information to D&T.

At the point the SEC provides sufficient evidence to avoid summary judgment on the issue of Mr. Grendys' knowledge of the falsity of the Audit Confirmation Letter, the SEC has also satisfied its burden as to Defendant's knowledge of the primary violations underlying the third claim for relief.  To support secondary liability for violations of the books and record keeping provisions, the SEC need only show a genuine dispute as to Defendant's knowledge that USF was circumventing its internal controls and keeping inaccurate records.  The entire purpose of the Audit Confirmation Letter was to provide information to USF's external auditors in creating USF's audited financial statements.  In other words, Mr. Grendys provided information to part of USF's system of controls for the purpose of influencing the records and books maintained by USF.  If in fact Mr. Grendys knew the information he was providing to D&T was false or misleading, he by definition knew he was helping to circumvent the internal controls in order to alter the accuracy of USF's records and books.  Having shown a genuine dispute as to Mr. Grendys' knowledge of the falsity of the information in the Letter, the SEC has likewise raised a genuine issue as to his knowledge of the primary violation that forms the basis for the third claim for relief.

C.     *Substantial Assistance*

On the issue of substantial assistance, Defendant makes three arguments: (1) Mr. Grendys did not intend to assist the primary violations; (2) Mr. Grendys was not the "proximate cause" of the primary violations; and (3) Mr. Grendys had no duty to disclose the correct information to USF's auditors.  The Court will address the third issue in the context of Defendant's proximate cause arguments.

1.   Intent and Motive

With respect to the first issue, Defendant concedes that "the intent inquiry is difficult to separate from the knowledge inquiry, and evidence of the latter applies equally to the former." On this basis alone, the Court easily concludes the SEC has demonstrated a genuine dispute that Mr. Grendys intended to substantially assist the primary violations, as it has demonstrated a genuine dispute that Mr. Grendys had actual knowledge of those violations. The only remaining argument Defendant has on this point is that Mr. Grendys had no motive to assist the primary violations.

As the SEC notes, Mr. Carter testified he told Mr. Grendys in effect that "the business would be there" if Mr. Grendys signed the Audit Confirmation Letter. Carter Dep. 94:15-95:4. In fact, between 2001 and 2002, Koch's sales to USF increased by $5 million, even setting aside sales to BC Rogers, another USF vendor that Koch Poultry acquired in 2002. Resp. Stmt. ¶ 124. Defendant argues that Koch's commodity sales to USF, as a total of Koch's total sales, did not increase. *Id.* Regardless of whether the sales actually increased in an appreciable manner, the sales do not conclusively show Mr. Grendys did not *believe* he would receive increased business in exchange for the letter. In any case, it is unnecessary for the SEC or the Court to speculate as to Mr. Grendys' potential motivation for aiding and abetting the scheme. At the point the SEC has met its burden on summary judgment to show Mr. Grendys knew he was assisting the primary violations, his motivations for doing so are irrelevant, and certainly the lack of a clear motivation is not an independent basis for granting summary judgment in favor of Defendant.

The cases cited by Defendant do not counsel an alternative outcome. In *Mercer v. Jaffe, Snider, Raitt and Heuer, P.C.*, 736 F. Supp. 764 (W.D. Mich. 1990), the court held the plaintiffs

provided insufficient evidence for the trier of fact to conclude that the Director of Enforcement of the Michigan Corporations and Securities Bureau knew or was reckless in not knowing that certain submissions were fraudulent. *Id.* at 772-73. Based on a number of factors, including the fact that the relevant Defendant spearheaded the investigation that exposed the underlying fraud, and his lack of anything to gain from complicity in the fraud, the Court granted summary judgment. The Court agrees that motive is relevant, but as in *Mercer*, motive (or lack thereof) is not dispositive of the intent inquiry for aiding and abetting liability.

The holding in *Laven v. Flanagan*, 695 F. Supp. 800 (D.N.J. 1988) is likewise unhelpful to Defendant. The *Laven* court granted summary judgment in favor of the defendants because (1) plaintiffs failed to provide evidence the defendants knew of the underlying fraud; and (2), the defendant's alleged conduct---signing a materially false prospectus---was insubstantial. *Id.* at 810. It is true that the defendants could not have "consciously intended" (in the words of Mr. Grendys) to assist a fraud they were unaware of. However, in this case the SEC has provided sufficient evidence of Mr. Grendys' knowledge of the primary violation, thus any action taken in support of those violations was intentional, regardless of what Mr. Grendys' motive might have been.

Finally, the court in *Moss v. Morgan Stanley Inc.*, 553 F. Supp. 1347 (S.D.N.Y. 1983) found there were insufficient allegations of substantial assistance because the claim was based on Morgan Stanley's inaction, yet the complaint failed to allege a duty to disclose. *Id.* at 1358. As explained below the inaction/duty to disclose theory of liability does not apply to this case. Ultimately, the *Moss* court dismissed the aiding and abetting claim against Morgan Stanley without any reference to motive, providing no aid to Defendant's argument. Contrary to

22

Defendant's argument, there is evidence in the record that Mr. Grendys had a motive to submit a false and misleading Audit Confirmation Letter, but even if such evidence was lacking, the SEC provided sufficient evidence of Mr. Grendys' intent to aid and abet the primary violations even absent an articulated motive to do so.

### 2.   Proximate Cause

Albeit less clear, Defendant's proximate cause argument seems to be that Mr. Grendys' conduct was not the proximate cause of the primary violations because (1) he had no duty to show the side letter to D&T; (2) the Audit Confirmation Letter was in fact accurate as to the amounts received by USF; and (3) nothing would have changed if Mr. Grendys had simply thrown away the Audit Confirmation Letter, rather than submitting it to D&T.

First, Defendant argues Mr. Grendys cannot be held liable because he had no duty to disclose the side letter, or in other words, to actively provide correct information to D&T.  The cases relied on by the Defendant for this argument are inapposite.  *See Chiarella v. United States*, 445 U.S. 222 (1980) (finding no duty to disclose non-public information regarding an impending takeover before trading in the target company's securities); *Dirks v. SEC*, 681 F.2d 824, 837 (D.C. Cir. 1982) (finding defendant *had* a duty to disclose non-public information or refrain from trading in certain securities).  The only case cited by Defendant remotely analogous to this case is *SEC v. Apuzzo*, where on a motion to dismiss, the court found the SEC failed to sufficiently allege substantial assistance by the defendant where there was no allegation that defendant provided *any* information to the relevant outside auditors.  758 F. Supp. 2d 136, 153 (D. Conn. 2010).  By contrast, Mr. Grendys is alleged to have actively provided false information to USF's auditors, which if true, may form the basis for aiding and abetting liability, regardless of Mr.

Grendys' lack of a duty to disclose information. Nevertheless, the SEC does not dispute that Mr.

Grendys did not have any positive duty to disclose information to D&T. Pl.'s Opp'n at 35 ("It is

true Mr. Grendys was under no obligation to respond at all to the audit confirmation and could

have simply discarded the letter in his circular file."). Rather, the SEC contends, and there is

sufficient evidence in the record from which the trier of fact could conclude, that Mr. Grendys

provided false information to USF's auditors in furtherance of USF's scheme to defraud.

However, by conceding Mr. Grendys had no duty to disclose, the SEC has a more difficult time

establishing causation. *See infra.*

Defendant's second and third arguments regarding proximate cause simply restate the

same contention: nothing would have changed if Mr. Grendys had simply thrown away the Audit

Confirmation Letter rather than submitting it to D&T. For its part, the SEC argues that if Mr.

Grendys had provided the information outlined in the side letter to D&T, the fraud would have

been discovered, thus submission of the false Audit Confirmation Letter substantially assisted the

fraud. The problem with the SEC's argument is that elsewhere in its brief, the SEC concedes

that Mr. Grendys was under no obligation to provide the side letter (or the information contained

therein) to D&T. *See* Pl.'s Opp'n at 35. The SEC cannot base its theory of causation on the

notion that Mr. Grendys substantially assisted the fraud by failing to provide information he

admittedly had no obligation to provide. The SEC must show that the primary violations were a

"reasonable and foreseeable result" of providing only the Audit Confirmation Letter, not Mr.

Grendys' failure to provide the side letter as well.

Defendant attempts to disprove any claim of causation by arguing that the fraud would

have continued unnoticed had Mr. Grendys simply ignored the Audit Confirmation Letter and

24

submitted nothing to D&T.  Although the bulk of the record focuses on the flawed theory of causation emphasized by the SEC, there is sufficient evidence in the record to show a genuine dispute as to whether the fraud would have been discovered if Mr. Grendys had refused to sign and submit the Letter.  Plaintiff's expert Mr. Douglas R. Carmichael testified that if the auditors did not receive a response to a confirmation letter, they would employ "alternative procedures," including examination of the underlying documents, to verify the information contained in the confirmation letter.  Carmichael Dep. 168:5-169:18.  Mr. Kesler, who led the audit team from D&T that performed the USF audit in question, testified that "virtually without exception, those confirmations were signed by the recipients and returned to us confirming the amounts" were correct.  Kesler Dep. 194:18-195:10.  Mr. Grendys himself signed and returned a confirmation letter for the audits performed in connection with Royal Ahold's acquisition of USF and FY 2000.  Pl.'s Ex. 9, 10; *see also* Grendys Dep. 66:22-70:21.  The trier of fact could conclude that if Mr. Grendys had failed to return the Audit Confirmation Letter, then the "alternative procedures" that D&T would have used to confirm the promotional allowance income from Koch Poultry would have revealed the fraud.  As Defense counsel noted, this is entirely a speculative exercise; each party "may have very basis in the world for giving [their] opinion, but because it never actually happened that way, [they] are speculating what might have happened under a hypothetical set of circumstances."  Carmichael Dep. 223:4-8.  In light of the limitations this hypothetical endeavor places on the ability of either party to provide evidence of causation, the Court finds the SEC has provided enough evidence to avoid summary judgment and will allow the trier of fact to decide the issue of causation.

## V. CONCLUSION

For the foregoing reasons, the Court finds the SEC has provided sufficient evidence in the record to create a genuine dispute as to Mr. Grendys' liability for aiding and abetting violations of the Exchange Act. A reasonable trier of fact could conclude from the evidence submitted that Mr. Grendys had actual knowledge of the primary violations, knew the information he was providing in the Audit Confirmation Letter was false or misleading, and that his conduct substantially assisted the primary violations. Therefore the Defendant's Motion for Summary Judgment is DENIED. Furthermore, the SEC's pleadings substantially conformed Local Civil Rule 7(h), and many of Defendant's objections are baseless. Therefore, Defendant's Motion to Strike is likewise DENIED.

An appropriate Order accompanies this Memorandum Opinion.

Date:   January 04, 2012

_____/s/_____

**COLLEEN KOLLAR-KOTELLY**
United States District Judge
